## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**REBECCA KLUG,**

    **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　Civil Action No. <u>3:18-cv-00711</u>

**MARSHALL UNIVERSITY**
**JOAN C. EDWARDS SCHOOL**
**OF MEDICINE, MARSHALL**
**UNIVERSITY BOARD OF GOVERNORS,**
**and FARID B. MOZAFFARI, an individual,**

    **Defendants.**

### <u>COMPLAINT</u>

COMES NOW Plaintiff, by counsel, and for her complaint against Defendants respectfully represents to the Court as follows:

### <u>Preliminary Statement</u>

1.　　This is an action for money damages, injunctive relief, and other equitable and legal relief, filed pursuant to Title IX of the Education Amendments Act of 1972 ("Title IX"), the West Virginia Human Rights Act ("WVHRA"), *W. Va. Code* § 5-11-1 *et seq.*, and the common law of the State of West Virginia arising out of Plaintiff's medical residency with Defendants.

2.　　Plaintiff alleges she was subjected to a discriminatory and hostile work environment and retaliated against for complaining of the same. Plaintiff also alleges that this retaliation culminated in the termination of her residency with Defendants.

Accordingly, Plaintiff further alleges that Defendants violated Title IX and their actions constitute a breach of Plaintiff's residency agreement and associated covenants of good faith and fair dealing.

3.     As a direct result of Defendants' unlawful, reckless, willful, wanton and negligent actions, Plaintiff suffered monetary loss, consequential and incidental damages, compensatory damages, emotional distress, aggravation, annoyance, and inconvenience.

## Jurisdiction

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as the dispute arises under the Constitution, laws, or treaties of the United States, namely, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

5.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.     This Court has jurisdiction over Defendants in this matter as at all relevant times in the Complaint, they were residents of the Southern District of West Virginia and thus subject to its jurisdiction.

7.     Venue is proper pursuant to U.S.C. § 1391(b) as the action is based on a federal question, Defendants, for the purpose of venue, at all relevant times resided in the Southern District of West Virginia, and the events giving rise to this civil action occurred in this venue.

## Parties

8.     Plaintiff Rebecca Klug is a resident of Cabell County, West Virginia, and is a member of a protected class under the WVHRA, *W.Va. Code* § 5-11-1 *et seq.*

2

9.      Plaintiff was, at all times relevant hereto, a student in the medical residency program and an employee of the Marshall University Joan C. Edwards School of Medicine.

10.     Defendant Marshall University Joan C. Edwards School of Medicine ("MU School of Medicine") is a state agency located in Cabell County, West Virginia.

11.     Defendant MU School of Medicine is a "person" and "employer" pursuant to *W. Va. Code* § 5-11-3.

12.     Defendant MU School of Medicine is an education and/or training program that receives federal funding pursuant to Title IX.

13.     The business and education affairs of Marshall University are under the control, supervision, and management of its governing body, Marshall University Board of Governors.

14.     Upon information and belief, Defendant Farid B. Mozaffari is the Program Director for the General Surgery Training Program at MU School of Medicine and an Associate Professor at Marshall University.

15.     Defendant Mozaffari is a "person" pursuant to the WVHRA.

16.     At all times relevant herein, Defendants acted through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## **Factual Background**

## **Graduate Medical Education or Residency Education**

17.     Graduate medical education is the period of didactic and clinical education in a medical specialty which follows the completion of a recognized undergraduate

medical education and which prepares physicians for the independent practice of medicine in that specialty. It is also referred to as residency education.

18.    Graduate medical education programs are accredited by the Accreditation Counsel for Graduate Medical Education ("ACGME"), a private, non-profit organization founded in 1981 from a consensus in the academic medical community for an independent accrediting organization.

19.    The ACGME's mission is to improve health care and population health by assessing and advancing the quality of resident physicians' education through accreditation.

20.    The federal government funds graduate medical education through Medicare by providing two types of funding to teaching hospitals: (1) Direct Graduate Medical Education ("DGME") payments; and (2) Indirect Medical Education ("IME") payments.

21.    Medicare DGME payments cover a residency programs' share of residents' stipends and fringe benefits. IME payments are meant to defray the higher cost of care at teaching hospitals.

22.    ACGME defines programs it accredits as a structured education experience in graduation medical education, designed to conform to the program requirements of a particular specialty/subspecialty, the completion of which may result in eligibility for board certification.

23.    The ACGME defines a resident as any physician in an accredited graduation medical education program, including interns, residents, and fellows.

4

24.    Defendant MU School of Medicine's mission states that "[i]t is the Office of Graduate Medical Education (GME) at the Joan C. Edwards School of Medicine's mission to provide exemplary, comprehensive and continuing educational opportunities in an environment enriched by scholarly activity for physicians in graduate medical education programs."

25.    The mission statement further states that the goal of the program is "to offer graduate medical education programs in which physicians in learning develop personal, clinical, and professional competence under the guidance and supervision of the faculty and staff outstanding in their respective fields and who are committed to teaching...As part of a comprehensive university, we engage in scholarly activity including research and will make available to resident physicians opportunities to participate in the scholarship of our medical community. The Institution and its leadership are committed to provide the necessary educational, financial and human resources to support and maintain excellence in graduate medical education to maintain compliance standards in accordance with the Accreditation Council for Graduate Medical Education."

26.    The American Board of Surgery ("ABS") certifies surgeons and requires the completion of "[a] minimum of 5 years of progressive residency education" in an ACGME accredited program, completion of specific skills programs, operative and clinical performance assessments, a chief resident year, and operative procedures experience.

27.    Upon successful completion, a surgeon may then be eligible for the General Surgery Qualifying Examination.

28.     Once a surgeon passes the General Surgery Qualifying Examination, the surgeon will be eligible for the General Surgery Certifying Exam to become ABS certified for a period of ten years.

### General Surgery Residency Program at MU School of Medicine

29.     The general surgery residency program at MU School of Medicine is five years and the appointment contracts are renewed year to year.

30.     The Residency Notice of Appointment sets forth the terms of the appointment, including stipend amount and benefits, and states the duties and responsibilities of the Resident and the School of Medicine, incorporating by reference the policies and procedures of the Surgery Residency Handbook.

31.     In the Residency Notice of Appointment, Defendants agreed to provide an educational program approved by the ACGME.

32.     Plaintiff was also provided with a Surgery Residency Handbook setting forth policies and procedures.

33.     The handbook describes the policies and procedures related to the criteria and milestones for advancement, promotions, and dismissals.

34.     The handbook also describes the due process procedures, including an appeals process for dismissals from the program.

35.     During her residency, Plaintiff engaged in patient care under faculty and clinical supervision and support.

36.     Medical education is also integral to the residency program.

37.     In this regard, Plaintiff was also required to attend mandatory lectures, presentations, and educational meetings as part of the program.

38.     In fact, the program required that on each Wednesday residents participated in educational meetings and lectures, with several hours of "protected time" for studying.

39.     Plaintiff was sometimes required to attend evening lectures organized by the surgery department as part of her residency.

40.     Plaintiff was required to take in-service training exams to allow Defendants to assess her progress and competencies in the medical residency.

41.     The Notice of Appointment provides that Residents are "afforded the protection of the School of Medicine policies on Affirmative Action, Equal Employment Opportunity, Sexual Harassment and Disability Accommodation.   The Resident is responsible to create a professional environment that reflects and supports the respect and dignity of all patients, staff, students, residents, fellows and faculty in accordance with human resource policies of the School of Medicine, UP&S and all of its affiliates. Accordingly, sexual harassment, or any form of harassment, will not be tolerated."

42.     The Notice of Appointment further states that the "School of Medicine embraces a ZERO TOLERANCE policy for workplace violence.   Acts, comments or threats of physical contact and/or violence, including intimidation, harassment and/or coercion, whether of a joking nature or otherwise, which involve or affect University of affiliated hospital staff or employees or visitors or which occur on the School of Medicine's or affiliated hospital's property will be not tolerated."

43.     Pursuant to the Notice of Appointment, Defendant MU School of Medicine is required to "ensure that the Resident has opportunities to participate in patient care activities of sufficient variety and with sufficient frequency to achieve the

competencies required by their chosen discipline. The School of Medicine will ensure that the Resident receives appropriate supervision by the teaching faculty."

44.     Also, pursuant to the Notice of Appointment, the training program will provide the resident with a written notice not to renew a resident contract or promote to the next level of training no later than four months prior to the end of the current contract. However, if the reason(s) for non-renewal occur(s) within the last four months of training, the program will provide as much a notice as circumstances dictate.

45.     The Notice of Appointment also provided medical residents with the option of participating in Defendants' grievance process related to adverse actions such as non-renewal.

### Plaintiff's first year of residency 2013-2014

46.     Plaintiff began the general surgery residency program on or about July 1, 2013.

47.     During that first year, Plaintiff noticed some sexist comments and conduct, but attempted to ignore it.

48.     For example, during orientation, a senior resident came into the room, asked the male residents to leave, and then told the three remaining women that, "no one will be getting pregnant this year."

49.     Plaintiff was disturbed by this comment, but attempted to "laugh it off."

50.     During her first year in the program, Plaintiff often worked over 100 hours per week.

51.     Plaintiff did not complain about her hours at that time, but the workload left little time to study.

52.     In or around the Spring of 2014, Defendant Mozaffari became the Program Director of the General Surgery Training Program.

53.     In or around June 2014, Plaintiff was given an award for "best intern" by Drs. Adkins, Bair and Zhang.

### Plaintiff's second year of residency 2014-2015

54.     Plaintiff signed another contract for her second year for the period July 1, 2014 through June 30, 2015.

55.     Plaintiff's husband had been accepted to medical school and they had planned a summer vacation before he began school in the Fall.

56.     Defendant Mozaffari told Plaintiff that she could not take a vacation during the time that she had planned.

57.     In or around July 2014, Plaintiff sent an email to her team leader, Dr. Ekong Uffort, related to the vacation issue.

58.     For reasons not clear to Plaintiff, Dr. Uffort became upset with her for sending an email.

59.     To address the situation, Plaintiff discussed it with Dr. Kamran Abolmaali, the Administrative Chief Resident.

60.     However, Dr. Uffort became even more upset and refused to speak to her.

61.     At this point, a male fourth year resident, Dr. Marco Yung, took Plaintiff in the call room and yelled at her for an hour for "handling it wrong" and being "disrespectful."

62.   Dr. Yung was handling a pocket knife menacingly the whole time he was berating her and told her that she if she told anyone about their meeting he would "make her life hell."

63.   Frightened and intimidated, Plaintiff did not say anything for the next six months.

64.   Plaintiff was subjected to an abusive and hostile work environment throughout this time period.

65.   For example, in the call room, male residents would watch offensive and sexually explicit videos.

66.   They would also watch violent and gory videos, such as videos of shootings.

67.   During meetings, one of the male residents would scroll through photos of women's breasts and then exclaim that it was for "research."

68.   Plaintiff continued to work over 100 hours per week in her second year of residency, leaving little time to study.

69.   She would often work during "protected time," that was supposed to be reserved for academics.

70.   Male interns did not want to listen to Plaintiff if she gave them instructions.

71.   The Chief Resident told her that she should "smile more," and "not be such a bitch."

72. Around January 2015, Plaintiff verbally complained to the Program Director and the Program Coordinator about the hostile work environment, the sexually explicit videos, her work hours, and not having enough time to study.

73. To her knowledge, nothing was done to address her concerns.

74. Also, in or around January 2015, Plaintiff took another In-Service Training test and scored poorly.

75. Upon information and belief, the other residents also scored low on the exam, but she was singled out for her performance by Defendant Mozaffari who confronted her about her score and told her that he did not think she really wanted to be a surgeon.

76. Plaintiff explained that she did want to be a surgeon and to succeed.

77. She believed that her reviews from surgeons she worked with were good.

78. She also told Defendant Mozaffari again that she was working in a toxic environment and that male residents were still looking at disgusting, degrading sexual videos at one of the hospitals where she was the only female resident.

79. She also complained about being subjected to hostile conduct and abusive, offensive language.

80. At the next resident meeting, Defendant Mozaffari announced that he did not want any sex videos in the call room.

81. Upon information and belief all the other residents knew that Plaintiff was the one who complained, since she was the only woman working in that location.

82. The residents continued to watch the degrading videos, but Plaintiff switched to a different hospital soon after that.

11

83.    At her review in April 2015, Defendant Mozaffari informed Plaintiff that she was "causing a lot of problems" and that they were not moving her up; she would have to repeat her second year.

84.    Plaintiff appealed the decision not to promote her, pursuant to program procedures for due process.

85.    Her grievance went to a hearing in front of an appeal committee and she received a favorable decision on or about April 9, 2015.

86.    The appeal committee found that Plaintiff had not been given any notice of deficiencies or any opportunity to remediate any deficiencies prior to being informed that she would not advance.

87.    Accordingly, on April 20, 2015, Plaintiff met with Defendant Mozaffari and was given an improvement plan setting forth specific requirements.

88.    She would advance to her third year if she complied with several requirements by June 2015.

89.    Plaintiff believed that the requirements were unnecessarily onerous and somewhat punitive, but agreed to them in order to advance.

90.    On May 12, 2015, Plaintiff's husband committed suicide.

91.    Plaintiff took two weeks off from work and then was contacted by Defendants letting her know that she needed to come back to work.

92.    Plaintiff returned to the residency program on or about June 2, 2015.

93.    Some of the other residents offered to take her place at St. Mary's Hospital so she could work at one of the other hospitals, since St. Mary's was the most difficult location.

12

94.     However, Defendant Mozaffari said that she would have to "sink or swim."

95.     When Plaintiff first went back to work, she worked an entire weekend by herself, not getting any sleep.

96.     Plaintiff was coping with her work and did not make any mistakes, but was feeling exhausted.

97.     That Monday, she went to Donna Webb, Program Coordinator, and asked her for a day off so she could sleep.

98.     Plaintiff took one day off to sleep and then returned to work.

99.     One day that week, Defendant Mozaffari asked Plaintiff how she was doing.

100.    She told him that she thought she needed to go to counseling.

101.    Defendant Mozaffari said to Plaintiff, "Ok, but, you need to get over this. Worse things than this are going to happen in your life."

102.    Plaintiff began crying and asked him how he could say that to her.

103.    The next day, they had a meeting in which Defendant Mozaffari told Plaintiff that they would forget about the improvement plan and move her to third year, given everything that had happened. He also said that they could discuss FMLA leave if she needed it.

104.    The very next day, Defendant Mozaffari called her in again for her evaluation; he then told her that he was getting reports that she was coming in late or not showing up at all.

105.    Plaintiff denied those allegations.

106.   She believed that Dr. Yung may have given false information about her to Defendant Mozaffari in order to sabotage her and tried to explain.

107.   Defendant Mozaffari would not listen to her side and told her that she was going to be held back to repeat the second year again.

108.   Defendant Mozaffari then said that "since she was lying to him," he was going to put her on medical leave and that she could not return until she was cleared by a psychologist.

109.   He also accused her of being "emotional."

110.   Plaintiff had been diagnosed with general depression and anxiety years before her medical residency and had successfully treated those conditions with medication for a long period of time.

111.   After her husband's death, Plaintiff was treated for major depressive disorder, moderate and recurrent, generalized anxiety disorder, and a normal grief reaction.

112.   She was released to return to work about a month later.

113.   Plaintiff intended to appeal the adverse decision to not promote her to third year for the second time, but several surgeons she worked with advised against it, suggesting that repeating the second year would give her time to heal.

**Plaintiff's third year of residency 2015-2016 (repeat of second year)**

114.   Plaintiff returned to the residency program as a second year.

115.   She still did not have much time to study and was working in excess of 100 hours per week.

116. On October 30, 2015, Plaintiff's father died; she took one day off for the funeral.

117. Throughout this year of residency, Plaintiff was treated differently than similarly situated male residents in that she was given less favorable assignments and she was judged more harshly.

118. Plaintiff was still treated in a particularly hostile and discriminatory manner by Dr. Yung, who was the Academic Chief Resident.

119. In fact, his abusive behavior escalated this year.

120. Plaintiff believes she was being treated unfairly based upon her disability status, her sex, and in reprisal for her complaints.

121. Dr. Yung took cases away from her, reassigned cases to interns that should have been hers, and verbally assaulted her in front of medical students, other surgical residents, and VA staff.

122. As a result of this discriminatory conduct, Plaintiff was not receiving the education and clinical experience that she should have been receiving.

123. Before Plaintiff was supposed to switch to the VA as part of the regular rotation, an intern called her to tell her that Dr. Yung found out she was coming there and "flipped out." The intern said that he was "going to get her" and that she should "watch out."

124. Plaintiff had verbally complained to Defendants about being treated unfairly several times, but her concerns had never been addressed adequately.

125. Therefore, on or about February 8, 2016, Plaintiff made a formal complaint, in writing, about Dr. Yung's abusive and discriminatory treatment of her.

126.    On March 4, 2016, Donna Webb, Surgery Resident Coordinator, sent Plaintiff an email to follow up on the December midpoint evaluation in which she had been told that there was one task that she needed to complete for her residency requirements that year.

127.    Plaintiff completed the task included in the email.

128.    On March 18, 2016, Plaintiff received a response from Defendant Mozaffari indicating that Dr. Yung had been reprimanded and that their schedules had been adjusted so that they would not work together.

129.    On March 28, 2016, Plaintiff was given a letter indicating that her contract for continued residency training would not be renewed for July 1, 2016 to June 30, 2017, and that her surgery residency would be terminated as of June 30, 2016.

130.    Defendant Mozaffari told Plaintiff that the program had decided as a group that she would not make a good surgeon.

131.    Her test scores were cited as a reason for her discharge from the program.

132.    Plaintiff believes that her test scores were similar to that of male residents who were not discharged from residency and that reason was pretextual and fraudulent.

133.    She further believed that she was being retaliated against and treated in a discriminatory manner, based upon her sex.

134.    Upon information and belief, a male resident who took several months off related to a medical issue was permitted to continue with his residency.

135.    Plaintiff believes that she was subjected to different rules and/or sanctions, based upon her sex and disability status.

136.  She further alleges that Defendants were engaged in a pattern and practice of unlawful discrimination against female physicians.

137.  Plaintiff appealed her contract termination and lost at the first two levels.

138.  The next level was Dean Shapiro.

139.  Plaintiff explained the foregoing circumstances to Dean Shapiro.

140.  Dean Shapiro told Plaintiff that she should not have gone back into residency after so much trauma and that she should have been placed in the lab for a year after her husband's death.

141.  He offered to put her in the lab for a year, so she would have regular work hours, and time to study and then she would be instated to the residency program.

142.  This agreement was verbal.

143.  Plaintiff accepted the Dean's offer.

144.  A few weeks later, she received a letter from Dr. Paulette Wehner, DIO/ Vice Dean of Graduate Medical Education, and Dean Shapiro that read, "In response to your Level III appeal regarding the non-renewal of your contract, please be advised that the decision of Dean Joseph Shapiro is to uphold the decisions of the Ad Hoc Committee (Level II Appeal) as well as the General Surgery Program's Clinical Competency Committee (Level I Appeal)."

145.  At the end of the year "Resident Roast," Dr. Uffort presented Dr. Klug with some massaging foot slippers and said that "Dr. Klug forgets she is in a surgical residency program and she requests extra time off to relax and massage her feet."

146.  Plaintiff had only taken off work related to her husband's death and subsequent medical leave, and one day for her father's funeral.

## Post-termination 2016 to the present

147.   Plaintiff went to work in the lab as a post-doctoral research scientist with the understanding that she would be able to go back into residency after one year.

148.   Plaintiff's rate of pay was the same as it was in the surgery residency program.

149.   In July 2017, Dr. Juan Sanabria, the vice-chairman of the Department of Surgery, told Plaintiff that she should stay in the lab one more year, because he felt she still had a lot of healing to do.

150.   Additionally, he thought she could make a strong impact with her research with the additional year, which would help her career.

151.   Plaintiff agreed with the understanding that her goal was to return to the surgery residency program.

152.   Plaintiff expected to return to the surgery residency program in June 2018.

153.   However, in the Spring of 2018, the Dean told Plaintiff that surgery does not want her back and has suggested that she just do something else.

154.   Plaintiff does not want to start over in another residency program, after having completed two years of residency with Defendants.

155.   Plaintiff agreed to work in the lab, based upon the assurances that she would be placed back into the surgery residency program after one year.

156.   Plaintiff believes that she has been treated in a discriminatory manner and that she was retaliated against for complaining about such treatment.

157.   She further believes that she was discriminated against on the basis of her disability status in addition to her sex.

18

158.   Upon information and belief, the termination of her contract with Defendants will negatively impact her chances of being accepted in another residency program.

159.   To date, Plaintiff has not been accepted to another residency program because of the manner in which her residency with Defendants ended.

160.   Defendants' actions have impaired Plaintiff's ability to advance her career as a physician and her ability to get fully licensed.

161.   For the aforementioned reasons, Plaintiff has suffered damages.

162.   As a result of Defendants' conduct, Plaintiff has suffered economic loss, emotional and mental distress, humiliation, anxiety, fear, apprehension, embarrassment, depression, aggravation, annoyance, inconvenience and loss of capacity to enjoy life.

163.   Plaintiff does not seek recovery from state funds; rather, recovery for damages is sought under or up to the limits of the state's applicable liability insurance policy.

### Claims for Relief

### First Claim

### [Violation of Title IX of the Education Amendments Act of 1972]

### (Sexual Harassment and hostile educational environment)

164.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

165.   Defendants operate a medical residency educational program that receives federal financial assistance from the Medicare program through DGME and IME payments. *See* 20 U.S.C. § 1681(a).

166. Defendants' residency program is covered by Title IX because it is a program that is operated by a corporation that is principally engaged in the business of health care and because federal DGME assistance is extended to the corporation as a whole. *See* 20 U.S.C. § 1687(3).

167. DGME payments are meant to cover the cost of stipends that are paid to residents.

168. The residency program is also covered by Title IX because it is a postsecondary institution. *See* 20 U.S.C. § 1687(2)(A).

169. Title IX instructs each federal department providing federal financial assistance to any education program or activity to issue regulations to allow for implementation of the statute. *See* 20 U.S.C. § 1982.

170. The Department of Health has issued such regulations at 45 C.F.R. § 86.1 *et seq.*

171. The Department of Health has defined federal financial assistance as wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, 45 C.F.R. § 86.2(g)(1)(ii), and as any contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program. 45 C.F.R. § 86.2(g)(5).

172. The Department of Health has defined a recipient of federal funding as any private institution or organization to whom federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance. 45 C.F.R. § 86.2(i).

173.    The Department of Health has defined an institution of graduate higher education as an institution which offers academic study beyond the bachelor of arts or bachelor of science degree, whether or not leading to a certification of any higher degree in the liberal arts or sciences.  45 C.F.R. § 86.2(1).

174.    The Department of Health has issued a regulation as to "education programs and activities," and have stated that no person on the basis of sex shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity.  45 C.F.R. § 86.31.

175.    Defendants' medical residency program constitutes an educational program or activity under 45 C.F.R. § 86.31 because it provides academic study, research opportunities, and occupational training.

176.    Defendants' medical residency program qualifies as an institution of graduate higher education because it provides post-baccalaureate academic study.  45 C.F.R. § 86.2(1).

177.    Defendants failed to remedy the hostile educational environment to which Plaintiff was exposed even after having notice of the harassment and discrimination that was occurring in its workplace.

178.    Defendants' failure to stop or remedy the harassment and discriminatory environment was deliberately indifferent to Plaintiff's rights.

179.    Plaintiff was treated less favorably than similarly-situated male residents in the terms and conditions of her medical residency.

180.    Plaintiff was discriminated against on the basis of her sex.

21

181.    The discriminatory conduct and actions interfered with Plaintiff's medical education.

182.    These actions constitute discrimination against Plaintiff under Title IX of the Education Amendments Act of 1972.

## Second Claim

### [Violation of Title IX of the Education Amendments Act of 1972]

### (Retaliation)

183.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

184.    Defendants knew that Plaintiff had complained about the hostile work environment and discriminatory treatment.

185.    Defendants' decision to terminate Plaintiff was based upon retaliation for Plaintiff making complaints.

186.    Defendants, for themselves and by and through their agents, retaliated against Plaintiff for making complaints.

187.    Specifically, Plaintiff was subjected to retaliation in regard to work assignments, unfair evaluations, being held to different and higher standards, abusive conduct, abusive language and behavior, and false reports about her performance and work ethic.

188.    Further, if Defendants had informed her earlier that they were not going to renew her contract in 2016, Plaintiff would have had the opportunity to seek an alternative residency for her third year.

189.    However, Defendants provided minimal notice.

190.    Plaintiff believes that the lack of notice was malicious and in retaliation for Plaintiff's complaints.

191.    These actions constitute gender discrimination/retaliation against Plaintiff under Title IX of the Education Amendments Act of 1972.

192.    Plaintiff has suffered damages as a result.

### Third Claim

### [Breach of Contract]

### (West Virginia Common Law)

193.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

194.    Defendants entered into a contract with Plaintiff to be a Resident.

195.    As part of the contract, Defendants agreed not to discriminate.

196.    However, Plaintiff was subjected to a toxic and hostile work environment and was discriminated against on the basis of her sex and disability status.

197.    Defendants failed to promote and terminated Plaintiff's contract in retaliation for her complaints about discrimination.

198.    But for these unlawful motives, Defendants would have renewed Plaintiff's Residency Agreement.

199.    Further, Dean Shapiro promised Plaintiff to reinstate her into the surgery medical residency program after working in the lab for one year.

200.    Plaintiff agreed to accept the position in the lab on the basis of the understanding that she would go back into residency after this assignment.

201.    Plaintiff was justified in relying upon the promises of the Dean.

202.    However, Dean Shapiro breached this agreement by failing to aid her in returning to surgical medical residency.

203.    If Plaintiff had been informed that she was not going to be permitted to return to the surgery medical residency program, she would have attempted to apply to other residency programs.

204.    However, Defendants did not provide any such notice and, instead, left Plaintiff to believe that she would be resinstated to the program.

### Fourth Claim

### [West Virginia Human Rights Act – Sex Discrimination]

205.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

206.    The above-described acts of Defendants constitute violations of the WVHRA, *W. Va. Code* § 5-11-1, *et seq.*, and the regulations promulgated pursuant thereto, by subjecting Plaintiff to unlawful sex discrimination and a hostile work environment.

207.    As a result of the fact that Defendants' supervisory and management personnel engaged in, perpetrated, and otherwise condoned the above-described acts, Defendants are strictly liable for the discrimination, harassment, and wrongful and/or discharge of Plaintiff.

208.    As a further result of Defendants' conduct, Plaintiff suffered compensatory damages.

## Fifth Claim

### [West Virginia Human Rights Act – Disability Discrimination]

209.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

210.   The above-described acts of Defendants constitute violations of the WVHRA, *W. Va. Code* §5-11-1, *et seq.*, and the regulations promulgated pursuant thereto, by subjecting Plaintiff to unlawful disability discrimination, based upon her disability status.

211.   As a result of the fact that Defendants' supervisory and management personnel engaged in, perpetrated, and otherwise condoned the above-described acts, Defendants are strictly liable for the disability discrimination.

212.   As a further result of Defendants' conduct, Plaintiff suffered compensatory damages.

## Sixth Claim

### [Aiding and Abetting]

213.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

214.   The above-described acts of Defendants constitute aiding and abetting unlawful discriminatory practices.

**PRAYER**

**WHEREFORE,** Plaintiff prays for judgment against Defendants, as follows:

1.      That this Court enter a declaratory judgment, pursuant to *W.Va. Code* § 55-13-1 *et seq.*, declaring the acts of Defendants to be in violation of *W.Va. Code* § 5-11-1 *et seq.*;

2.      That this Court enter a permanent injunction against Defendants ordering them to establish an ongoing discrimination training program for their employees, in order to prevent future discrimination;

3.      That Plaintiff be awarded compensatory damages in an amount to be determined at trial for the emotional and mental distress, humiliation, anxiety, embarrassment, depression, aggravation, annoyance, inconvenience, and loss of enjoyment of life, suffered by her as a result of Defendants' unlawful acts;

4.      That Plaintiff be reinstated in the surgery medical residency program;

5.      That Plaintiff be awarded any and all additional economic losses suffered as a result of Defendants' conduct;

6.      That punitive damages be awarded against Defendants in an amount to be determined at trial;

7.      That Plaintiff be awarded the costs of litigation and reasonable attorney's fees pursuant to *W.Va. Code* § 5-1-13(c) and the general authority of the court;

8.      That Plaintiff be awarded prejudgment and post judgment interest on any damages awarded at the trial of this matter;

9.      That Plaintiff be awarded such further and general relief as the Court deems appropriate; and

10.    The recovery sought in this case is limited to the applicable insurance

coverage.

**PLAINTIFF DEMANDS A JURY TRIAL OF ALL ISSUES SO TRIABLE.**

**REBECCA KLUG**
Plaintiff
By Counsel

Kristina Thomas Whiteaker (State Bar No. 9434)
David L. Grubb (State Bar No. 1498)
THE GRUBB LAW GROUP
1114 Kanawha Boulevard, East
Charleston, WV 25301
304-345-3356 (telephone)
304-345-3355 (facsimile)