IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

REBECCA KLUG,

      Plaintiff,

v.                                                        Civil Action No. 3:18-cv-00711
                                                          Judge Robert C. Chambers

MARSHALL UNIVERSITY
JOAN C. EDWARDS SCHOOL
OF MEDICINE, MARSHALL
UNIVERSITY BOARD OF GOVERNORS,
and FARID B. MOZAFFARI, an individual,

      Defendants.


**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT MARSHALL UNIVERSITY
JOAN C. EDWARDS SCHOOL OF MEDICINE'S MOTION TO DISMISS**

This is Plaintiff Rebecca Klug's response in opposition to Defendant Marshall University Joan C. Edwards School of Medicine's ("MU School of Medicine's" or "Defendant's") motion to dismiss. For the reasons set forth below, MU School of Medicine's motion is without merit and should be DENIED in its entirety.

## I.        FACTUAL BACKGROUND

The following facts, as alleged in the Complaint, must be taken as true. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The general surgery residency program at MU School of Medicine is five years in duration. (ECF No. 1 at 6.) The appointment contracts for residents are renewed year to year. (*Id.*) The Residency Notice of Appointment ("NOA") sets forth the terms of the appointment, including stipend amount, benefits, and duties of the Resident and the School of Medicine,

incorporating by reference the policies and procedures of the Surgery Residency Handbook. (*Id*.)  In the NOA, Defendants agreed to provide an educational program approved by the ACGME.  (*Id*.)  Plaintiff was also provided with a Surgery Residency Handbook setting forth policies and procedures.  (*Id*.)  The handbook describes the policies and procedures related to the criteria for advancement, promotions, and dismissals, as well as the due process procedures, including an appeals process for dismissals from the program.  (*Id*.)

The NOA provides that Residents are "afforded the protection of the School of Medicine policies on Affirmative Action, Equal Employment Opportunity, Sexual Harassment and Disability Accommodation.  The Resident is responsible to create a professional environment that reflects and supports the respect and dignity of all patients, staff, students, residents, fellows and faculty in accordance with human resource policies of the School of Medicine, UP&S and all of its affiliates.  Accordingly, sexual harassment, or any form of harassment, will not be tolerated."[1]  (*Id*. at 7.)

Plaintiff began the general surgery residency program on or about July 1, 2013.  (*Id*. at 8.) During that year, Plaintiff noticed some sexist comments and conduct, but attempted to ignore it. (*Id*.)  For example, during orientation, a senior resident came into the room, asked the male residents to leave, and then told the three remaining women that "no one will be getting pregnant this year."  (*Id*.)  In or around the Spring of 2014, Defendant Mozaffari became the Program Director.  (*Id*. at 9.)  In or around June 2014, Plaintiff was given an award for "best intern."  (*Id*.)

---

[1]  Pursuant to the NOA, "The School of Medicine will ensure that the Resident receives appropriate supervision by the teaching faculty."  (*Id*.)  Also, pursuant to the NOA, the training program will provide the resident with a written notice not to renew a resident contract or promote to the next level of training no later than four months prior to the end of the current contract. However, if the reason(s) for non-renewal occur(s) within the last four months of training, the program will provide as much a notice as circumstances dictate.  (*Id*. at 8.)  The NOA also provided medical residents with the option of participating in Defendants' grievance process related to adverse actions such as non-renewal.  (*Id*.)

Plaintiff signed another contract for her second year for the period July 1, 2014 through June 30, 2015. (*Id*.) Early in that contract, Plaintiff alleges that she was subjected to a hostile work environment including being berated by a male fourth year resident, Dr. Marco Yung, who took Plaintiff in the call room and yelled at her for an hour about being "disrespectful." (*Id*.) Dr. Yung was handling a pocket knife menacingly the whole time he was berating her and told her that if she told anyone about their meeting he would "make her life hell." (*Id*. at 10.) Frightened and intimidated, Plaintiff did not say anything for the next six months. (*Id*.) Plaintiff was subjected to an abusive and hostile work environment throughout this time period. (*Id*.) For example, in the call room, male residents would watch offensive and sexually explicit videos. (*Id*.) They would also watch violent and gory videos, such as videos of shootings. (*Id*.) During meetings, one of the male residents would scroll through photos of women's breasts and then exclaim that it was for "research." (*Id*.) The Chief Resident told her that she should "smile more," and "not be such a bitch." (*Id*.)

Around January 2015, Plaintiff verbally complained to the Program Director and the Program Coordinator about the hostile work environment and the sexually explicit videos. (*Id*. at 11.) She told Defendant Mozaffari again that she was working in a toxic environment and that male residents were still looking at disgusting, degrading sexual videos at one of the hospitals where she was the only female resident. (*Id*.) At the next resident meeting, Defendant Mozaffari announced that he did not want any sex videos in the call room. (*Id*.) The residents continued to watch the degrading videos, but Plaintiff switched to a different hospital soon after that. (*Id*.) At her review in April 2015, Defendant Mozaffari informed Plaintiff that she was "causing a lot of problems" and that they were not moving her up; she would have to repeat her second year. (*Id*. at 12.) Plaintiff appealed the decision not to promote her, pursuant to program procedures for

due process. (*Id.*) Her grievance went to a hearing in front of an appeal committee and she received a favorable decision on or about April 9, 2015. (*Id.*) Accordingly, on April 20, 2015, Plaintiff met with Defendant Mozaffari and was given an improvement plan setting forth specific requirements. (*Id.*) She would advance to her third year if she complied with several requirements by June 2015. (*Id.*)

On May 12, 2015, Plaintiff's husband committed suicide. (*Id.*) Plaintiff took two weeks off from work and then was contacted by Defendants letting her know that she needed to come back to work. (*Id.*) Plaintiff returned to the residency program on or about June 2, 2015. (*Id.*) Some of the other residents offered to take her place at St. Mary's Hospital so she could work at one of the other hospitals, since St. Mary's was the most difficult location. (*Id.*) However, Defendant Mozaffari said that she would have to "sink or swim." (*Id.* at 13.) When Plaintiff first went back to work, she worked an entire weekend by herself, not getting any sleep. (*Id.*) Plaintiff was coping with her work and did not make any mistakes, but was feeling exhausted. (*Id.*) That Monday, she went to Donna Webb, Program Coordinator, and asked her for a day off so she could sleep. (*Id.*) Plaintiff took one day off to sleep and then returned to work. (*Id.*) One day that week, Defendant Mozaffari asked Plaintiff how she was doing. (*Id.*) She told him that she thought she needed to go to counseling. (*Id.*) Defendant Mozaffari said to Plaintiff, "Ok, but, you need to get over this. Worse things than this are going to happen in your life." (*Id.*)

The next day, they had a meeting in which Defendant Mozaffari told Plaintiff that they would forget about the improvement plan and move her to third year, given everything that had happened. (*Id.*) The next day, Defendant Mozaffari called her in again for her evaluation and told her he was getting reports that she was coming in late or not showing up at all. (*Id.*) Plaintiff denied those allegations. (*Id.*) She believed that Dr. Yung may have given false

4

information about her to Defendant Mozaffari in order to sabotage her.  (*Id*. at 14.)  She tried to explain, but Defendant Mozaffari would not listen to her side and told her that she was going to be held back to repeat the second year again.  (*Id*.)  Defendant Mozaffari then said that "since she was lying to him," he was going to put her on medical leave and that she could not return until she was cleared by a psychologist.  (*Id*.)  He also accused her of being "emotional."  (*Id*.)

Plaintiff had been diagnosed with general depression and anxiety years before her medical residency and had successfully treated those conditions with medication for a long period of time.  (*Id*.)  After her husband's death, Plaintiff was treated for major depressive disorder, moderate and recurrent, generalized anxiety disorder, and a normal grief reaction.  (*Id*.)  She was released to return to work about a month later.  (*Id*.)  Plaintiff intended to appeal the adverse decision to not promote her to third year for the second time, but several surgeons she worked with advised against it, suggesting that repeating the second year would give her time to heal.  (*Id*.)

Plaintiff returned to the residency program as a second year.  (*Id*.)  On October 30, 2015, Plaintiff's father died; she took one day off for the funeral.  (*Id*. at 15.)  Throughout this year of residency, Plaintiff was treated differently than similarly situated male residents in that she was given less favorable assignments, was judged more harshly, and Dr. Yung's, the Academic Chief Resident, abusive behavior escalated.  (*Id*.)  Plaintiff believes she was being treated unfairly based upon her disability status, her sex, and in reprisal for her complaints.  (*Id*.)  Dr. Yung took cases away from her, reassigned cases to interns that should have been hers, and verbally assaulted her in front of medical students, other surgical residents, and VA staff.  (*Id*.)  As a result of this discriminatory conduct, Plaintiff was not receiving the educational and clinical experience that she should have been receiving.  (*Id*.)

5

Before Plaintiff was supposed to switch to the VA as part of the regular rotation, an intern called her to tell her that Dr. Yung found out she was coming there and "flipped out." The intern said that he was "going to get her" and that she should "watch out." (*Id.*) Plaintiff had verbally complained to Defendants about being treated unfairly several times, but her concerns had never been addressed adequately. (*Id.*)

Therefore, on or about February 8, 2016, Plaintiff made a formal complaint, in writing, about Dr. Yung's abusive and discriminatory treatment of her. (*Id.*) On March 4, 2016, Donna Webb, Surgery Resident Coordinator, sent Plaintiff an email to follow up on the December midpoint evaluation in which she had been told that there was one task that she needed to complete for her residency requirements that year. (*Id.* at 16.) Plaintiff completed the task included in the email. (*Id.*) On March 18, 2016, Plaintiff received a response from Defendant Mozaffari indicating that Dr. Yung had been reprimanded and that their schedules had been adjusted so that they would not work together. (*Id.*) Ten days later, on March 28, 2016, Plaintiff was given a letter indicating that her contract for continued residency training would not be renewed, and that her surgery residency would be terminated as of June 30, 2016. (*Id.*)

Defendant Mozaffari told Plaintiff that the program had decided as a group that she would not make a good surgeon. (*Id.*) Her test scores were cited as a reason for her discharge from the program. (*Id.*) Plaintiff believes that her test scores were similar to that of male residents who were not discharged from residency and that reason was pretextual and fraudulent. (*Id.*) She further believed that she was being retaliated against and treated in a discriminatory manner, based upon her sex. (*Id.*) Upon information and belief, a male resident who took several months off related to a medical issue was permitted to continue with his residency. (*Id.*) Plaintiff believes that she was subjected to different rules and/or sanctions, based upon her sex

and disability status.  (*Id*.)  She further alleges that Defendants were engaged in a pattern and practice of unlawful discrimination against female physicians.  (*Id*. at 17.)  Plaintiff appealed her contract termination and lost at the first two levels.  (*Id*.)

The next level was with Dean Shapiro.  (*Id*.)  Plaintiff explained the foregoing circumstances to Dean Shapiro.  (*Id*.)  Dean Shapiro told Plaintiff that she should not have gone back into residency after so much trauma and that she should have been placed in the lab for a year after her husband's death.  (*Id*.)  He offered to put her in the lab for a year so that she would have regular work hours and time to study.  (*Id.*)  Then, she would be reinstated to the residency program.  (*Id*.)  This agreement was verbal.  (*Id*.)  Plaintiff accepted the Dean's offer.  (*Id*.)

A few weeks later, she received a letter from Dr. Paulette Wehner, DIO/Vice Dean of Graduate Medical Education, and Dean Shapiro that read, "In response to your Level III appeal regarding the non-renewal of your contract, please be advised that the decision of Dean Joseph Shapiro is to uphold the decisions of the Ad Hoc Committee (Level II Appeal) as well as the General Surgery Program's Clinical Competency Committee (Level I Appeal)."  (*Id*.)  At the end of the year "Resident Roast," Dr. Uffort presented Dr. Klug with some massaging foot slippers and said that "Dr. Klug forgets she is in a surgical residency program and she requests extra time off to relax and massage her feet."  (*Id*.)  Plaintiff had only taken off work related to her husband's death and subsequent medical leave, and one day for her father's funeral.  (*Id*.)

Plaintiff went to work in the lab as a post-doctoral research scientist with the understanding that she would be able to go back into residency after one year.  (*Id*. at 18.)  Plaintiff's rate of pay was the same as it was in the surgery residency program.  (*Id*.)  In July 2017, Dr. Juan Sanabria, the vice-chairman of the Department of Surgery, told Plaintiff that she should stay in the lab one more year, because he felt she still had a lot of healing to do.  (*Id*.)

Additionally, he thought she could make a strong impact with her research with the additional year, which would help her career.  (*Id*.)  Plaintiff agreed with the understanding that her goal was to return to the surgery residency program.  (*Id*.)  Plaintiff expected to return to the surgery residency program in June 2018.  (*Id*.)

However, in the Spring of 2018, the Dean told Plaintiff that surgery does not want her back and has suggested that she just do something else.  (*Id*.)  Plaintiff does not want to start over in another residency program, after having completed two years of residency with Defendants. (*Id*.)  Plaintiff agreed to work in the lab, based upon the assurances that she would be placed back into the surgery residency program after one year.  (*Id*.)  Plaintiff believes that she has been treated in a discriminatory manner and that she was retaliated against for complaining about such treatment.  (*Id*.)  She further believes that she was discriminated against on the basis of her disability status in addition to her sex.  (*Id*.)  Upon information and belief, the termination of her contract with Defendants will negatively impact her chances of being accepted in another residency program.  (*Id*. at 19.)  Defendants' actions have impaired Plaintiff's ability to advance her career as a physician and her ability to get fully licensed.  (*Id*.)

Plaintiff alleges that Defendants failed to remedy the hostile educational environment to which she was exposed even after having notice of the harassment and discrimination that was occurring in its workplace.  (*Id*. at 21.)  Defendants' failure to stop or remedy the harassment and discriminatory environment was deliberately indifferent to Plaintiff's rights.  (*Id*.)  Plaintiff was treated less favorably than similarly-situated male residents in the terms and conditions of her medical residency.  (*Id*.)  Plaintiff was discriminated against on the basis of her sex.  (*Id*.)  The discriminatory conduct and actions interfered with Plaintiff's medical education.  (*Id*. at 22.)

These actions constitute discrimination against Plaintiff under Title IX of the Education Amendments Act of 1972.  (*Id.*) [2]

Plaintiff also alleges that Defendants knew that Plaintiff had complained about the hostile work environment and discriminatory treatment.  (*Id.*)  Defendants' decision to terminate Plaintiff was based upon retaliation for Plaintiff making complaints.  (*Id.*)  Defendants, for themselves and by and through their agents, retaliated against Plaintiff for making complaints.  (*Id.*)  Specifically, Plaintiff was subjected to retaliation in regard to work assignments, unfair evaluations, being held to different and higher standards, abusive conduct, abusive language and behavior, and false reports about her performance and work ethic.  (*Id.*)  These actions constitute gender discrimination/retaliation against Plaintiff under Title IX of the Education Amendments Act of 1972.  (*Id.* at 23.)

Plaintiff also alleges Defendants breached their contract and violated the West Virginia Human Rights Act "WVHRA" by discriminating against her on the basis of her sex and disability status.

## II.     ARGUMENT

## A.     <u>Motions to Dismiss Are Disfavored and Rarely Granted</u>.

Defendant MU School of Medicine moves to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that Plaintiff has not met the pleading standard established by Rule 8 of the Federal Rules.

Rule 8 requires simply "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In considering a motion to dismiss pursuant to Rule 8, it is a basic tenet that a court must accept all of the factual allegations in the Complaint as true.

---

[2]  Plaintiff's Complaint contains additional factual allegations regarding Department of Health funding and Title IX's application to Defendants.  (ECF No. 1 at 19-21.)  Those allegations are incorporated herein by reference.

9

*See Iqbal*, 556 U.S. at 678.  As the Supreme Court clarified, the claim stated in a complaint must be "plausible on its face."  *Id.*  However, "[t]he plausibility standard is not akin to a 'probability requirement,'" and "does not require 'detailed factual allegations.'"  *Id.*  Indeed, "[w]hen there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  In conducting its analysis, the court must "draw all reasonable inferences from those facts in the plaintiff's favor." *Edwardo v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).  Therefore, a motion to dismiss under Rule 12(b)(6) should be granted only if, after accepting all well-pleaded allegations contained in a complaint as true and drawing all reasonable inferences therefrom in the plaintiff's favor, the complaint fails to allege enough facts to state a claim that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 555, 570 (2007).  Viewed in this context, Plaintiff's Complaint provides a factual basis for her claims that far exceeds the minimum requirements of the Federal Rules under these standards, and as a result, her claims should not be dismissed.

**B.**     **Plaintiff Has Stated Viable Claims Against MU School of Medicine.**

To support its meritless argument in favor of dismissal, MU School of Medicine recasts and glosses over many of the factual allegations in Plaintiff's Complaint, to suggest that all of her claims accrued no later than March 28, 2016, and that they are barred by the statute of limitations.  However, a cursory review of the pleading reveals that Plaintiff has set forth factual allegations supporting her claims that the discriminatory conduct she complains of was continuing in nature and that, until the Spring 2018, she reasonably believed that she would be reinstated in the medical surgery residency program.  Accordingly, Defendant has utterly failed to meet its burden of proving that Plaintiff can prove no set of facts in support of her claim.

10

C.      **Plaintiff's Claims Are Not Barred by the Applicable Statute of Limitations**.

Defendant asserts that Plaintiff was terminated from the residency program on March 28, 2016, and that her cause of action accrued on that date, ignoring everything that occurred after that date.  However, Plaintiff's surgical residency did not end until June 30, 2016.  After she was informed that her contract would not be renewed in March 2016, Plaintiff appealed the decision through the due process channels, pursuant to Defendant's policies.  In this regard, Plaintiff had every reason to believe that the intention not to renew her contract would be reversed as it had been the previous year.  At the third level of appeal, Plaintiff met with Dean Shapiro, who suggested that she work "in the lab for a year, so she would have regular work hours, and time to study and then she would be instated to the residency program."[3]  (ECF No. 1 at 17.)  Plaintiff considered the position in the research laboratory as a way to resolve her appeal and agreed to accept the position, with the understanding that she would return to the residency program in one year.  Given the appeal process and the promise that she would return to the program after one year, the significance of the letter dated March 28, 2016 is diminished, since it did not constitute an unequivocal, final adverse decision.  *Independent Fire Co. No. 1 v. West Virginia Human Rights Com'n*, 180 W. Va. 406, 376 S.E.2d 612 (1988) (the time period for filing a complaint ordinarily runs on the date when employer unequivocally notifies employee of termination); *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 914 A.2d 735 (2007) (the statute of limitations begins to run upon the actual termination date, rather than upon notification).

Weeks after accepting the research lab position, Plaintiff received a letter indicating that her third level appeal had been denied.[4]  Even that letter could not be considered a final,

---

[3]     Although the Complaint does not include the specific date of Plaintiff's meeting with Dean Shapiro, Plaintiff believes that it took place in May 2016.

[4]     Although the date was not included in the Complaint, Plaintiff represents that this letter is dated May 24, 2016.

unequivocal decision, considering the assurances from the Dean that she would return to the surgical residency program after one year.  In fact, Plaintiff was not unequivocally informed that she was not going to be reinstated until the spring of 2018, which is the earliest date upon which Plaintiff's cause of action can have actually accrued.

Furthermore, Plaintiff attempted to return to the residency program in the Spring of 2017 and 2018.  In 2017, she was informed that it would be better for her career to take "one more year to heal" and then, in the spring of 2018, she was informed that the surgery department did not want her back.  Each of her attempts to return can be considered discrete and new acts of discrimination and/or retaliation which are actionable on their own, in addition to being evidence of ongoing discrimination.  *State ex rel. Raven Crest Contracting, LLC v. Thompson*, 240 W. Va. 8, 807 S.E.2d 256 (2017) (a new discrete act of discrimination in failure to rehire not time-barred).

The application of equitable modification of the limitations period is also appropriate in this case.  In *Taylor v. Commtec/Pomeroy Computer Resources,* Judge Goodwin applied the doctrine of equitable tolling in a prevailing wage case, finding that a plaintiff's failure to file suit timely was excusable and that fairness and equity dictated that the claim should not be barred. 2:05-cv-00445, 2006 WL 362463, at *4-5 (S.D.W. Va. Feb. 15, 2006).  In support of his decision, Judge Goodwin noted that the West Virginia Supreme Court routinely cites to the Ninth Circuit Court of appeals case of *Naton v. Bank of Cal*., 649 F2d 691 (9th Cir. 1981), related to equitable tolling and equitable estoppel.  *Taylor*, 2006 WL 362463, at *4.  The *Naton* Court explained,

> Two kinds of equitable modification have been recognized: (1) equitable tolling, which often focuses on the plaintiff's excusable ignorance of the limitations period and on lack of prejudice to the defendant…and (2) equitable estoppel, which usually focuses on the actions of the defendant…

> Equitable modification of the limitations period may be appropriate when misleading conduct of the defendant has induced plaintiff to delay filing…A finding of estoppel must rest on consideration of several factors.  Of critical importance is a showing of the plaintiff's actual and reasonable reliance on the defendant's conduct or representations.

*Naton*, 649 F.2d at 696 (internal citations omitted).

In this case, both doctrines support a modification of the limitations period.  After receiving the letter informing her that her contract would not be renewed, Plaintiff timely appealed the decision, believing that it would be reversed, as it had before.  At the third level, Plaintiff believed that her appeal had been resolved by the offer to allow her to work in the research department of the School of Medicine for one year and then return to surgical residency.  Plaintiff's failure to sue Defendants, based upon the initial letter is excusable.  Accordingly, even if the Court finds that Plaintiff's cause of action accrued on March 28, 2016, the statute of limitations should be equitably tolled.  Further, the doctrine of equitable estoppel applies, based upon her appeals and then Defendants' representations that Plaintiff should work in the research department to give her "time to heal" before returning to the residency program.  Plaintiff reasonably relied upon those representations and was induced to defer taking any action on the non-renewal of her contract, based upon them.  Accordingly, Defendants should be equitably estopped from relying upon a statute of limitations date based upon the first notification that she received.

Notwithstanding the foregoing, Plaintiff's claims are not time-barred, even if the Court finds that the March 28, 2016, is the operative date for the purposes of the limitations period, because of the tolling provision of *W. Va. Code* § 55-17-3.  This provision mandates that plaintiffs must give notice to a government agency "at least thirty days before instituting an action."  Plaintiff mailed her notice on March 21, 2018, and accepting Defendant's

13

representations, was received on March 26, 2018.  In order to provide the full thirty days' notice, the earliest Plaintiff would have been permitted to file a lawsuit was April 26, 2018.  However, Defendant asserts that Plaintiff's statute ran on April 25, 2018, because the statute of limitations is tolled for only thirty days from receipt of the written notice by the state agency.  Pursuant to *W. Va. Code* § 53-17-3(a)(2), the statute of limitations is tolled for thirty days from the date the notice is provided and if sent with return receipt requested, of the returned receipt.

The Supreme Court of the United States recently held that the ordinary meaning of "tolled" is that the limitations period stops running and then starts running again when the tolling period ends, "picking up where it left off."  *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 601, (2018).  In the *Artis* decision, the Court discusses various in which it has used the terms, "toll" and "suspend" interchangeably and explains that tolling pauses the progression of the limitations period.  *Id.* at 602.  Further, the Court notes that this principle has also been applied in its decisions on equitable tolling.  *Id.*  In this case, at the time that the noticed was received by Defendants, Plaintiff still had two days left on (Defendants' view of) the statute of limitations date of March 28, 2018.  The statute of limitations was tolled, or suspended, for thirty days from March 26, 2018 (to April 25, 2018).  At that point, the clock starts back up, and the remaining two days on the statute ran to April 27, 2018, the date upon which the Complaint was filed.  Accordingly, Plaintiff's claims are not time-barred, and Defendant's motion should be denied.

**D.**     **MU School of Medicine Should Not Be Dismissed.**

Next, Defendant MU School of Medicine argues that it should be dismissed, as it is not a separate legal entity, but rather, is included with Marshall University.  It further argues that this Court has found that it "does business as" the Joan C. Edwards School of Medicine in *Zimmeck v. Marshall Univ. Bd. Of Governors*, No. 3:13-14743, 2013 WL 5700591, at *1 n.1 (S.D.W. Va.

Oct. 18, 2013).  However, it does not appear that this point was addressed in *Zimmeck*, since MU School of Medicine was listed as a "d/b/a" in the style of the case.  In her Complaint, Plaintiff alleges that Defendant MU School of Medicine is a state agency located in Cabell County, West Virginia; that it is a "person" and "employer" pursuant to *W. Va. Code* §5-11-3; and that it is an education and/or training program that receives federal funding pursuant to Title IX.  Defendant offers its opinion, without any further support, that Defendant MU School of Medicine and Marshall University are "one and the same."  At this point in the case, no discovery on this issue has taken place, and it is unclear what the relationship is between the entities.  It appears that Defendants are defending this case jointly and no prejudice will occur from including MU School of Medicine as a named party, rather than as a "d/b/a."  In this regard, viewing the factual allegations of the Complaint in the light most favorable to Plaintiff, Defendant has failed to meet its burden at this time of showing that Plaintiff does not state a plausible claim.  Accordingly, Defendant's motion to dismiss on the basis that it is not a separate legal entity should be DENIED.

**E.      Sovereign Immunity Does Not Bar Plaintiff's WVHRA Claims Against MU School of Medicine.**

Defendant next argues that Plaintiff's WVHRA claims are prohibited based upon sovereign immunity.  Plaintiff agrees that generally, the Eleventh Amendment provides sovereign immunity from suits against the State and state agencies.  As Defendant acknowledges, there are exceptions to this immunity.  In *Kerr v. Marshall University Bd. of Governor's*, this Court explained that "[t]here are three (3) narrow exceptions to Eleventh Amendment immunity: (1) a state may unequivocally announce its intention to subject itself to suit in federal court; (2) Congress may abrogate the State's immunity by statute; and (3) suits for prospective injunctive relief against state officials acting in violation of federal law avoid

dismissal."  No. 2:14-cv-12333, 2015 WL 1405540, at *8 (S.D.W. Va. Feb. 4, 2015) (citations omitted).

In this case, Plaintiff is seeking injunctive relief.  Specifically, Plaintiff pleaded that "this Court enter a permanent injunction against Defendants ordering them to establish an ongoing discrimination training program for their employees, in order to prevent future discrimination; and, "Plaintiff be reinstated in the surgery medical residency program."  (ECF No. 1. at 26.)  In *Ex Parte Young*, 209 U.S. 123 (1908), the United State Supreme Court discussed its exception to Eleventh Amendment immunity, under which "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights. This carve out is triggered, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." *Al-Asbahi v. W. Virginia Univ. Bd. of Governors*, No. 1:15-cv-144, 2017 WL 402983, at *10 (N.D.W. Va. Jan. 30, 2017), *aff'd*, 724 F. App'x 266 (4th Cir. 2018).[5]  In this regard, Plaintiff has pleaded that Defendants treated her in a discriminatory manner on the basis of her sex and her disability status on an ongoing basis. Such discriminatory conduct violates her federally protected rights, pursuant to Titles I and II of the ADA, Title VII of the Civil Rights Act, and Title IX.  Plaintiff has specifically alleged violations of her federally protected rights pursuant to her claims pursuant to Title IX and the WVHRA, the state counterpart to the ADA and the Civil Rights Act.[6]  The injunctive relief requested by Plaintiff is prospective in nature. Accordingly, Defendant is not

---

[5]  If the Court declines to exercise jurisdiction of Plaintiff's state law claims, she respectfully requests that they be dismissed without prejudice, in accordance with *Al-Asbahi v. W. Va. Univ. Bd. of Governors*, No. 1:15-cv-144, 2017 WL 402983, at *10 (N.D.W. Va. Jan. 30, 2017).

[6]  Plaintiff has not exhausted her administrative remedies as required by Title VII; however, in the event that the Court dismisses her WVHRA claims, Plaintiff respectfully requests leave to file an Amended Complaint to include disability discrimination claims, pursuant to the ADA.

entitled to sovereign immunity for such relief, and its motion to dismiss Plaintiff's WVHRA claims should be denied.

**F.**   **Plaintiff's Title IX Claims Are Not Barred by the Doctrine of Sovereign Immunity.**

Defendant's arguments that it is entitled to sovereign immunity to Plaintiff's Title IX claims are also without merit.  Plaintiff has set forth in her Complaint sufficient allegations to show that Defendant's immunity has been abrogated by Congress.  Specifically, Plaintiff alleges facts in her Complaint that Defendant is an education and/or training program that receives federal funding pursuant to Title IX and that the School of Medicine and Marshall University under the control the Marshall University Board of Governors. (ECF No. 1 at 3.)  Further, Plaintiff sets forth factual allegations that Defendants receive federal funding pursuant to Title IX.  (*Id*. at 4.)  Plaintiff further sets forth additional, substantive factual allegations supporting her claims that Defendants are subject to and have violated Title IX by subjecting her to sexual harassment and a hostile education environment, and retaliating against her.  (*Id*. at 164-176, 183-192.)

In support of its claims of immunity from Title IX actions, Defendant cites only a Puerto Rico district court case, ignoring relevant, dispositive case law from this jurisdiction.[7]  Indeed, in *Litman v. George Mason University*, the Fourth Circuit concluded that a state waives its immunity from suit in federal court by accepting Title IX funding in a decision that thoroughly discusses the Eleventh Amendment and sovereign immunity.  186 F.3d 544, 555 (4th Cir. 1999). Judge Johnston cited *Litman* in the *Kerr* decision in which he noted that Congress conditioned an institution's "'receipt of Title IX funds on an unambiguous waiver of [the educational

---

[7]   Defendant cites the case of *Lipsett v. University of Puerto Rico* for the proposition that only injunctive relief is available pursuant to Title IX and that Plaintiff did not plead for injunctive relief.  This proposition is wrong on both counts.  Plaintiff sought injunctive relief, (as discussed *supra*) and other damages pursuant to Title IX.

institution's' Eleventh Amendment immunity, and that in accepting such funding,' the educational institution consents to litigate a plaintiff's suit in federal court." *Kerr*, 2015 WL 1405537, at *10. Plaintiff's Complaint contains sufficient facts supporting her Title IX claims entitling her to relief, and Defendant has failed to meet its burden of showing that plaintiff cannot state a plausible claim. Accordingly, Defendant's motion to dismiss Plaintiff's Title IX should be denied.

G.      **Plaintiff's Breach of Contract Claim States a Claim upon Which Relief Can Be Granted**.

Plaintiff has set forth a plausible cause of action for breach of contract. Defendant claims that it is entitled to sovereign immunity from Plaintiff's claim, citing *Zimmeck*. In *Zimmeck*, the plaintiff, a former student, cited an implied contract between her and Marshall University. Here, Plaintiff has cited express contracts – namely, the residency contract and the oral contract with Dean Shapiro related to her employment at the research lab.

In her Complaint, Plaintiff alleges that Defendants breached the residency contract in that they failed to provide an environment free from discrimination and that they retaliated against her for complaining about discrimination. Further, she alleges that Dean Shapiro promised to reinstate her into the surgery medical residency program after working in the lab for one year. Plaintiff agreed to accept the position in the lab on the basis of the understanding that she would go back into residency after this assignment. Plaintiff was justified in relying upon the promises of the Dean. However, Dean Shapiro breached this agreement by failing to aid her in returning to surgical medical residency. This Court has previously recognized a cause of action for breach of an oral contract in a somewhat similar context. *Ridpath v. Marshall University Bd. of Governors,* No. CA–03–2037 (S.D.W. Va. Feb. 17, 2004). In this regard, Plaintiff has set forth sufficient facts supporting her claims and Defendant's motion to dismiss should be denied.

**H.**   **Plaintiff's Aiding and Abetting Claim States a Claim upon Which Relief May Be Granted.**

Defendant argues that Plaintiff's claim fails to set forth sufficient facts in support of her claim of aiding and abetting, citing only the language contained under the heading of the cause of action.  However, the previous paragraphs of the Complaint, containing detailed allegations of, *inter alia*, the specific discriminatory conduct of Defendant Mozaffari, as well as the Chief Resident, were incorporated by reference.  (ECF No. 1 at 25.)  Plaintiff alleges that she was subjected to a hostile and discriminatory environment, that Defendants failed to remedy the discriminatory environment, and were deliberately indifferent to Plaintiff's rights.  (*Id.* at 21.)  Also, in the Complaint, Plaintiff alleges that Defendants' supervisory and management personnel engaged in, perpetrated, and otherwise condoned such discriminatory conduct.   Plaintiff generally agrees with Defendant's discussion of *Larry v. Marion County Coal Company*, but disagrees with Defendant's conclusion that she has not set forth factual allegations supporting the claim of aiding and abetting.  Indeed, viewed in the light most favorable to Plaintiff, she has alleged sufficient facts that Defendant Mozaffari condoned and ratified the discriminatory and hostile work environment of which she complained, and that Dean Shapiro subsequently assisted Defendant Mozaffari's retaliatory and discriminatory termination of her contract by inducing her into accepting a research position and delaying filing a civil action based upon his assurances that she would be reinstated to the surgical residency program.  These acts constitute aiding and abetting unlawful discriminatory practices.

## III.   CONCLUSION

Based on the foregoing, MU School of Medicine has not, and cannot, meet its burden of demonstrating that Plaintiff's Complaint should be dismissed.   Therefore, MU School of Medicine's motion to dismiss should be DENIED in its entirety.

Respectfully submitted,

**REBECCA KLUG**
Plaintiff
By Counsel

s/ Kristina Thomas Whiteaker
_____
Kristina Thomas Whiteaker (State Bar No. 9434)
David L. Grubb (State Bar No. 1498)
THE GRUBB LAW GROUP
1114 Kanawha Boulevard, East
Charleston, WV  25301
304-345-3356 (telephone)
304-345-3355 (facsimile)

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**REBECCA KLUG,**

     **Plaintiff,**

**v.**                                      **Civil Action No. 3:18-cv-00711**
                                            **Judge Robert C. Chambers**

**MARSHALL UNIVERSITY
JOAN C. EDWARDS SCHOOL
OF MEDICINE, MARSHALL
UNIVERSITY BOARD OF GOVERNORS,
and FARID B. MOZAFFARI, an individual,**

     **Defendants.**

## CERTIFICATE OF SERVICE

     I, Kristina Thomas Whiteaker, counsel for Plaintiff, do hereby certify that I have this 24th day of July, 2018, electronically filed with the Clerk of the Court *Plaintiff's Response in Opposition to Defendant Marshall University Joan C. Edwards School of Medicine's Motion to Dismiss* using the CM/ECF system, which will send a copy of this document, as well as notification of such filing, to the following:

Perry W. Oxley, Esquire
L.R. Sammons, III, Esquire
Eric D. Salyers, Esquire
Anspach, Meeks, Ellenberger, LLP
517 9th Street, Suite 1000
Huntington, WV  25701

s/ Kristina Thomas Whiteaker

_____
Kristina Thomas Whiteaker (State Bar No. 9434)
David L. Grubb (State Bar No. 1498)
THE GRUBB LAW GROUP
1114 Kanawha Boulevard, East
Charleston, WV  25301
304-345-3356 (telephone)
304-345-3355 (facsimile)