# In The Matter Of:

*Klug v.*
*Marshall University Board of Governors, et al.*


COPY

*Donna Webb*
*March 5, 2021*

*Mountain State Reporting LLC*
*2505 Lakeview Drive*
*St. Albans, WV  25177*
*304-727-8590*

Original File WebbDonna.prn
Min-U-Script® with Word Index

Page 89

1  part?
2  A   No. The research corporation and
3  department is entirely different. Each department has their
4  own conferences. Family medicine, surgery, internal
5  medicine. And our M&M Conference discusses confidential
6  patient information. So anyone outside of the department,
7  unless there's a reason for them to be there, they probably
8  shouldn't be.
9  Q   Okay. And so who complained? Or was it
10 just that you thought she shouldn't be there?
11 A   I let Dr. Mozafarri know that she was
12 attending the conference.
13 Q   And what did he say?
14 A   He said that Becky shouldn't be there, that
15 confidential information was being discussed.
16 Q   Okay. And then what did you do?
17 A   I'm not sure that I did anything after that.
18 Q   Did you talk to Dr. Sanabria about it?
19 A   I probably did.
20 Q   And do you remember what happened?
21 A   I mean she just didn't come anymore, so I'm
22 not sure what happened after that.
23       MS. WHITEAKER: Okay. That's all the
24 questions I have for you, ma'am. Thank you.

Page 90

1       MR. OXLEY: Is Exhibit 2 -
2       MS. WHITEAKER: That's the handbook?
3       MR. OXLEY: Yes, there you go. That's
4  Exhibit 2.
5            EXAMINATION
6       BY MR. OXLEY:
7  Q   Good afternoon, Ms. Webb. How are you doing
8  today?
9  A   I'm good. How are you?
10 Q   Very good. I have a couple of questions for
11 you. I want to turn with you to -- let's start on Page 40,
12 and on Page 40 there's a section called "Promotion, Criteria,
13 and Milestones." Do you see that?
14 A   I do.
15 Q   Okay. Now, this just pertains to criteria
16 and milestones for promotion to PGY 1. Do you see that?
17 A   Correct, uh-huh.
18 Q   What does this general section pertain to?
19 A   These are just tasks and a list of things that
20 should be completed in order to be considered for promotion
21 to another level.
22 Q   Okay. So these were things that the program
23 set forth that needed to be completed to be eligible for
24 promotion to the next level?

Page 91

1  A   Correct.
2  Q   Okay. So let's go to PGY 2. And that will
3  be on Page 43; is that right?
4  A   Correct.
5  Q   Okay. Now, it says, "Educational Program
6  Requirements," and it goes down and it says, "Attendance,
7  participation and submission of exams . . . Score of 70% or
8  higher on weekly exams; Completion of ASTS Transplant
9  Curriculum; Attendance at 80% of Grand Rounds and M&M
10 Conferences; Attendance at 80% of Journal Club; Attendance
11 at 80% of GI Club; Write and submit Abstract on research topic
12 as a PGY 1 to state or national meeting for poster or oral
13 presentation," or the topic chosen for PGY 1; is that right?
14 A   Correct.
15 Q   "Abstract must be discussed with Program
16 Director before submission." And then it goes on with other
17 of those, and one of them is score of 60% correct on ABSITE;
18 is that right?
19 A   Right.
20 Q   All right. Now, I want to take just a second
21 and go to this document, which is the midpoint evaluation.
22       MR. OXLEY: Do you know what exhibit this is?
23       BY MR. OXLEY:
24 Q   So this is Exhibit 7. So the court reporter

Page 92

1  has handed us Exhibit 7. The first column over here is the
2  intention to have these match up with these program
3  requirements, criteria and milestones for promotion PGY 2?
4  A   Correct.
5  Q   Okay. And so these are reviewed to see
6  whether or not they've been met as it pertains to the
7  educational program requirements; is that right?
8  A   Correct.
9  Q   All right. Now, if we go back, I noted one
10 of the requirements was 60% correct on ABSITE?
11 A   Correct.
12 Q   There's an ABSITE policy on Page 8; is that
13 right?
14 A   Yes.
15       MS. WHITEAKER: Page 8 of the handbook?
16       MR. OXLEY: Of the handbook, yes.
17       BY MR. OXLEY:
18 Q   Now, if you get 75% or higher on the ABSITE
19 score, what happens?
20 A   You get your name on the ABSITE plaque.
21 Q   Okay. You get your name on the ABSITE
22 plaque. And what happens to the person who gets the highest
23 score?
24 A   Well, it changed since this, but now they get

Page 93

1 to attend a national -- the American College of Surgeons
2 meeting and participate in the surgical Jeopardy contest.
3     Q    Okay. If someone scores between the 74th
4 percentile and the 50th percentile, they're on an educational
5 enhancement plan; is that right?
6     A    Correct.
7     Q    And it sets forth things under the
8 educational enhancement plan that need to be done; is that
9 right?
10     A    Correct.
11     Q    The 50th percentile or less, they have
12 additional criteria. It looks like they have to write two
13 paragraphs for every summary problem missed; is that right?
14     A    Right.
15     Q    And this last section is remediation?
16     A    Correct.
17     Q    And I'll read that in. "A score of less than
18 the PGY minimum stated in the table below qualifies the
19 resident for serious remediation. This and other
20 educational issues discussed in this paragraph under ABSITE
21 policy, will significantly impact the resident's status in
22 the program and promotion to another PGY level."
23     And then it goes down and sets forth
24 mandatory scores?

Page 94

1     A    Correct.
2     Q    Okay. For a PGY 1 it's 55%, for PGY 2 it's
3 60%, PGY 3 65%, PGY-4 70%. And that's percentage of problems
4 correct; is that right?
5     A    That's correct.
6     Q    Okay. And then it goes on to say, "If the
7 exam is to be retaken in June, the resident must achieve at
8 least 5% increase in their score"?
9     A    Correct.
10     Q    Okay. Now, I want to go to --
11     MR. OXLEY: Is this Exhibit 8, just to check
12 to make sure? This is the March the 4th e-mail. Exhibit 8,
13 okay.
14     BY MR. OXLEY:
15     Q    So this is Exhibit 8, and you testified about
16 Exhibit 8 earlier, and so the date of this is March 4, 2016?
17     A    Correct.
18     Q    You sent the e-mail to Rebecca Klug; is that
19 right?
20     A    Correct.
21     Q    And in this e-mail it says, "In order to
22 assist you in completing your Criteria for Promotion" - I
23 notice that Criteria for Promotion is capitalized; is that
24 right?

Page 95

1     A    Correct.
2     Q    What does it refer to?
3     A    It refers to the list of tasks that are to
4 be completed in the handbook.
5     Q    Okay. Does it refer to the ABSITE policy
6 remediation plan or education enhancement plan?
7     A    No.
8     Q    Okay. So when you wrote this, it was just
9 as it pertains the criteria milestone for promotion?
10     A    Correct.
11     Q    All right. "In order to assist you in
12 completing your Criteria for Promotion, I have listed the
13 things that you were deficient in during your Midpoint
14 Evaluation in December and still need to complete."
15     Then it says, "Write and submit an abstract
16 to a state or national meeting for poster or oral presentation
17 by May's Clinical Competency Meeting." Did I read that
18 correctly?
19     A    Correct.
20     Q    All right. So does that mean - it has been
21 proposed in this case that if she were to submit an abstract,
22 she would get promoted to PGY 3. Is that accurate?
23     A    No.
24     Q    Okay. Was that in any way the intent of that

Page 96

1 e-mail?
2     A    No.
3     Q    Okay. What were you intending to do here?
4     A    Just to remind her, assist her, let her know
5 that she hadn't completed that particular task under the
6 Criteria for Promotion for her PGY level.
7     Q    And that was in reference to the Criteria for
8 Promotion requirements on Page 43 of the handbook?
9     A    Correct.
10     Q    Did you reference in any way in this e-mail
11 the requirements that she had under the education enhancement
12 plan or the remediation plan?
13     A    No.
14     MR. OXLEY: Now, I think this is Exhibit 10.
15 Is that right?
16     MS. WHITEAKER: Number 10 this this one
17 (indicating).
18     MR. OXLEY: Okay. What is this one, the C3
19 notes? It looks like this (indicating). I didn't label very
20 well here going along. I might not do very well if we were
21 keeping score at home.
22     REPORTER: Here it is. It is 11.
23     MR. OXLEY: Eleven, okay.
24     BY MR. OXLEY:

Page 97

1  Q   Okay. I'm not handing you Exhibit 11. Do
2  you recognize that?
3  A   I do.
4  Q   And this was dated?
5  A   April 6, 2016.
6  Q   And the first two pages are typed up. Now,
7  my question is did you type those?
8  A   I can't be sure.
9  Q   Okay. Who else could have typed them?
10 A   It's possible that Dr. Denning would have
11 typed them.
12 Q   Okay. Would he have like taken your notes
13 or something?
14 A   Yes, he would have used my notes.
15 Q   Okay. And then in this it says that the
16 committee had discussions and the committee decided to uphold
17 the original decision not to renew Dr. Klug's contract for
18 2016-17; is that right?
19 A   Correct.
20 Q   Now, these are your notes?
21 A   Correct.
22 Q   At some level do they jar your recollection
23 as to what happened?
24 A   Yes, uh-huh.

Page 98

1  Q   Okay. I want to go to the conversations
2  here, committee discussions.
3  A   Yes.
4  Q   That was when Dr. Klug left the room after
5  she had made her presentation. Let me ask you that first.
6  Was Dr. Klug there that day?
7  A   Yes.
8  Q   Did she make a presentation?
9  A   Yes.
10 Q   Was she asked questions by Dr. Denning?
11 A   Yes.
12 Q   Okay. And you took notes on all of that,
13 which is the first part?
14 A   Correct.
15 Q   And then she left and the C3 Committee
16 discussed her situation?
17 A   Correct.
18 Q   And you wrote down different peoples' names
19 and what they had to say about this?
20 A   Correct.
21 Q   All right. Dr. Arrington, what
22 significance is Dr. Arrington in this case to Dr. Klug?
23 A   Dr. Arrington was her assigned mentor.
24 Q   Now, what does a mentor do in the context of

Page 99

1  remediation?
2  A   In this case Dr. Arrington's charge was to
3  help Dr. Klug improve her medical knowledge, to improve her
4  ability to pass the ABSITE, put together a study plan, you
5  know, and help her improve her education.
6  Q   Okay. In the very beginning would she have
7  e-mails to Dr. Mozafarri and copy you on them and talk about
8  what they had done that week or month and what they planned
9  to do the next week or month as far as study was concerned?
10 A   Yeah, early on, yes.
11 Q   Okay. Given that Dr. Arrington was Dr.
12 Klug's mentor, what impact did that have on the C3 Committee?
13 A   Well, it had a lot of impact. I mean Dr.
14 Arrington was very upset with the situation and was actually
15 pretty vocal about the fact that Dr. Klug had not kept her
16 meetings up with her, had made no effort to continue the study
17 plan and that sort of thing. So she just felt like that she
18 was not taking it seriously, and so she felt that the decision
19 should be upheld.
20 Q   Okay. And it says here, "Did not fulfill
21 study plan." Is that what you meant by that?
22 A   Yes.
23 Q   Okay. And it says, "Using her problems as
24 an excuse?"

Page 100

1  A   Correct.
2  Q   Okay. So the next person was Dr. Bown, and
3  he said - the first thing he said was the same issues. Does
4  that mean that he agreed with Arrington?
5  A   He absolutely agreed with her.
6  Q   Okay. And he said, "She's made no
7  improvement?"
8  A   That's correct.
9  Q   Okay. "Knew her job was in jeopardy last
10 July?"
11 A   Correct.
12 Q   Okay. Then Dr. Walker said that she had met
13 her requirements at the VA, right?
14 A   Correct.
15 Q   Okay. And then Robinson talked about her
16 treatment of patients; is that correct?
17 A   Yes.
18 Q   What role did her clinical surgical skills
19 in treating the patients play with the C3 Committee?
20 A   A huge role. I mean that's kind of the
21 charge of the program is to make sure that residents are safe
22 practicing physicians when they leave the program.
23 Q   Based on your notes, do you remember any
24 discussion about whether or not she could be a safe surgeon?

Page 101

1  A  Yes. There was some concern about issues
2  that had been missed, lab work and that sort of thing on the
3  wrong patients that had been given. There was some concern
4  about whether or not she was safe in her patient care.
5  Q  Were there also concerns about her logging
6  too many hours?
7  A  Yes. That was part of the problem with the
8  VA.
9  Q  And what is the issue – you know, most people
10 might think, well, it's good to work a bunch of hours, to work
11 hard. What is the problem with that? Why is that a problem?
12 A  The problem is that if you work too many hours
13 as a resident, and it's an ACGME mandate that the wellness
14 of the residents is a concern for us. I mean if you work too
15 many hours, it's difficult to practice safely and take care
16 of your patients safely. Your thought processes are off.
17 And so that's why they require that we reduce the hours and
18 make sure they don't work over a certain amount of hours.
19 Q  Okay. Do you remember Dr. Adkins?
20 A  I do.
21 Q  Do you remember her referencing Dr. Adkins
22 in her midpoint evaluation concerning an episode that had
23 occurred where she felt like she asked her to leave, or
24 something to that effect?

Page 102

1  A  I do.
2  Q  And do you remember him writing a response
3  to that in an e-mail?
4  A  I do.
5  Q  And do you recollect him saying that at one
6  point her hand became unsteady as it came to the surgical
7  instrument?
8  A  I do.
9  Q  And he had to tell her to leave?
10 A  Yes.
11 Q  Is that one of the concerns that this raises?
12 A  Yes.
13 Q  Okay. Was it a consensus vote? Did
14 everybody agree on that decision?
15 A  Yes.
16 Q  Now, she appealed this decision, right?
17 A  Correct.
18 Q  And it went to the Ad Hoc Committee, right?
19 A  Correct.
20 Q  Is she allowed to choose the people who are
21 on the Ad Hoc Committee?
22 A  Yes, I believe she was.
23 Q  And she chose some of the members of that,
24 and they still confirmed the decision of the C3 Committee?

Page 103

1  A  Correct.
2     MR. OXLEY: Now, I want to draw your
3  attention to – this is the final evaluation, PGY 2. What
4  exhibit is that? I have that as 10. I'm not sure that I'm
5  right about that. I've lost confidence in my ability to mark
6  them.
7     MS. WHITEAKER: I think that one is 10.
8     MR. OXLEY: Is it 10?
9     MS. WHITEAKER: I'm pretty sure. Yes.
10    MR. OXLEY: Is that 10? All right. That's
11 it. All right. So let me use that copy. I've marked on this
12 copy, unfortunately.
13    BY MR. OXLEY:
14 Q  So I want to direct your attention to
15 Exhibit 10, and under the first column, one, two, three, four,
16 five, six, seven, eight down. Do you see eight down?
17 A  I do.
18 Q  What does eight down say?
19 A  "Educational Enhancement Plan."
20 Q  Did she meet or complete her Educational
21 Enhancement Plan?
22 A  No.
23 Q  In that regard, did she keep her meetings
24 with Dr. Arrington in order to study for the ABSITE to increase

Page 104

1  her knowledge?
2  A  No.
3  Q  Did she improve her ABSITE score by 5%?
4  A  No.
5  Q  Did she improve her ABSITE score at all,
6  percentile-wise?
7  A  No.
8  Q  Did she turn in the paragraphs that she was
9  required to turn in?
10 A  No.
11 Q  Okay. Now I want to hit another matter that
12 was mentioned during direct examination. During March of
13 2015 she was on a remediation plan, and part of that
14 remediation plan dealt with the H.E.L.P. Program, right?
15 A  Correct.
16 Q  Why would the program refer someone to the
17 H.E.L.P. Program?
18 A  We referred her to the H.E.L.P. Program to
19 see if there were any problems with her taking tests. If
20 there were problems with her taking tests, the H.E.L.P.
21 Program would help her develop strategies to improve that.
22 Q  I'm showing you a document. Do you
23 recognize that document? I don't have a copy of it. I'll
24 show it to you here in a second.

Page 105

1  A  I do.
2  Q  But first let me comment on it, then we'll
3  mark it. Actually, you know what, I might have a copy. I
4  do have a copy. I apologize. I'm sorry.
5      I would like to have this marked as 18, as
6  Exhibit 18.
7      (WHEREUPON, Webb Deposition
8       Exhibit No. 18, E-Mail dated
9       3/18/15, was marked for
10      identification.)
11  BY MR. OXLEY:
12  Q  Now, Exhibit 18, what is Exhibit 18?
13  A  Are you asking me?
14  Q  Yes, I'm asking you.
15  A  It's an e-mail that I sent to Dr. Klug
16  regarding an appointment that we made with the H.E.L.P.
17  Program.
18  Q  Okay. And what's the date of that e-mail?
19  A  That would be March the 18th, 2015.
20  Q  And, to your knowledge, did Dr. Klug ever
21  take advantage of the H.E.L.P. Program or keep this
22  appointment?
23  A  Not to my knowledge.
24  Q  On the typed up notes from Exhibit 11 a couple

Page 106

1  things I want to point out. Under Bullet Point 3, I'm going
2  to read this. "If you had it all to do over again, what would
3  you do? 'take the appropriate amount of time to heal. I
4  would have enrolled in HELP program and created a more
5  structured environment." Did I read that correctly?
6  A  Correct.
7  Q  Is that suggestive to you that she did not
8  ever go to that appointment at the H.E.L.P. center?
9  A  It is.
10  MS. WHITEAKER: Can you tell me where you're
11  reading off of? I'm just not –
12  MR. OXLEY: It is right there (indicating).
13  MS. WHITEAKER: Oh, the second page?
14  MR. OXLEY: Yes.
15  MS. WHITEAKER: Okay.
16  BY MR. OXLEY:
17  Q  And over here in the typewritten section it
18  says -- I'll read this, and you tell me if I read it correctly.
19  "She admits that she had a lack of communication with Dr.
20  Mozafarri and her mentor, Dr. Arrington, did not adhere to
21  Dr. Arrington's study plan or meetings with her." Is that
22  right?
23  A  Correct.
24  Q  And Dr. Arrington was leading her, as her

Page 107

1  mentor, on remediation?
2  A  Correct.
3  Q  So when you were asked earlier with respect
4  to Exhibit 10 whether or not she completed everything on
5  Exhibit 10, did she complete her Educational Enhancement
6  Plan?
7  A  She did not.
8  Q  And as part of that, she did not complete her
9  study plan with Arrington?
10  A  Correct.
11  Q  She admitted that?
12  A  Correct.
13  Q  And she did not turn in the paragraphs? You
14  never got a copy of that?
15  A  Correct.
16  Q  And she did not go to the H.E.L.P. Program?
17  A  Correct.
18  Q  Have other people had problems with their
19  test taking abilities and it been discovered and you allowed
20  them to try to do things to help them through the H.E.L.P.
21  Program?
22  A  Yes.
23  Q  All right. I want to turn back to these
24  e-mails.

Page 108

1      MR. OXLEY: Did we make the group of e-mails
2  an exhibit?
3      MS. WHITEAKER: I didn't think so. I mean
4  there were e-mails.
5   I  MR. OXLEY: You read them into the record.
6  There's a big thick bunch of e-mails, or text messages. Did
7  we just have the one? Here it is?
8      MS. WHITEAKER: It's 14.
9      MR. OXLEY: Okay. Do you have a problem
10  with we making this 14-A?
11      MS. WHITEAKER: No, that's fine.
12      MR. OXLEY: I mean that makes sense because
13  it's a completion.
14      MS. WHITEAKER: I agree.
15      MR. OXLEY: Would you mark that 14-A?
16      (WHEREUPON, Webb Deposition
17       Exhibit No. 14-A, Text
18       Messages, was marked for
19       identification.)
20      MR. OXLEY: So 14-A, with 14, which would go
21  underneath of this, I'm going to read through this and then
22  I want to read this in context with -- is this 12? Exhibit
23  12, that's the notes.
24      MS. WHITEAKER: Yes, that's 12.



April 6, 2016

CLINICAL COMPETENCY COMMITTEE MEETING – 1ST LEVEL APPEAL FOR DR. REBECCA KLUG -

PRESENT: DRS. DENNING, THOMPSON, ARRINGTON, BOWN, HARRISON, ROBINSON, WALKER, KLUG, KIM MANN, TRAUMA NURSE PRACTITIONER, AND DONNA WEBB, PROGRAM ADMINISTRATOR (OBSERVER)

The meeting was requested by Dr. Rebecca Klug to discuss and appeal the Clinical Competency Committees recommendation for non-renewal of Dr. Klug's contract.

The meeting was called to order by Dr. David Denning, Chairman of the Clinical Competency Committee. He gave a brief description of the reason for the meeting. He then asked Dr. Klug to present her case to the Committee.

Dr. Klug presented her case by stating that she understood the reasons the letter of nonrenewal was given to her. For purposes of these minutes, short statements of Dr. Klug's presentation will follow:

- Wants to be a surgeon
- Accepts that she has deficiencies and has been working vigorously to correct them.
- Her cases are current, has written and submitted an abstract for a meeting, has developed study plans.
- She feels that she returned to her position as a surgical resident too soon after the death of her husband, her opinion now is that possibly 6-12 months would have been better.
- She also experienced another personal tragedy that made her return to work more difficult.
- She stated that she has been treated for depression and recently was diagnosed with ADD and is receiving treatment for this. She has seen a counselor of her own choosing and has seen Dr. Patton as well.
- During this time, she could manage coming to work, but that was all. Could not do anything after going home
- She feels that knowing she has ADD will help her improve.
- She admits that she had a lack of communication with Dr. Mozaffari and her mentor, Dr. Arrington, did not adhere to Dr. Arrington's study plan or meetings with her.
- She stated that she herself, did not inquire about her progress in the deficiencies that had been discussed with her.
- She was deficient in her administrative tasks, but has now brought everything up to date.
- She said that while she listened to her evaluations with Dr. Mozaffari, she did not really believe them.
- Dr. Klug feels she is not a lost cause and has the desire, capability and is regaining her confidence. She can correct her lack of objective data.





Dr. Denning then ask Dr. Klug some questions:

- Did you receive progress report appropriately – "yes she did"
- Do you feel the nonrenewal is 100% contingent on your poor performance on the ABSITE? – "seems that way, my clinical skills are ok, my deficiencies are in education."
- If you had it all to do over again, what would you do? " take the appropriate amount of time off to heal. I would have enrolled in HELP program and created a more structured environment."
- Do you believe the education time in the program is adequate? " yes, I take responsibility for all my problems. I am impressed with changes and the educational process has improved. I am not always prepared, trouble with retaining information.
- If you were on the Committee what would you do? "As far as promotion is concerned, not sure, but should remain in program. I care about MU Surgery and the area patients,"
- Do you feel you have the stamina, fortitude to do Surgery? Would you be better suited to do something else? "I feel that I do have the stamina. My time has been split, but I am stronger now and feel like I could do this. I understand what the life of a surgeon is like and I feel it is very difficult to measure myself based on this past year."

Dr. Denning asked Dr. Klug to leave and the committee discussed the situation. The Committee decided to uphold the original decision not to renew Dr. Klug's contract for 2016-17.



C³ Mtg - 1st Level Appeal          4/6/16

Present:
 Denning, Bown, Thompson, Robinson, Harrison, Arrington, Klug, - (Webb) observer, Mann.

Re: Non-renewal of Contract

In Reviewing Records
Resp. Decision & obj. mat. presented
Questioning herself over last yr.
  - Want to be a Surg - yes
Reviewing [Mistakes]
  - Should not have come back
  - unable to hand. demands of Surg.

Coming bk in Aug. - was better
Suffering from depression
6-mo - 1yr - sh. have stopped out.
finally making prog & is better, diagnosed
w/ ADD recently.
Not strong enough to handle personal
blow. (situation c m/y)
Not adhering to Study Plan or ntwp
  c during. Not retaining info
Could handle coming to work, but when
she went home, could not study/do
anything.

- not communicating apprec. c̄ appro. people.
- not asking about prog. - what others thought of me.

Not lost Cause:
- desire, Capability
- Could correct lack of ~~took~~ obj. data.
- Regaining her Confidence

What would be diff?
- Knew about learning disabilities
- Ed. Prog - Help - regardless outcome
- Absite review Courses
- Dr. Knight agreed to help c̄ studying for boards.
- Deserve final chance
- ~~Faculty~~ - helping her - Wilson, Wolfe, McLagg.
- Some minor imp. of Absite Score
- Other residents - Morning, Knight would like to talk about
- Case logs have been brought up to date.
- Completed all requirements - Criteria for promotion.

Do you receive prog rpts appro. - yes, was emailed re: Abstract.
Not aware of fact that Absite

End of last yr - problems - yes - no-diem.
Do you listen to what May told you &
understand - yes, but did not believe
that

Diem 100% Contingent on poor perf on
Absite - Seems that way, Clinical
Skills ok - deficiency is Edu

All over again what would you do
 — time off - heal
 — would have enrolled in HELP
   prog. - Co.
 — Create more structured environment

Believe Ed. time in Prog is adequate?
Prepare? Read/Study? Faculty problem - No
Takes responsibility for problems. Impressed
c Changes, Ed process has improved
Not always prepared, trouble retaining info.

SCORE quizzes / True Learn Quizzes

Assigned Dr. Arrington as mentor — met c̄ her sporadically because of depression.

Ok Committee what would you do. Promotion - not sure but should remain in prog. Cares about Med Surg & area pts Needs an intensive educational prog.

Feel you have stamina, fortitude to do Surgery? Suited to do something else?

Feel that I do have Stamina Time has been split - but stronger & better now & feels like she could do this. Understand what life of Surgeon is like. Very diff to measure herself based on this first yr.

Committee Discussion

Arrington - did not fulfill study plan. Using her problems as an excuse. Should stick to decision. Can't keep letting someone repeat Prog.

Bown - same issues, no improvement. Knew job was in jeopardy last July.

Thompson - Compare 1st yr to 2nd yr — no comparison. doesn't know pts as well as intern.

Walker - think hard about what she said. did good job of explaining situation. Can she return? She thinks she can. - did good job at VA no problems. Took care of responsibilities.

Robinson - Poor H&P, old labs, disorganized, pt. could have died.

Did not seek help or CR in progress.

Has problems c̄ time management & hrs. spent in hospital. Thinks it committee's responsibilities to ch. her progress

Let's assume no documentation on this problem. What would you do?

Leaves no impression, hasn't operated č her.

Have to educate & protect patients

Have to ensure that we have done our job of communicating her problems to her. Need to be on solid ground.

Has to understand her limitations & what takes to be a Surgeon. Our job is to help her understand.