**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**REBECCA KLUG,**

      **Plaintiff,**

**v.**                            **Civil Action No. 3:18-cv-00711
                                       Judge Robert C. Chambers**

**MARSHALL UNIVERSITY
BOARD OF GOVERNORS,
and FARID B. MOZAFFARI, an individual,**

      **Defendants.**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT FARID B. MOZAFFARI'S MOTION FOR SUMMARY JUDGMENT**

This is Plaintiff's memorandum in response to Defendant Farid B. Mozaffari's ("Defendant's"), pending motion for summary judgment.   As is conclusively demonstrated below, Defendant's motion is baseless and should be swiftly rejected.

## I.      SUMMARY OF ARGUMENT

This is not a case that can, or should, be disposed of by pretrial motion.  In fact, it raises significant issues of profound importance – including, but not limited to, the extent to which individuals are protected against discrimination by the sex and disability discrimination provisions of the West Virginia Human Rights Act ("WVHRA").

Dr. Rebecca Klug was a surgical resident at Marshall University School of Medicine. During the course of her time as a resident, she alleges that she was treated less favorably than male residents, that she was subjected to a hostile work environment, and that her educational

opportunities were diminished due to her sex and disability status.  Dr. Klug further alleges her repeated complaints were disregarded for over a year and then when she went outside the department to make a complaint to the university Equity Office, she was retaliated against and terminated.

In his dispositive motion, Defendant seeks to deny Dr. Klug her day in court based on both meritless and misguided arguments.  Dr. Klug's testimony, as well as the additional evidence discussed herein, underscores the existence of triable factual issues. In light of the foregoing, Dr. Klug submits that none of Defendant's arguments are well-taken.  Accordingly, Plaintiff respectfully requests that this Court DENY Defendant's motion in its entirety.

## II.      STANDARD FOR SUMMARY JUDGMENT ANALYSIS

The standard used to determine whether a motion for summary judgment should be granted or denied has been oft stated by the United States Court of Appeals for the Fourth Circuit:

> A moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir. 1979).

Further, the United States Supreme Court of Appeals has stated that a genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With this in mind, in reviewing a motion for summary judgment, a court is required to consider the facts and draw all reasonable inferences in a light most favorable to the nonmoving party, in this case, Dr. Klug.  *Id.* 477 U.S. at 255.  Moreover, Plaintiff is entitled to have the credibility of all her evidence presumed. *Miller v. Leathers*, 913 F.2d 1085 (4th Cir. 1990).  The moving party has the initial burden to

show the absence of evidence to support Dr. Klug's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In this regard, Dr. Klug must demonstrate that a triable issue of fact exists; she may not rest upon mere allegations or denials.  *Anderson*, 477 U.S. at 248.

Further, a plaintiff's burden in resisting a summary judgment motion regarding an alleged violation of the WVHRA is *de minimis*:

> Although the plaintiff has the ultimate burden of proving elements of the claim of discrimination by a preponderance of the evidence, ***the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is* de minimis***.  In determining whether the plaintiff has met the *de minimis* initial burden of showing circumstances giving rise to an inference of discrimination, the function of the circuit court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.   It is not the province of the circuit court itself to decide what inferences should be drawn.

Syllabus Pt. 1, *Conrad v. Ara Szabo*, 198 W. Va. 362, 480 S.E.2d 801 (1996); Syllabus Pt. 4, *Hanlon v. Chambers,* 195 W. Va. 99, 464 S.E.2d 741 (1995) (emphasis added).  This point is underscored by the West Virginia Supreme Court's repeated pronouncements regarding the proper construction of the WVHRA:  "In applying our [anti-discrimination] statutes, we remain mindful that, as a remedial law, ***it should be liberally construed to advance those beneficent purposes***."[1] *Skaggs v. Elk Run Coal Co., Inc.*, 198 W. Va. 51, 479 S.E.2d 561 (1996) (emphasis added).  Therefore, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  *Conrad*, 198 W. Va. at 374, 480 S.E.2d at 813, quoting *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2nd Cir.1994).

---

[1]    *See also Allen v. State Human Rights Commission*, 174 W. Va. 139, 148 327 S.E.2d 99, 109 (1984):  "[E]very act of unlawful discrimination in employment, housing, or public accommodations is akin to an act of treason, undermining the very foundations of our democracy."

### III.    STATEMENT OF RELEVANT FACTS

This case presents a complex factual background that is difficult to summarize. However, Defendant's recitation leaves out key information, mischaracterizes testimony, and contains several misstatements of fact.  In doing so, Defendant would, improperly, have the Court view the facts in the light most favorable to him, instead of Plaintiff.

The general surgery residency program at MU School of Medicine is five years in duration.  The appointment contracts for residents are renewed year to year.  The Residency Notice of Appointment ("NOA") sets forth the terms of the appointment, including compensation, benefits, and duties of the Resident and the School of Medicine.  The Surgery Residency Handbook includes the policies related to the criteria for advancement, promotions, and dismissals, as well as the due process procedures, including an appeals process for dismissals from the program.

The NOA provides that Residents are "afforded the protection of the School of Medicine policies on Affirmative Action, Equal Employment Opportunity, Sexual Harassment and Disability Accommodation.  The Resident is responsible to create a professional environment that reflects and supports the respect and dignity of all patients, staff, students, residents, fellows and faculty in accordance with human resource policies of the School of Medicine, UP&S and all of its affiliates.  Accordingly, sexual harassment, or any form of harassment, will not be tolerated."  (NOA, at page 5, attached hereto as Ex. 1.)

Dr. Rebecca Klug began the general surgery residency program on or about July 1, 2013.  (Acceptance letter, attached hereto as Ex. 2.)   In her first year, Dr. Klug noticed some questionable behavior and unequal treatment of women in that year, but pushed through, hoping that the environment would improve as she progressed in the program.  (Klug Aff. ¶ 4, attached

hereto at Ex. 3.)  For example, during orientation, a senior resident, Dr. Adkins, came into the room, asked the male residents to leave, and then told the three remaining women that "no one will be getting pregnant this year."  (Pl.'s Dep. 52, 56-58, 112, Nov. 20, 2019, attached hereto at Ex. 4.)  In or around June 2014, Defendant Mozaffari became the Program Director; however, he officially started in that position on or about July 1, 2014.  (Mozaffari Dep. 6, Feb 3, 2020, attached hereto at Ex. 5.)  Defendant Mozaffari fostered a hard-core, "macho" working environment in which he punished residents in meetings by making them do push-ups in front of everyone.  (*Id*. 141.)  Despite all this, Dr. Klug did very well during her first year, also referred to as "PGY1."  In fact, Dr. Klug was given the Chief Resident Award which was given to the "Intern that exemplifies the best work ethic and most dedication to the pursuit of excellence in general surgery" that year.  (Award, attached hereto at Ex. 6.)

Dr. Klug signed another contract for her second year (PGY2) for the period July 1, 2014 through June 30, 2015.  (Ex. 1.)  That year, she worked more closely with Dr. Marco Yung, a superior resident.  (Klug Aff. ¶ 11.)  In or around July 2014, Dr. Yung, who was a fourth year resident, took Dr. Klug in the call room and yelled at her for an hour about being "disrespectful" about a routine scheduling matter that she had brought to the attention of one of program managers.  (Klug Dep. 79-81.)  He was angry because he felt that she had complained to the administration.  (*Id*.)  Dr. Yung opened and closed a pocket knife the whole time he was berating her and told her that if she told anyone about their meeting he would "make her life hell."  (*Id*.) Frightened and intimidated, Dr. Klug did not make any complaints at all for the next six months. (Klug Aff. ¶ 14.)  However, she was subjected to an abusive and increasingly hostile work environment throughout this time period.  (*Id*. ¶ 17.)  For example, in the call room, male residents would routinely watch offensive and sexually explicit videos.  (Klug Dep. 95-103.)

They would also watch violent and gory videos, such as videos of real shootings.  (*Id*. 98.)
During meetings, one of the male residents would scroll through photos of women's breasts,
make comments to other males, and then exclaim that it was for "research."  (*Id*. 99; Klug Aff. ¶
19.)  In another instance, male residents would play a video in which women were judged on a
"crazy-hot matrix," suggesting that "hot" women were more "crazy" and discussing where
women they knew would fit into that matrix.  (Klug Dep. 97-98, 115-116; Klug Aff. ¶ 20.)  Dr.
Klug felt embarrassed and out of place due to this type of conduct.  She was also subjected to
direct sexist comments.  For example, Dr. Yung told her that she should "smile more," and "not
be such a bitch."  (Klug Dep. 106.)  He told her that if she did not smile more, people would
think she was "crazy" like Dr. Wolfer, one of the few female surgeons.  (*Id*. 88-89.)

Finally and despite her fears of retaliation, around January 2015, Dr. Klug verbally
complained to the Program Director, Defendant Mozaffari and the Program Coordinator, Donna
Webb, about the hostile work environment and the sexually explicit videos.  (*Id*. 110-113; Webb
Dep. 53-54, Mar. 5, 2021, attached hereto at Ex. 7.)  She told Defendant Mozaffari and Ms.
Webb that she was working in a "toxic environment" and that male residents were looking at
disgusting, degrading sexual videos at one of the hospitals where she was the only female
resident.  (Mozaffari Dep. 48; Webb Dep. 109-111.)  Around that time, Dr. Yung had been
watching the trailer from the movie "50 Shades of Grey" in the call room, which Dr. Klug felt
was embarrassing and inappropriate in the workplace.  (Klug Dep. 100-103.)  Instead of handling
the complaint in a discreet manner, at the next resident meeting, Defendant Mozaffari announced
to everyone that he did not want any sex videos in the call room and specifically mentioned the
"50 Shades of Grey" movie.  (*Id*. 113-114.)  All of the residents knew that Dr. Klug was the one

who complained, since she was the only female at the VA where most of this activity occurred. (*Id*.)

Despite the complaints, there continued to be pornography and inappropriate content on the call room computers. (Wolfer Dep. 13-14, 25-26, Jan. 22, 2020, attached hereto at Ex. 8.) Also, after her complaints about the working environment, Dr. Klug was treated worse by Dr. Yung in particular, but also by Dr. Mozaffari.  For instance, Dr. Klug was given less favorable scheduling and she was required to work more hours than male surgical residents.  (Klug Dep. 66; Wolfer Dep. 18.)  During PGY2, Dr. Klug asked for time off to attend counseling sessions with her husband, who was dealing with depression, but was rarely granted time off for those appointments.  (Klug Dep. 29-30.)  However, male residents were given more flexibility in their scheduling.  (Klug Aff. ¶ 30.)  During her mid-point evaluation in November 2014 with Defendant Mozaffari and Ms. Webb, Dr. Mozaffari also told Dr. Klug that she should smile more and that she needed to find the "fine line between being a pushover and being a bitch." (*Id*. ¶ 16.)

 Female surgeons who were faculty at MU have testified that the work environment in the surgical department was inherently sexist.  (Wolfer Dep. 18-22; McCagg Dep. 6, Jan. 13, 2020, attached hereto at Ex. 9.)  One of the surgeons, Dr. Wolfer, witnessed pornography on the computers and also complained about seeing pornographic images on call room computers. (Wolfer Dep. 13-14, 25-26.)  Dr. Wolfer testified that nothing was done about it after her complaints.  (*Id*.)  Dr. McCagg, another female surgeon, testified that she left Marshall because a female surgeon could not get ahead there due to sexism.  (McCagg Dep. 6.)  She corroborated Dr. Klug's allegations that male residents were treated more favorably than Dr. Klug, attributing that disparate treatment to Dr. Klug's gender.  (*Id*. 20.)  She also confirmed that Dr. Klug complained to her about the discriminatory environment.  (*Id*. 20-21.)  Despite the fact that she

agreed that Dr. Klug was being treated in a discriminatory manner, Dr. McCagg admitted that she did not take any action to report these complaints to the administration. (*Id*. 22.) Dr. McCagg testified at her deposition that her own complaints to Dr. Mozaffari "fell on deaf ears." (*Id*.) Dr. Wolfer also admitted that Dr. Klug brought complaints of sex discrimination to her attention and that she did not report these complaints or take any action on them. (Wolfer Dep. 18, 25-26.) Dr. Wolfer further testified that Defendant Mozaffari removed her from the committee that reviews residents when she did attempt to raise issues about the work environment. (*Id*. 8, 10-11, 38-39, 44.)

In or around March 2015, Defendant Mozaffari informed Dr. Klug that they were not moving her up due to her low ABSITE score and performance issues and also that she would have to repeat her second year. (Mar. 12, 2015 letter, attached hereto at Ex. 10.) Dr. Klug was shocked, since she had never been told that there were any issues with her performance before and, instead, had been praised for her excellent work the year before. In fact, on November 18, 2014, Dr. Klug was evaluated and received good scores. (Nov. 18, 2014 evaluation, attached hereto at Ex. 11.) That evaluation noted that Dr. Klug "wks [works] hard" and that she was making "good progress." (*Id*.) She appealed the decision not to promote her, pursuant to program procedures for due process. (Appeal Decision, attached hereto at Ex. 12.) Her grievance went to a hearing in front of an appeal committee and she received a favorable decision on or about April 9, 2015. (*Id*.) The committee found that Defendant Mozaffari had failed to properly notify her of any deficiencies and that he had not followed proper procedures. (*Id*.) It reversed the decision not to promote. (*Id*.)

Accordingly, on April 20, 2015, Dr. Klug met with Defendant Mozaffari and was given an improvement plan setting forth specific requirements to complete her PGY2 year. (Apr. 20,

2015 Educational Enhancement Plan, attached hereto at Ex. 13.)  It was her understanding that she would advance to her third year if she complied with the requirements of the plan listed by June 2015.  (Klug Aff. ¶ 37.)  She planned to meet those requirements by the required time frame.  (*Id*. ¶ 39.)

Tragically, on May 12, 2015, Dr. Klug's husband (who was a medical student) committed suicide.  (Klug Dep. 43.)  Dr. Klug initially took two weeks off from work and then was contacted by Defendants letting her know that she needed to come back to work or her position would be in jeopardy.  (*Id*. 126-127.)  On May 15, 2015, Dr. Klug's advisor, Dr. Arrington, sent an email to Dr. Mozaffari in which she mused that Dr. Klug may want to take six months or a year of leave and then return to her residency; however, that option was never presented to Dr. Klug.  (May 13, 2015 email, attached hereto as Ex. 14.)  Dr. Klug returned to the residency program on or about June 2, 2015.  (Klug Dep. 127.)  Some of the other residents offered to take her place at St. Mary's Hospital so she could work at one of the other hospitals, since St. Mary's was known as the most difficult and stressful location.  (*Id*.)  However, she was told that Defendant Mozaffari said that she would have to "sink or swim," refusing to allow anyone to switch rotations with her.  (*Id*.)  Reportedly, he also told the senior residents not to discuss anything about the loss of her husband with Dr. Klug.  (Klug Aff. ¶ 48.)

When Dr. Klug first went back to work, she worked an entire weekend by herself, not getting any sleep.  (Klug Dep. 127.)  Her first case was a gunshot wound to the head (the same way her husband died).  (Wolfer Dep. 22.)  She managed to make it through the case, but was upset afterward.  (*Id*.)  During this difficult period, Dr. Klug was coping with her work and did not make any mistakes, but was feeling exhausted.  (Klug Dep. 127.)  That Monday, June 8, 2015, she had a meeting with Ms. Webb and Dr. Abolmaali, the acting Program Director

(Defendant Mozaffari was out of town). (*Id.* 127-128.) Dr. Klug asked them for some time off. They told her that they would "work something out" and "don't worry" that she would be a "PGY3." (*Id.*)

At the end of the year "Resident Roast," Dr. Uffort (a male) presented Dr. Klug with some massaging foot slippers and said that "Dr. Klug forgets she is in a surgical residency program and she requests extra time off to relax and massage her feet." (Klug Aff. ¶ 49.) At this point, Dr. Klug had only taken off work for two weeks related to her husband's death. (*Id.* ¶ 50.) She was dismayed and embarrassed at the suggestion that she was lazy for taking time off after her husband's death. (*Id.* ¶ 51.)

Upon his return, Dr. Mozaffari was not sympathetic to Dr. Klug's emotional distress. (Klug Dep. 129.) One day that first week she was back, Defendant Mozaffari asked Dr. Klug how she was doing. (*Id.*) She told him that she thought she needed more time off to grieve. (*Id.*) Defendant Mozaffari said to Dr. Klug, "You know, you're going to have to get over this. Something worse is going to happen in your life." (*Id.*) In his deposition, Defendant Mozaffari admitted that he said words to that effect, but suggested that he meant that she should not think nothing worse could happen to her, because things can always get worse. (Mozaffari Dep. 66.) Either way, the sentiment was not well taken and Dr. Klug felt that he was extremely insensitive to her feelings. (Klug Dep. 129.) She started crying and told him that it was a horrible thing to say to her. (*Id.*)

On June 20, 2015, Dr. Klug sent Defendant Mozaffari an email to inform him of the environment since she had been back. (June 20, 2015 email, attached hereto at Ex. 15.) In that email, she explained how Dr. Yung had been criticizing the decisions she made about patient care, his tantrum in the ICU, and about him throwing away her patient notes. (*Id.*)

On June 25, 2015, Defendant Mozaffari called Dr. Klug in for an evaluation and told her he was getting reports that she was coming in late or not showing up at all. (Klug Dep. 185.) Dr. Klug denied those allegations. (*Id*.) She believed that Dr. Yung had given false information about her to Defendant Mozaffari in order to sabotage her and in retaliation for her complaints against him. (Klug Aff. ¶¶ 57-58.) She tried to explain, but Defendant Mozaffari would not listen to her side and told her that she was going to be held back to repeat the second year again. (*Id*. ¶ 59.) Defendant Mozaffari then said that "since she was lying to him," he was going to put her on medical leave and that she could not return until she was cleared by a psychologist as being "fit for duty." (Klug Dep. 185; Mozaffari Dep. 68-69.) He also accused her of being "emotional" because she had cried during the conversation where he said worse things could happen to her. (Klug Dep. 129.) Further, he said that she was not allowed to go to a "tarot reader or palm reader." (Mozaffari Dep. 68.) Dr. Klug felt insulted by these comments and believed that she was being treated in a punitive manner. (Klug Dep. 185.)

Dr. Klug had been diagnosed with general depression and anxiety years before her medical residency and had successfully treated those conditions with medication for a long period of time. (*Id*. 18-20.) After her husband's death, Dr. Klug was treated for major depressive disorder, moderate and recurrent, generalized anxiety disorder, and a normal grief reaction. (Aff. ¶ 62.) She was released to return to work about a month later, but continued to undergo mental health treatment. (Klug Dep. 186.) Dr. Klug intended to appeal the adverse decision to not promote her to third year for the second time, but several surgeons she worked with advised against it, suggesting that repeating the second year would give her time to heal and that it would be easier to just repeat second year and then go on to third year. (Klug Aff. ¶ 64.) She agreed to return to PGY2 for a "do-over" year. (*Id.* ¶ 65.)

On or about August 2, 2015, Dr. Klug returned to the residency program as a second year (PGY2).  (Klug Dep. 185.)  Throughout this year of residency, Dr. Klug was treated differently than similarly situated male residents in that she was given less favorable assignments and was judged more harshly.  (Klug Aff. ¶ 67.)  Also, then-Academic Chief Resident Dr. Yung's abusive and retaliatory behavior escalated.  (Klug Dep. 129-130, 185.)  For example, Dr. Yung took cases away from her, reassigned her cases to male interns, and verbally assaulted her in front of medical students, other surgical residents, and hospital staff.  (*Id*.)  Dr. Yung indicated that she was not to be trusted with patients, even while he prevented her from obtaining the training she should have received as resident by steering cases away from her.  (Klug Aff. ¶ 72.)  At times, Dr. Yung would even physically position his body between her and attending physicians so she could not communicate with them as they gathered to discuss cases.  (*Id.* ¶ 74.)  Dr. Klug believes that Dr. Yung thwarted her development as a surgeon by his discriminatory treatment of her and that this behavior had an effect on how other surgeons viewed her abilities.  (*Id.* ¶¶ 75-76.)  For instance, another male surgeon excused her from a surgical case, saying, "This is a big boy case."  (Wolfer Dep. 22)

Plaintiff believed that Dr. Yung was angry at her for complaining about him to the Program Director and that he retaliated against her by making it more difficult for her to achieve her goals and training requirements.  (Klug Aff. ¶ 83.)  As a result of this discriminatory conduct, Dr. Klug was not receiving the educational and clinical experience that she should have been receiving.  (*Id*. ¶ 84.)  Dr. Klug complained about this unfair treatment on many occasions, verbally, and in writing.  (Ex. 15; Klug Dep. 66, 110-113; Webb Dep. 53-54, 109-111; Mozaffari Dep. 48; Wolfer Dep. 18, 25-26; McCagg Dep. 20-22; and Klug Aff. ¶ 79.)

For example, during the second PGY2 year, Dr. Klug was supposed to switch to the VA as part of the regular rotation, and an intern called her to tell her that Dr. Yung found out she was coming there and "flipped out."  (Klug Aff. ¶ 86.)  The intern said that he was "going to get her" and that she should "watch her back."  (*Id*. ¶ 87.)  She reported this to Defendant Mozaffari who did not document this complaint at all or demonstrate that he did anything to address it.  (*Id*. ¶ 88.)

Pursuant to Marshall's policies, every faculty member is a mandatory reporter of sexual harassment and discriminatory conduct and had an affirmative duty to report any such complaints to the Title IX Coordinator whose job it is to investigate these complaints.  (Hart Dep. 43, 49-50, 52-53, 72-73, Feb. 17, 2020, attached hereto at Ex. 16.)  No such reports or investigations ever took place, despite Dr. Klug making complaints to Dr. Mozaffari, Donna Webb, Dr. Wolfer, Dr. McCagg, and other faculty members, including Dr. Arrington, and Dr. Denning.  (Ex. 15; Klug Dep. 110-113; Webb Dep. 53-54, 109-111; Mozaffari Dep. 48; Wolfer Dep. 18, 25-26; McCagg Dep. 20-22.)  Each one of these faculty members knew about the abusive and hostile work environment and failed to make a complaint.  For their part, Drs. Wolfer and McCagg both testified that they did not receive adequate training from MU about Title IX or how to report discriminatory behavior.  (Wolfer Dep. 13; McCagg Dep. 12.)  They also both testified that their own complaints about being mistreated never went anywhere and that complaining was futile. (Wolfer Dep. 18, 20-21, 26-28; McCagg Dep. 22-23.)

At the January 4, 2016, mid-point evaluation, Dr. Klug was told to submit her research abstract by May 2016.  She was also told to complete her case logs by January 11, 2016.  (Jan. 4, 2016 evaluation, attached hereto at Ex. 17.)  She completed these tasks before the deadlines. (Jan. 5, 2016 email, attached hereto at Ex. 18; Mar. 28 2016 email, attached hereto at Ex. 19.)  At

that meeting, Dr. Klug again told Dr. Mozaffari about the hostile work environment and also told

him that she did not feel that he was supporting her in her training.  (Klug Aff. ¶ 90.)

Finally, after failing to get any action on her complaints within the School of Medicine,

on February 8, 2016, Dr. Klug made a formal, written complaint about Defendant Mozaffari and

Dr. Yung's abusive and discriminatory treatment of her and sent it to Dr. Denning, Defendant

Mozaffari, Dr. Harrison, and Dr. Arrington.  (Feb. 8, 2016 complaint, attached hereto at Ex. 20.)

On or about February 15, 2016, Dr. Klug was scheduled to meet with Debra Hart, the Title IX

coordinator for Marshall University.  (Feb. 15, 2016 email, attached hereto at Ex. 21.)  However,

the University was on a delay that day due to weather.  Ms. Hart emailed Dr. Klug asking her if

she would like to reschedule the meeting and also for her telephone number.  (*Id*.)  Dr. Klug

responded to Ms. Hart that she would be able to attend the meeting and provided her telephone

number.  (*Id*.)  Ms. Hart called Dr. Klug and they talked on the telephone for approximately thirty

minutes.  (Klug Aff. ¶ 98.)  During that conversation, Dr. Klug described her complaints against

Dr. Yung and Defendant Mozaffari.  (*Id*. ¶ 99.)  Dr. Klug detailed many of the instances in which

she either submitted a written or verbal complaint to Dr. Mozaffari, Donna Webb and/or Dr.

Wehner.  (*Id*. ¶ 100.)  At the end of the phone call, Ms. Hart instructed Dr. Klug to send her a

complete written complaint, along with the electronic complaint form that she could find on the

website of the Office of Equity Programs.  (*Id*. ¶ 101.)  On the form, for the category the alleged

discrimination was based on, she instructed Dr. Klug to check the "other" box, as there were

several things going on in the complaint. (*Id*. ¶ 102.)  Dr. Klug submitted the form and a three

page narrative after the cover sheet dated February 17, 2016.  (Feb. 17, 2016 Complaint, attached

hereto at Ex. 22; Hart Dep. 53-54.)  However, Ms. Hart testified that she did not consider the

complaint to be about discrimination since Dr. Klug checked the wrong box on the first page of

the complaint and did not conduct any type of investigation, despite the fact that Dr. Klug included a three page narrative after the cover sheet, in which she described a hostile work environment including offensive videos, verbal assault, and unfair treatment compared to other residents.  (Hart Dep. 54-59; Ex. 22.)  After receiving the complaint, Ms. Hart called Dr. Klug on February 17, 2016.  (Klug Aff. ¶ 104.)  Ms. Hart asked Dr. Klug to send her the three additional pages in a separate email.  (*Id.* ¶ 105.)  During that conversation, Dr. Klug told Ms. Hart that she checked "No" on the electronic form in the section asking if the behavior was continuing.  (*Id.*)  Dr. Klug told her that it was in error.  (*Id.*)  Ms. Hart stated that "It's okay, I understand what you mean."  (*Id.* ¶ 107.)  On March 4, 2016, Donna Webb, Surgery Resident Coordinator, sent Dr. Klug an email to follow up on the December midpoint evaluation in which she had been told that there was <u>one</u> task that she needed to complete for her residency requirements that year.  (Mar. 4, 2016 Midpoint Evaluation Update, attached hereto at Ex. 23.)  Dr. Klug completed the task included in the email.  (Ex. 19.)  Dr. Klug was not told that there were any other requirements that she was missing to complete PGY2.  (Klug Aff. ¶ 110.)

On March 18, 2016, Dr. Klug received a response to her complaint from Defendant Mozaffari indicating that Dr. Yung had been reprimanded and that their schedules had been adjusted so that they would not work together.  (Mar. 18, 2016 letter, attached hereto at Ex. 24.)  A mere ten days later, on March 28, 2016, Dr. Klug was given a letter indicating that her contract for continued residency training would not be renewed, and that her surgery residency would be terminated as of June 30, 2016.  (Mar. 28, 2016 letter, attached hereto at Ex. 25.)  Dr. Klug was blindsided, since she had not been told at her mid-point that her position was at risk and believed that she was on-track for promotion.  (Klug Aff. ¶ 113.)  The only thing that had changed in that time frame was that she made the formal complaint to the Title IX office.  (Ex. 22.)

15

Defendant Mozaffari told Dr. Klug that the program had decided as a group that she would not make a good surgeon. (Mozaffari Dep. 105.) Dr. Mozaffari claimed to recuse himself from the committee that makes the promotion decisions, but he chose all members of that committee. (*Id*. 88, 135.) Further, he presented to the deciding committee a chart of Dr. Klug's alleged failures to meet her goals that contained inaccuracies and attempted to paint her in the worst light. (*Id*. 107.) This chart or "timeline" included information that was misleading and false, demonstrating Dr. Mozaffari's animus toward Dr. Klug. (Timeline, attached hereto at Ex. 26.) For example, the chart indicates that Dr. Klug failed to meet requirements that were either eliminated, modified, or were actually completed, creating the false narrative that she utterly failed to meet any of her requirements. For example, Donna Webb put "Citi certification not completed" on the timeline, but Dr. Klug had completed that training and Ms. Webb had received the certificate. She admitted in her deposition that the information was inaccurate on the timeline. (Webb Dep. 18-19.) Also, Ms. Webb put "no" in the column indicating that Dr. Klug did not have "100% completion of SCORE curriculum" even though she admitted that she did not know if Dr. Klug had completed it or not. (*Id*. 19-22.) In fact, Dr. Klug had completed 100% of the SCORE curriculum. (SCORE completions, attached hereto at Ex. 27.) Further, Ms. Webb marked "No" indicating that Dr. Klug did not meet a deadline for "Duty Hours violations for March noted." (Ex. 26.) However, there was no deadline and there was nothing for Dr. Klug to do for this item. Under "resolution/requirements" for this item it stated "cautioned to monitor duty hours more closely and let Chief or Dr. Mozaffari know if there is a problem." (*Id*.) Other discrepancies also exist between the "timeline" and what Dr. Klug had actually completed.

Her test scores were cited as one of reasons for her discharge from the program. (Mozaffari Dep. 103.) However, Dr. Klug's test scores were similar to that of male residents

who were not discharged from residency.  (*Id.* 22-23.)   Further, male residents had been promoted through the program with similar test scores and who had also failed to meet some of the other handbook requirements.  (*Id.* 23.)   In discovery, MUBOG produced information indicating that male residents received similar scores and were not discharged, or even placed on education enhancement plans.  (MUBOG Disc. Resp, attached hereto at Ex. 28.)  For example, Resident Number 15, a male, scored the following percentiles:  3, 0, 1, and 1. However, he was not discharged from the program.  (Ex. 28, at 3 and 6.)  Another example is Resident Number 40, also a male, who scored the following percentiles:  1 and 2.  Again, he was not discharged from the program.  (Ex. 28, at 4 and 9.)  Another male resident scored poorly and was still promoted. (Webb Dep. 70-73.)  Another male resident was given extended medical leave to go to rehab for alcoholism and was not discharged from the program.  (*Id.* 61.)

Dr. Klug believes that she was subjected to different rules and/or sanctions, based upon her sex and disability status.  (Klug Aff. ¶ 123.)  Consistent with ACGME rules, Drs. Wolfer and Dr. McCagg both testified that the ABSITE test scores were not supposed to be considered as requirements for promotion, but instead, only for assessment of progress.  (Wolfer Dep. 31; McCagg Dep. 69.)  Dr. Mozaffari also acknowledged that residents could not be discharged solely for ABSITE scores.  (Mozaffari Dep. 23.)  Dr. McCagg testified that "male residents, who had not met that percentile multiple times who were continually advanced and later they even graduated." (McCagg Dep. 24-25.)

While Dr. Mozaffari was not a voting member of the C3 committee or the appeals committees, he provided false information to the committees upon which they relied for their decisions.  (Mozaffari Dep. 107.)  Dr. Klug was not provided a copy of the "timeline" that contained misleading and false information about her remediation plans and her completed tasks.

(Klug Aff. ¶ 119.)   Accordingly, she did not know that during the appeals, she needed to let the members know that she had actually completed most, if not all tasks included on the misleading chart.   (*Id*. ¶ 121.)   The timeline created by Dr. Mozaffari and Donna Webb made the entire evaluation process unfair and discriminatory.   (*Id*. ¶ 122.)   Dr. Mozaffari also made the final decision to terminate Dr. Klug.  (Mozaffari Dep. 87.)

Dr. Klug completed all the criteria for PGY2 and earned a certificate of completion. Actually she successfully completed it the year before and received two certificates of completion for PGY2.   (PGY2 Certificates, attached hereto at Ex. 29.)   However, she was terminated from the surgical residency program.  (Ex. 25.)

## IV.    ARGUMENT

### A.    Defendant Farid B. Mozaffari is not Entitled to Immunity

State officials performing discretionary functions are entitled to qualified immunity, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.   A right is "clearly established" when "its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Cooper v. Sheehan,* 735 F.3d 153, 158 (4th Cir. 2013) (cited by *Rex v. W. Virginia Sch. of Osteopathic Med*., 119 F. Supp. 3d 542, 552-553 (S.D.W. Va. 2015), *See also*, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).   Further, the analysis of whether qualified immunity is available must start with whether the acts alleged were malicious or oppressive.   *State v. Chase Securities, Inc.* 188 W. Va. 356, 365, 424 S.E.2d 591, 600 (1992) ("There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive.")   In this case, Plaintiff informed Defendant that she was being subjected to a hostile and discriminatory work and educational environment on the basis of her sex, that he

failed to remedy the discriminatory environment, and that he retaliated against her.  She will present evidence that Defendant Mozaffari fostered and condoned a discriminatory, sexist environment, that he failed to investigate or address her complaints for over a year, and that he unfairly evaluated her performance, leading to her termination. This evidence is sufficient to establish that his conduct violated the clearly established rights found in the WVHRA's prohibitions against sex and disability discrimination.  There are genuine issues of material fact surrounding the extent of the harassing conduct, the disparate treatment of male and female residents, Dr. Klug's complaints, and how Dr. Klug's progress pursuant to her education enhancement plan.

Defendant Mozaffari is subject to liability for his own actions as well as his actions as a supervisor.  *Baynard v. Malone,* 268 F.3d 228 (4th Cir. 2001).  To establish supervisory liability, a Plaintiff must show:  (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994); *Rex v. W. Virginia Sch. of Osteopathic Med.*, 119 F. Supp. 3d 542, 552 (S.D.W. Va. 2015).  Defendant has failed to meet his burden to show that there are no genuine issues of material fact regarding these elements.  Because Plaintiff has produced evidence of Defendant's knowledge of her complaints related to a clearly established law, his inadequate response, and her injuries, including being unfairly evaluated and being retaliated against after her complaints, Defendant is not entitled to immunity.

**B.      There are Genuine Issues of Material Fact regarding Plaintiff's Sex
        Discrimination Claims against Defendant**

In order to set forth a *prima facie* case of impermissible employment discrimination under

the HRA, a plaintiff must establish the following: (1) that she is a member of a protected class;

(2) that the employer made an adverse employment decision affecting her; and (3) that, but for

her protected status, the employer would not have made the adverse decision. Syl. pt. 3, *Conaway*

*v. E. Associated Coal Corp*., 178 W.Va. 164, 358 S.E.2d 423, 429 (1986).  In establishing the

third element of the *prima facie* case, the plaintiff must "show some evidence which would

sufficiently link the employer's decision and the plaintiff's status as a member of a protected class

so as to give rise to an inference that the employment decision was based on an illegal

discriminatory criterion."  *Id*. at 429–30.  The plaintiff can establish this link by any of the

following methods: (1) an admission from the employer, (2) unequal or disparate treatment

between members of the protected class and others, (3) the elimination of legitimate reasons for

the decision, or (4) statistics showing that members of the protected class receive substantially

worse treatment than others.  *Id*. at 430.  *Larry v. Marion Cnty. Coal Co.*, 302 F. Supp. 3d 763,

770 (N.D.W. Va. 2018).

Further, to establish a claim for sexual harassment based upon a hostile or abusive work

environment under the WVHRA, a plaintiff must prove that (1) the subject conduct was

unwelcome; (2) it was based on the sex of the plaintiff; (3) it was "'sufficiently severe or

pervasive to alter the . . . [plaintiff's] conditions of employment and create an abusive work

environment'"; and (4) it was imputable on some factual basis to the employer.  *Hanlon v.*

*Chambers*, 195 W. Va. 99, 106-7 (1995).  In this case, Dr. Klug has produced evidence that she

was subjected to offensive comments and videos containing female nudity, violence, and sexist

attitudes such as the "crazy-hot" matrix and female subjugation, as in "50 Shades of Grey."   She was also told not to be "crazy" or act like a "bitch" and that she needed to "smile more" by the Chief Resident.  Defendant Mozaffari also told Plaintiff that she needed to smile more.

In terms of sex discrimination, Dr. Klug may prove her claim through either direct or circumstantial evidence. However, like here, there is often very little direct evidence of discriminatory intent.  *Hanlon* 195 W. Va. at 106 n.4, 464 S.E.2d at 748 n. 4 (noting discrimination is seldom proved by direct evidence).

In this case, Dr. Klug, a female surgical resident, has produced evidence that she was treated in a disparate manner, compared to male surgical residents.  Defendant has proffered evidence that Dr. Klug was terminated from the program due to her failure to complete her remediation plan requirements.  However, female surgeons corroborate her allegations that she was treated poorly compared to her male colleagues and that the general surgery department had a sexist atmosphere.  Such discriminatory conduct prevented and interfered with Dr. Klug's ability to acquire proper training as a surgical resident.  There are triable issues of fact related to the extent to which male residents were given better schedules, were assigned more favorable cases, and were treated with greater respect and collegiality than Dr. Klug, based upon her sex. Dr. Klug further has evidence that she was evaluated unfairly and that her ultimate termination from the program was based upon, at least in part, false information about her progress toward completing the requirements for her promotion to PGY3.

At this point, then, Dr. Klug has established genuine triable issues of fact that must be resolved by a jury.  "After the employer has articulated a nondiscriminatory justification for its employment decision, [ ] a plaintiff need not show more than the articulated reasons were implausible and, thus, pretextual.  A finding of pretextuality allows a juror to reject a defendant's

21

proffered reasons for a challenged employment action and, thus, permits the ultimate inference of discrimination."  Syllabus Pt. 5, *Barefoot*.

Further, there is evidence in the record sufficient to infer that Defendant's discriminatory animus toward Plaintiff was a motivating factor in his unfair assessment of her progress during her repeat PGY2 year, which was presented to the committees evaluating her for promotion.  In Syllabus Point 6 of *Skaggs v. Elk Run Coal Co., Inc.*, the West Virginia Supreme Court held that:

> [A] plaintiff states a claim for disparate treatment pursuant to the WVHRA if he or she proves by a preponderance of the evidence that a forbidden intent was ***a motivating factor in an employment action***.  Liability will then be imposed on a defendant unless it proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

(Emphasis added.)  As the Court stated in *Barefoot*:

> "[t]he plaintiff is not required to show that the defendant's proffered reasons were false or played no role in the termination, but only that they were not the only reasons and the prohibited factor was at least one of the "motivating" reasons. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (where employer shows a legitimate motive, the plaintiff need not show the prohibited factor was the sole or principal reason or the "true reason").

193 W. Va. at 487 n. 18, 457 S.E.2d at 164 n. 18.[2]

Dr. Klug has presented a *prima facie* case and has adduced evidence that Defendant's proffered reason for her termination was pretextual.  The record demonstrates that there are many triable issues of fact related to her sex discrimination and hostile work environment claims; therefore, Defendant's motion for summary judgment should be denied.

---

[2]   The Court also emphasized that "[i]t must be remembered the question [ ] is whether the record evidence reasonably supports an inference that [the defendant] did not act for nondiscriminatory reasons and not whether the evidence *necessarily* leads to the conclusion that [the defendant] did act for discriminatory reasons. *Id.* at 486-7, 457 S.E.2d at 163-4.  (Emphasis in original.)

**C.      There are Genuine Issues of Material Fact regarding Plaintiff's Disability Discrimination Claims against Defendant**

The same analytical framework presented related to Plaintiff's sex discrimination claims applies to her disability discrimination claims.  In this case, there is evidence that Defendant treated Plaintiff in a discriminatory manner, based upon his perception of her disability status. Instead of supporting Dr. Klug in her normal grief response after her husband's death, Defendant Mozaffari expected her to quickly recover and get back to normal. When she voiced her mental struggle with grief, he accused her of being too "emotional" and put her on leave until she could pass a "fit for duty" test by a "real" doctor and not a "palm reader."  He was insulting and uncaring in his actions.  Although Plaintiff was glad to have some extra time off to address her grief and obtain mental health treatment, she felt that she was treated as "damaged goods" upon her return to work and that Defendant and Dr. Yung's demeanor toward her was dismissive and discriminatory.  Her use of medical leave was treated as a weakness and she was treated as though she was "crazy" and not capable of performing in difficult or challenging surgical cases ("big boy cases").  At her appeals hearing in 2016, Dr. Denning asked Dr. Klug how she thought her "depression will affect her ability to become a surgeon" demonstrating that her perceived mental health issues were a motivating factor in the decision to terminate her from the program. (Klug Aff. ¶ 116.)

To establish a *prima facie* case of disability discrimination, a plaintiff must show that she is a disabled person within the meaning of the law, that she is qualified to perform the essential function of the job (either with or without reasonable accommodation), and that she has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises.  *Hosaflook v. Consolidation Coal Co.*, 201 W. Va. 325, 330 n.4

(1997).

To have the status of being a "protected person" who can assert a claim for disability discrimination, Dr. Klug must show that she is "a disabled person within the meaning of the law." *Skaggs v. Elk Run Coal Company,* 198 W. Va. at 71 n. 22, 479 S.E.2d at 581 n. 22. Significantly, in 1989 the definition of "disability" was amended by the West Virginia Legislature to expand protected status to include not only persons who actually have substantially limiting impairments, but also to persons who have a record of such impairments or who are "regarded as" having such impairments.[3] *W. Va. Code* §5-11-3(m).

As a result (and contrary to Defendant's contention), it is not necessary for Dr. Klug to prove that she was "actually" disabled at the time of her discharge. Rather, she may pursue a

---

[3]    As amended, the WVHRA provides that the term "disability" means:

(1)    A mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;

(2) *A record of such impairment*; or

(3) *Being regarded as having such an impairment*.

*W. Va. Code* §5-11-3(m). (Emphasis added.) Likewise, the regulations implementing the WVHRA provide that a "qualified person with a disability" is:

a person who has one or more physical or mental impairments that substantially limits one or more major life activities; a person who has one or more physical or mental impairments that does not substantially limit one or more major life activities, but that is treated by others as being such a limitation; a person who has one or more physical or mental impairments that substantially limits major life activities only as a result of the attitudes of others toward such impairment; *and a person who has no such impairments, but who is treated by others as having such impairments*.

*W. Va. C.S.R.* 77-1-2.8. (Emphasis added.) *See also Stone v. St. Joseph's Hospital of Parkersburg*, 208 W.Va. at 102, 538 S.E.2d at 399. The regulations further delineate the definition of "regarded as having an impairment" as meaning:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by another as being such a limitation;

(2) Has a physical or mental impairment that substantially limits major life activities, only as a result of the attitudes of others toward such an impairment; or,

(3) *Has none of the impairments defined above but is treated by another as having such an impairment*.

*Id.* (Emphasis added.)

"regarded as" disabled claim "without proving that she actually had a substantially limiting impairment." *Stone*, 208 W. Va. at 102, 538 S.E.2d at 400, quoting *St. Peter v. Ampak-Division of Gatewood Products, Inc.,* 199 W.Va. 365, 370, 484 S.E.2d 481, 486 (1997) (*per curiam*) (rejecting employer's argument that an employee was not a protected person under the WVHRA because he was allegedly not "actually limited" in a major life activity at the time of his allegedly wrongful termination).

Under this definition, "whether a person is a 'person with a disability within the meaning of the law' is ordinarily an issue of fact for a properly instructed jury or other fact-finder applying the appropriate definitional test set forth in the statute and implementing regulations." *Id.* at 102, 538 S.E.2d at 400, citing *Strawderman v. Creative Label Co., Inc.,* 203 W.Va. 428, 508 S.E.2d 365 (1998)

In light of the preceding discussion regarding the correct definition of "disability," Dr. Klug meets the definition of "disabled."   Defendant put Dr. Klug on medical leave until she could pass a "fit for duty" test, indicated the he believed her mental status prevented her from performing the essential duties of her position.   Upon her return to work, Dr. Klug suffered from adverse conditions, including unfair treatment, unfair evaluations, and ultimately, termination. Thus, she satisfies the first two prongs of her *prima facie* case.   In terms of the third prong, the issue again comes down to one of inferences.   Here, Dr. Klug will present evidence showing that after she returned to work following her medical leave, her residency training was impeded by discriminatory and retaliatory conduct by Dr. Yung, which was condoned by Dr. Mozaffari and that Dr. Mozaffari failed to address the unfair working conditions. Dr. Mozaffari also terminated her from the program, based upon a slanted and false evaluation of her performance.   In fact, Dr. Mozaffari and Donna Webb provided a false sense of security that she would be promoted to

PGY2 during her repeat PGY2 year by not advising her that she was in danger during her mid-point evaluation and sending her a memo suggesting she was on-track.  Based on the foregoing, Dr. Klug has met the third prong of her *prima facie* case of disability discrimination.  As the Supreme Court noted in *Conrad*, "the main issue is whether there was sufficient evidence from which to infer some linkage between the protected activities and the discharge.  Typically, though not necessarily, the inference arises from a temporal proximity between the two[.]"  198 W. Va. at 375, 480 S.E.2d at 814.

Likewise, in an action for retaliatory discharge under the WVHRA, Dr. Klug's burden is to prove by a preponderance of the evidence:  (1) that she engaged in protected activity; (2) that her employer was aware of the protected activities; (3) that she was subsequently discharged; and, (absent other evidence tending to establish a retaliatory motivation) (4) that her discharge followed her protected activities within such period of time that the court can infer retaliatory motivation.  *Brammer v. West Virginia Human Rights Commission*, 183 W.Va. 108, 110-111, 394 S.E.2d 340, 42 (1990).  Based on the foregoing analysis, Dr. Klug easily meets her *prima facie* burden.  She made a formal complaint (protected activity), Defendant was aware of this protected activity, she was subsequently discharged, <u>and</u> the discharge occurred within such close proximity (two weeks) to her protected activity that an unlawful discriminatory and retaliatory motive can be inferred.

As with her sex discrimination claim, the evidence presented by Dr. Klug (when viewed in the light most favorable to her) related to her disability discrimination claim demonstrates that Defendant's reason for discharging her was:  (1) pretextual; and/or (2) combined with an unlawful discriminatory motive. Based on the foregoing, Plaintiff has presented sufficient evidence to demonstrate that there is a genuine issue of material fact regarding her disability

discrimination claim.  In this context, Defendant's motion for summary judgment should be
DENIED.

### D.    There Are Genuine Issues of Fact Related to Plaintiff's Aiding and Abetting Claims

> West Virginia's highest court has previously applied the Restatement standard in
> the civil context, holding that "[f]or harm resulting to a third person from the
> tortious conduct of another, one is subject to liability if he knows that the other's
> conduct constitutes a breach of duty and gives substantial assistance or
> encouragement to the other so to conduct himself."

*Larry v. Marion Cnty. Coal Co.*, 302 F. Supp. 3d 763, 777 (N.D.W. Va. 2018)

In this case, Plaintiff has alleged that Dr. Mozaffari aided and abetted the discriminatory
conduct of Dr. Marco Yung and other male residents who subjected Plaintiff to a hostile work
environment.  Plaintiff repeatedly complained to Dr. Mozaffari that Dr. Yung was treating her
unfairly based upon her sex and that he retaliated against her after she made complaints about the
work environment.  She told Dr. Mozaffari that Dr. Yung was "out to get her," that he lied about
her, that he gave her cases to male interns, and that he was preventing her from receiving proper
training.  Dr. Mozaffari did not report any of these complaints to the Equity Office, nor did he
undertake any substantive or documented investigations until Dr. Klug finally made a formal,
written complaint that she submitted to the Office of Equity herself.  Then, Dr. Mozaffari still did
not do anything to investigate the complaint, such as taking witness statements, in order to
evaluate the extent of the discrimination that was alleged.  He just adjusted Dr. Klug's schedule,
gave Dr. Yung a reprimand for professionalism and disruptive behavior, and then informed Dr.
Klug that she was being discharged from the program two weeks later.  (Mar. 18, 2016 letter,
attached hereto at Ex. 24.)  Prior to the formal complaint that was submitted outside the School
of Medicine, Dr. Mozaffari knew that Dr. Klug felt that she was being discriminated against and

that Dr. Yung was retaliating against her.  Although Dr. Mozaffari did tell all the residents to stop looking at inappropriate videos in the call room, he did not undertake any investigation into who was looking at what and did not follow up to see if such conduct had ended.  Dr. Mozaffari encouraged and assisted in maintaining a discriminatory environment by refusing to substantively address inequities in the residency program, and specifically, in failing to prevent retaliation and discrimination by Dr. Yung against Dr. Klug.  "Aiding and abetting liability occurs when the actor 'knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.'"  *Larry v. Marion Cnty. Coal Co.*, 302 F. Supp. 3d 763, 777 (N.D.W. Va. 2018).

## V.     CONCLUSION

In evaluating the record – including Plaintiff's deposition testimony and the testimony of Defendants' representatives – it is abundantly clear that ***Dr. Rebecca Klug has presented substantial evidence – far exceeding the* de minimus *standard required – supporting her legal claims that Defendant violated the WVHRA.***  When this evidence and all reasonable inferences to be drawn from that evidence, are then viewed in the light most favorable to Dr. Klug, it is equally clear that Defendant's motion for summary judgment should be DENIED in its entirety.

In *Conrad v. ARA Szabo*, the West Virginia Supreme Court of Appeals emphasized that "the issue of discriminatory animus is generally a question of fact for the trier of fact, especially where a *prima facie* case exists."  198 W. Va. at 369, 480 S.E.2d at 808.  Therefore, the issue "does not become a question of law unless only one conclusion could be drawn from the record in the case.  In an employment discrimination context, the employer must persuade the court that even if all of the inferences that could reasonably be drawn from the evidentiary materials of the record were viewed in the light most favorable to the employee, no reasonable jury could find for

the plaintiff." *Id.* Because Defendant has failed to present the case "in the light most favorable

to the plaintiff," and because the record in this case could lead a rational trier of fact to find for

Dr. Klug on her claims, summary judgment is inappropriate.

Respectfully submitted,

**REBECCA KLUG**
Plaintiff
By Counsel

s/ Kristina Thomas Whiteaker

_____
Kristina Thomas Whiteaker (State Bar No. 9434)
THE GRUBB LAW GROUP, PLLC
1114 Kanawha Boulevard, East
Charleston, WV  25301
304-345-3356 (telephone)
304-345-3355 (facsimile)

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**REBECCA KLUG,**

     **Plaintiff,**

**v.**                                   **Civil Action No. 3:18-cv-00711**
                                           **Judge Robert C. Chambers**

**MARSHALL UNIVERSITY
BOARD OF GOVERNORS,
and FARID B. MOZAFFARI, an individual,**

     **Defendants.**

**<u>CERTIFICATE OF SERVICE</u>**

     I, Kristina Thomas Whiteaker, counsel for Plaintiff, do hereby certify that I have this 23rd day of April, 2021, electronically filed ***Plaintiff's Memorandum of Law in Opposition to Defendant Farid B. Mozaffari's Motion for Summary Judgment*** using the CM/ECF system, which will send a copy of this document, as well as notification of such filing, via electronic mail and United States mail, as follows:

Perry W. Oxley, Esq./L.R. Sammons, III, Esq.
Eric D. Salyers, Esq./David E. Rich, Esq.
Oxley Rich Sammons
Post Office Box 1704
Huntington, WV  25718

s/ Kristina Thomas Whiteaker

_____
Kristina Thomas Whiteaker (State Bar No. 9434)
THE GRUBB LAW GROUP, PLLC
1114 Kanawha Boulevard, East
Charleston, WV  25301
304-345-3356 (telephone)
304-345-3355 (facsimile)