## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

REBECCA KLUG,

     Plaintiff,

v.
                                   Civil Action No. 3:18-cv-00711
                                   Judge Robert C. Chambers

MARSHALL UNIVERSITY
BOARD OF GOVERNORS,
and FARID B. MOZAFFARI, an individual,

     Defendants.

### AFFIDAVIT OF REBECCA KLUG

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, TO-WIT:

     Rebecca Klug, first being duly sworn, states as follows:

     1.     I am the Plaintiff in a lawsuit against Marshall University Board of Governors and Farid B. Mozaffari, Civil Action No. 3:18-cv-00711.

     2.     This affidavit is based upon my personal knowledge.

     3.     I began the general surgery residency program on or about July 1, 2013.

     4.     In my first year, I definitely noticed some questionable behavior and unequal treatment of women in that year, but I was hoping that the environment would get better as I progressed and tried to ignore it.

     5.     During orientation, Dr. Adkins, came into the room, asked the male residents to leave, and then me and the other two women that "no one will be getting pregnant this year."

1

6.     I performed very well the first year and got good reviews and recognition for my accomplishments.

7.     I signed another contract for PGY2 for the period July 1, 2014 through June 30, 2015.

8.     I had a vacation scheduled for the last week of June 2014, however at the beginning of the month Dr.Mozaffari requested that I postpone until July 2014, the next academic year.

9.     When I pushed back on this issue, Dr. Mozaffari and Dr. Uffort forced me to agree with their request. They said, "the hospital was too busy," and it was for "patient safety."

10.     He also said I could not take vacation when Dr. Denning is in town, "he is the chairman and it would look bad." Finally, Dr. Mozaffari stated that we could go discuss the issue with my husband for his approval. I felt intimidated and humiliated, I conceded to their request, as I was not going to allow Dr. Mozaffari to use my husband in this manner.

11.     During PGY2, I worked more closely with Dr. Marco Yung, a superior resident.

12.     In or around July 2014, Dr. Yung, who was then a fourth year resident, took me in the call room by ourselves and yelled at me for about an hour about how I was "disrespectful" and told me that I handled it wrong after I sent an email to the program manager about my schedule.

13.     He was really angry and told me that if I complained to anyone else, he would "make my life hell."

14.     I was scared and intimidated and did not make any complaints about anything for the next six months because I was afraid of what Dr. Yung would do.

15.     During my mid-point evaluation in November 2014 with Dr. Mozaffari and Ms. Webb, I asked for advice on how to deal with the male interns, under my charge, who were not doing the work I assigned them and speaking to me in a disrespectful manner.

16.     Dr. Mozaffari told me that I should smile more and that I needed to find the "fine line between being a pushover and being a bitch," and that "we all went through it." but that I received good marks because, "we didn't expect much out of you intern year."

17.     Even though the work environment was hostile, including offensive and sexually explicit videos that male residents would play constantly in the call room, I was afraid to complain about it for a long time.

18.     In my experience, male residents were allowed greater leeway in how they acted and could get angry or throw tantrums, but anger was considered inappropriate if a female resident or physician demonstrated it.

19.     During meetings, one of the male residents would scroll through photos of women's breasts, make comments to other males, and then exclaim that it was for "research."

20.     Male residents would also play a video in which women were judged on a "crazy-hot matrix," suggesting that "hot" women were more "crazy" and discussing where women they knew would fit into that matrix.

21. One male resident told me details of a sexual affair he had with one of our female attending surgeons.

22. I felt really embarrassed and out of place due to this type of conduct.

23. Once during lunch, I was discussing some concerns I noticed in the residency program with Dr. Yung, he told me to quit complaining, that I was lucky I even had a job.

24. Dr. Yung had been watching the trailer from the movie, "50 Shades of Grey" in the call room, which I felt was embarrassing and inappropriate in the workplace.

25. I told him that I did not think it was appropriate, but he just ignored me.

26. Finally, around January 2015, I got up the nerve to complain to the Program Director, Defendant Mozaffari and the Program Coordinator, Donna Webb, about the hostile work environment and the sexually explicit videos.

27. I told Defendant Mozaffari and Ms. Webb that I was working in a "toxic environment" and that male residents were looking at disgusting, degrading sexual videos at one of the hospitals where I was the only female resident working.

28. Dr. Mozaffari did bring up the explicit videos in a meeting with residents and told people to stop watching them, but did it in such a way that everyone knew that I had to be the one who complained, since I was the only female at that hospital.

29. After these complaints, I was treated worse by Dr. Yung in particular, but also by Dr. Mozaffari.

30. For instance, I was given less favorable scheduling and was required to work more hours than male surgical residents.

31.     Over the Christmas and New Year's holiday 2014-2015, Dr. Yung granted the male interns extra days off leaving me the only resident to cover our surgical service for several days.

32.     I requested time off to attend counseling sessions with my husband, who was dealing with depression and wanted to me to go with him to some of his sessions but was rarely granted time off for those appointments.

33.     However, male residents were given more flexibility in their scheduling and were given time off when they requested it.

34.     For example, a male resident was granted nearly two weeks off for the loss of his father-in-law. I was granted only one day off for my father's funeral.

35.     I was not told during my first PGY2 year that there were any problems with my performance until I was told that my contract was not going to be renewed.  I appealed that decision and won because I had not been given any notice.

36.     On April 20, 2015, I met with Defendant Mozaffari and he gave me a remediation plan setting forth specific requirements to complete my PGY2 year.

37.     I understood that I would advance to third year if I complied with the requirements of the plan listed by June 2015.

38.     I had every intention of meeting those requirements.

39.     I planned to meet those requirements by the required time frame.

40.     My husband committed suicide soon after that on May 12, 2015.

41.     I took two weeks off from work initially and then I was contacted by Dr. Kamran Abolmaali, administrative chief resident, and told that if I didn't come back my position would be in jeopardy.

42.    He assured me I could have more time off for grieving during the next academic year. They really needed me back soon, as the residency program was understaffed during the month of June 2015 because several residents were on vacation or graduating from the program.

43.    I was never given an option to take a six month or year of medical leave and come back, even though I know now that that was something that Dr. Arrington brought up.

44.    My rotation was scheduled for St. Mary's, the toughest of all rotations under usual circumstances. This month of June 2015 was particularly tough, as we were understaffed due to resident vacations.

45.    Some of the other residents told me that they had offered to take my place at St. Mary's Hospital. That would place me at the VA or Cabell Huntington Hospital, with less responsibility, more personal support and fully staffed, but Dr. Mozaffari said that I was going to have to "sink or swim."

46.    I went back to the residency program on June 2, 2015.

47.    When I came back, no one talked to me about my husband and it was "back to business" as usual.

48.    I was told that Dr. Mozaffari told the senior residents not to discuss anything about the loss of my husband with me.

49.    At the end of the year "Resident Roast," Dr. Uffort (a male) presented me with some massaging foot slippers and said that "Dr. Klug forgets she is in a surgical residency program and she requests extra time off to relax and massage her feet."

50.    I had only taken off work for two weeks related to my husband's death.

6

51.    I was dismayed and embarrassed at the suggestion that she was lazy for taking time off after her husband's death.

52.    At graduation on June 17th, 2015 I received a diploma for successful completion of PGY-2 year of residency; I believed this confirmed that I would become a PGY3.

53.    I did not feel like Dr. Mozaffari was sympathetic to my emotional distress.

54.    The work environment was really stressful and Dr. Yung, who was then Chief Resident, was treating me in a discriminatory and hostile manner.

55.    I sent Dr. Mozaffari and email on June 20, 2015, in which I told him about all the problems with Dr. Yung and how he was overly critical, would not listen to me and let everyone know that he did not want to work with me.

56.    I also wrote that Dr. Yung would not let me call Dr. Mozaffari about a patient and that he would not respond to her when she was trying to communicate with him about patients. This same behavior happened when I was an intern.

57.    A few days after I sent that email to him, Dr. Mozaffari called me in and told me that he was getting reports from Dr. Yung that I was coming in late or not showing up to work.

58.    That was not true, and I tried to tell him that Dr. Yung was lying to get me in trouble because he was mad that I complained about him.

59.    Defendant Mozaffari would not listen to me and said that I was going to be held back to repeat PGY2 again.

60.     He also said that since I was "lying" and was too emotional that I was going to have to go on medical leave until I was cleared by a psychologist as being "fit for duty."

61.     I agreed that I needed additional time off to grieve and wanted to go to counseling.

62.     I went on medical leave and got treatment for major depressive disorder, moderate and recurrent, generalized anxiety disorder, and a normal grief reaction.

63.     I was released to return to work about a month later.

64.     I intended to appeal the adverse decision to not promote me to third year for the second time, but Donna Webb and  several surgeons, including Dr. Mozaffari, suggested to me that repeating the second year would give me more time to heal and that it would be easier to just repeat second year and then go on to third year.

65.     I agreed to return to PGY2 for a "do-over" year.

66.     After my medical leave on August 2, 2015, I returned to the residency program as a second year (PGY2).

67.     Throughout this year of residency, I believe that I was treated differently than similarly situated male residents in that I was given less favorable assignments and was judged more harshly. I was placed on night-float more than my peers, which decreased opportunities for operating room time and experience needed performing general surgery cases.

68.     One male resident was performing poorly clinically, he was moved to the VA for the remaining ten months of the year. This rotation has significantly smaller responsibilities and affords the resident ample free time compared to other rotations. I felt

8

he was treated beneficially, as this extra time and less responsibility facilitated his academic and clinical skills improvement.

69.   I believe that this discriminatory treatment was based upon my sex and because that I was deemed to be "crazy" and "emotional" after I took medical leave.

70.   Chief Resident Dr. Yung's abusive and retaliatory behavior escalated during this time frame.

71.   For example, Dr. Yung took cases away from me, reassigned my cases to male interns, and verbally assaulted me in front of medical students, other surgical residents, and hospital staff.

72.   Dr. Yung acted like I was not to be trusted with patients and let everyone know that he did not want to work with me at all.

73.   At the same time, he prevented me from obtaining the training I should have received as resident by steering cases away from me.

74.   At times, Dr. Yung would even physically position his body between me and attending physicians so I could not communicate with them as we gathered to discuss cases.

75.   I believe that Dr. Yung impeded my development as a surgeon by his discriminatory treatment of me.

76.   I also think that behavior had an effect on how other surgeons viewed my abilities.

77.   Three surgeons at the VAMC, Drs. Meuer, Yudina and Finley, stated that they noticed I was being mistreated by Dr. Yung and not in the operating room as much as they would like to see me.

9

78.     For instance, another male surgeon excused me from a surgical case, saying, "This is a big boy case."

79.     I complained about this unfair treatment on many occasions, verbally, and in writing to various Marshall employees and faculty members, including Dr. Mozaffari, Dr. Wehner, Ms. Webb, Dr. Denning, Dr. Arrington, Dr. Wolfer, and Dr. McCagg. Dr. Meuer, Dr. Finley.

80.     I was required to meet with my mentor Dr. Arrington, on a regular basis. The weekly meetings were held, however there were occasions Dr. Arrington needed to cancel the meeting or they would not fit into my required work hours.

81.     The meetings with Dr. Arrington were not useful for my academic growth. We typically discussed how I was dealing with the stressors of residency, interactions, or problems I was facing or concerns I had regarding the other residents or the program. She frequently discussed issues she was having with the male residents herself.

82.     Social workers, physician assistants, nurse practitioners and nurses noticed and told me that Dr. Yung was treating me poorly; however, I do not think they were ever questioned by the administration.

83.     I think that Dr. Yung was angry at me for complaining about him to the Program Director and that he retaliated against me by making it more difficult for her to achieve my goals and training requirements.

84.     As a result of this discriminatory conduct, I did not receive the educational and clinical experience that I should have been receiving.

85.     My complaints were not adequately addressed by Marshall.

86.     For example, during the second PGY2 year, I was supposed to switch to the VA as part of the regular rotation, and an intern called her to tell me that Dr. Yung found out I was coming there and "flipped out."

87.     The intern said that he was "going to get me" and that also told me that I needed to "watch my back."

88.     She reported this to Defendant Mozaffari who did not address it as far as I know.

89.     At the January 4, 2016, mid-point evaluation, Dr. Mozaffari told me that I need to discuss all complaints with Dr. Arrington, so she can help me understand interactions I had with surgeons or other residents.

90.     At that meeting, I again told Dr. Mozaffari about the hostile work environment and told him that I did not feel that he was supporting me in my training.

91.     I did not trust that he had my best interests at heart.

92.     I felt that I had no choice but to make a formal complaint to the University in writing, because I did not think that I was being treated fairly and I had nowhere else to turn.

93.     On February 8, 2016, I made a formal, written complaint about Defendant Mozaffari and Dr. Yung's abusive and discriminatory treatment and sent it to Dr. Denning, Defendant Mozaffari, Dr. Harrison, and Dr. Arrington.

94.     On or about February 15, 2016, I was supposed to meet with Debra Hart, the Title IX coordinator for Marshall University.

95.     However, the University was on a delay that day due to weather.

96.     Ms. Hart emailed me and asked I wanted to reschedule the meeting and also for my telephone number.

97.     I responded to Ms. Hart that she would be able to attend the meeting and provided her telephone number.

98.     Ms. Hart called me, and we talked on the telephone for approximately thirty minutes.

99.     During that conversation, I described my complaints against Dr. Yung and Defendant Mozaffari.

100.    I also detailed many of the instances in which I either submitted a written or verbal complaint to Dr. Mozaffari, Donna Webb and/or Dr. Wehner.

101.    At the end of the phone call, Ms. Hart told me to send her a complete written complaint, along with the electronic complaint form that she could find on the website of the Office of Equity Programs.

102.    On the form, for the category the alleged discrimination was based on, she instructed me to check the "other" box, as there were several things going on in the complaint.

103.    I sent the form and a three-page narrative after the cover sheet dated February 17, 2016.

104.    After receiving the Complaint, Ms. Hart called me on February 17, 2016.

105.    She asked me to send the three additional pages in a separate email.

106.    During that conversation, I told her that when I checked "No" on the electronic form in the section asking if the behavior was continuing, it was in error.

107.    She replied, "It's okay, I understand what you mean."

108.    On March 4, 2016, Donna Webb, Surgery Resident Coordinator, sent me an email to follow up on the December midpoint evaluation in which she had been told that there was only one more task needed to complete for her residency requirements that year.

109.    I completed the task included in the email.

110.    I was not told that there were any other requirements that I was missing to complete PGY2 and I was not warned that there were any issues.

111.    On March 18, 2016, I received a response to my complaint from Defendant Mozaffari indicating that Dr. Yung had been reprimanded and that our schedules would be changed so we would not work together.

112.    I was pleased with not having to work with Dr. Yung anymore, but then I was told that I was being terminated from the program ten days later.

113.    I was blindsided, since I had not been told at her mid-point that my position was at risk and believed that I was on-track for promotion.

114.    Donna Webb texted me that on Monday, March 28th, 20016, Dr. Mozaffari would like to meet with me in the surgery conference room. Drs. Denning, Arrington Mozaffari were present as was Crystal Tolley. Dr. Mozaffari presented me with a letter that my contract would not be renewed for the upcoming academic year.

115.    He stated that I was to finish all rotations and requirements professionally to conclude June 30th, 2016 I would be required to turn in all department property. He asked if I had any questions, I asked if he could provide specifics or reasons for not renewing my contract. He replied: "The C3 committee decided and this is final. We are not going to sit here and go back and forth and argue about things."

116.   I was granted a meeting with the C3 committee to appeal their decision for the non-renewal of my contract. I was not provided with any specific reasons or details they used to come to this decision. When I asked for these reasons, Dr. Denning replied by asking the following questions: Do you want to be a surgeon? Do you think you have the stamina to become a surgeon? How do you think your depression will affect your ability to become a surgeon?

117.   I specifically asked for the evidence that existed for the reasons provided for the non-renewal of contract. I was not provided any evidence to substantiate their decision and reasons for the decision.

118.   The only thing that had changed since my mid-point is that I made the formal complaint to the Title IX office.

119.   I was never provided a copy of the "timeline" that Defendants have produced in this case at the time of my notification that I was being terminated or during the appeals process.

120.   That document contains many errors and indicates that I did not complete tasks that I did complete.

121.   If I had known that Marshall personnel were relying on inaccurate information, I could have proved that I had met the requirements.

122.   The timeline created by Dr. Mozaffari and Donna Webb made the entire evaluation process unfair and discriminatory.

123.   I believe that I was subjected to different rules and/or sanctions, based upon her sex and disability status.

14

124.    Male residents with low test scores and similar or worse performance than I had were promoted in the program and completed the surgical residency program.

125.    I completed all the criteria for PGY2 and earned a certificate of completion.

126.    I actually have two certificates of completion for PGY2, since I was awarded one the year before also.

127.    Since being discharged from the surgical residency program, I have not been able to find a placement at another institution.


AND FURTHER AFFIANT SAITH NAUGHT.

REBECCA KLUG

Taken, subscribed and sworn to before me this _23_ day of April 23, 2021.

My commission expires _June 13, 2022_ .


NOTARY PUBLIC

OFFICIAL SEAL
Amanda McMillen
Notary Public
State of West Virginia
My Commission Expires
June 13, 2022
104 Garnett Drive
Dunbar, WV 25064