**In The Matter Of:**

*Klug v.*
*Marshall University Board of Governors, et al.*

COPY

*Farid B. Mozaffari, M.D.*
*February 3, 2020*

*Mountain State Reporting LLC*
*2505 Lakeview Drive*
*St. Albans, WV 25177*
*304-727-8590*

Original File MozaffariFarid.prn
Min-U-Script® with Word Index

Page 5

1    A    Yes.
2    Q    And of course if you need a break at any time
3 let me know. I'll be happy to do that.
4    A    Okay.
5    Q    Did you review any documents in preparation
6 for your deposition today?
7    A    I have.
8    Q    Do you recall what documents you reviewed?
9    A    I reviewed some of the documents as far as
10 Dr. Klug's performance and midterm evaluations.
11    Q    Okay. What else?
12    A    And the deposition that she gave.
13    Q    Dr. Klug's?
14    A    Yes.
15    Q    Did you review the transcript of Dr. Wolfer's
16 deposition?
17    A    I have not.
18    Q    What about Dr. McCagg?
19    A    I have not.
20    Q    Can you describe for me your educational
21 background?
22    A    Yes. How far back do you want me to go?
23    Q    Just starting with undergrad.
24    A    Undergrad, I graduated from UCLA. And then

Page 6

1 for medical school I graduated from Cambridge Oversees
2 Medical Training Program. I did an internship at University
3 of Kentucky. I finished my general surgery residency here
4 at Marshall. I went to Medical College of Georgia for
5 plastics fellowship, plastic surgery fellowship.
6    Q    Of Georgia?
7    A    Medical College of Georgia.
8    Q    Okay. Where are you currently employed?
9    A    I have my own practice in San Diego.
10    Q    What positions did you hold at Marshall?
11    A    I was first an assistant professor and then
12 I was promoted to associate professor. I was part of the
13 SCORE Curriculum Committee for two years. I was clerkship
14 director for medical students.
15    Q    You were the what director?
16    A    Clerkship director. And then I became the
17 program director for the residency.
18    Q    When did you become program director?
19    A    I believe officially I became program
20 director July 1, 2014.
21    Q    What are the job responsibilities of a
22 program director at Marshall?
23    A    Specifically or generally as to –
24    Q    What did you do?

Page 7

1    A    Make sure that the residency program was in
2 compliance with all the rules and regulations of ACGME, the
3 American Board of Surgery, and Marshall specifically. I was
4 in charge of residency as far as all the residents, the
5 well-being of the residents, and how the program was run
6 generally.
7    Q    Who was your direct supervisor?
8    A    That would be the chairman, Dr. Denning.
9    Q    And who were your direct reports, as in who
10 reported to you as program director, if anyone?
11    A    Directly reported to me, there wasn't
12 anybody who was required to directly report to me other than
13 the residents.
14    Q    Where was Dr. Wehner in the management
15 structure?
16    A    She's in charge of all the residency
17 programs.
18    Q    How many residency programs are there,
19 approximately?
20    A    I would have to count them. I don't know
21 exactly how many there are.
22    Q    But you were program director for general
23 surgery; is that right?
24    A    Yes.

Page 8

1    Q    Was Dr. Wehner above you?
2    A    Yes.
3    Q    Did anyone evaluate your job performance
4 when you were a program director?
5    A    The residents would.
6    Q    Besides the residents?
7    A    The chairman.
8    Q    Dr. Denning?
9    A    Yes.
10    Q    Did you get written evaluations?
11    A    I do not recall. We did written get
12 evaluations as a faculty, and part of that was the other
13 positions and appointments that we had held, so yes, it was
14 in writing.
15    Q    Who did that?
16    A    Dr. Denning.
17    Q    How did the residents evaluate you?
18    A    Written and verbally. At the end of the year
19 they would evaluate the program, and one of the things that
20 they evaluated in the program was also to evaluate the program
21 director.
22    Q    Okay. Was that the resident surveys or
23 something else?
24    A    The resident survey directly has to do with

Case 3:18-cv-00711   Document 144-5   Filed 04/23/21   Page 3 of 11 PageID #: 1137

Farid B. Mozaffari, M.D.
February 3, 2020
Klug v.
Marshall University Board of Governors, et al.

Page 21

1 citation and a major deficiency in our program that our
2 residents were not passing the boards on the first attempt
3 a sufficient percentage of the time, and that our program was
4 in danger of closing down if I did not make an improvement
5 in board pass rates. So I made sure that education -- not just
6 ABSITE scores, but education became a big focus of the
7 program.
8   Q   How did you do that? How did you promote
9 education besides the change to the score levels?
10  A   I made sure that the resident had good
11 protective time to study. I made sure that they had available
12 materials for them to study. I revamped the entire
13 educational way that we were requiring residents to study and
14 told them up front that it was expected of them to be reading
15 and have the book knowledge, that simply doing well on the
16 floor or doing well in the OR was not going to be sufficient
17 to get them through the program, and we made available to them
18 databanks and practice tests, question banks, online modules,
19 textbooks.
20  Q   Where did you get the question bank
21 information? Where do the question banks come from?
22  A   There are programs that are available
23 nationally to all the programs with question banks.
24  Q   How did you make those available?

Page 22

1   A   We signed up our institution so the residents
2 would have access to them online.
3   Q   Is that something the residents would have
4 to purchase individually?
5   A   We purchased it for them. If we had not,
6 then they could have purchased it individually.
7   Q   Okay. Do they have like preparation
8 courses? Is that what it's like, practice tests?
9   A   There are online practice modules, being
10 practice tests.
11  Q   Okay. And is that something you paid for?
12  A   The program paid for it, yes.
13  Q   That's what I mean. Not you personally, but
14 the program paid for those practice tests?
15  A   Yes.
16  Q   Did you ever make any exceptions to the
17 minimum ABSITE score in terms of promotion?
18  A   I don't think I understand your question.
19  Q   Did you ever promote somebody who didn't make
20 the minimum score that you set?
21  A   Yes.
22      MR. OXLEY: Objection to form. Go ahead and
23 answer the question again.
24      THE WITNESS: Yes.

Page 23

1      BY MS. WHITEAKER:
2   Q   Okay. And why would you make exceptions to
3 that?
4      MR. OXLEY: Just for clarification, when you
5 say "you," are you talking about the C3 Committee or him
6 personally?
7      MS. WHITEAKER: I'm talking about the
8 program, I guess.
9      MR. OXLEY: Okay. When you say "you"?
10     BY MS. WHITEAKER:
11  Q   Yes. I mean ultimately I think as program
12 director, you had the final say in whether somebody got
13 promoted or not. Isn't that right?
14  A   Yes. ACGME is very clear that the ABSITE
15 score by itself cannot be used to hold a resident back or fire
16 a resident from the program. They say that it can be used
17 in conjunction with other criteria, but not just by itself.
18  Q   Okay, thank you. So there were times where
19 you would promote a resident who didn't meet your minimum
20 ABSITE score, right?
21  A   Yes.
22  Q   And what are the occasions upon which you
23 would do that?
24  A   If they had no other deficiencies.

Page 24

1   Q   And tell me, when you say deficiencies, what
2 are the other deficiencies that they could have that would
3 prevent them from progressing forward?
4   A   General medical knowledge, performance on
5 the floor, performance in the OR.
6   Q   Evaluation?
7   A   Evaluations. And each resident who did not
8 perform well on the ABSITE was given a remediation, and if
9 they had completed the remediation.
10  Q   Okay. What do you mean by remediation?
11  A   They were given specific steps that they
12 needed to complete by a certain deadline and things that were
13 expected of them to do.
14  Q   How does a resident get onto remediation, or
15 how do they qualify for remediation is a better way to say
16 it?
17  A   If we've identified an area where they were
18 substandard or not up to par, then we would put them on
19 remediation. It had to be something substantial. It wasn't
20 for just a minor thing.
21  Q   Is a resident automatically on remediation
22 if he or she gets below a certain ABSITE score?
23  A   Yes.
24  Q   Do you remember what that level was for the

Case 3:18-cv-00711   Document 144-5   Filed 04/23/21   Page 4 of 11 PageID #: 1138

Farid B. Mozaffari, M.D.
February 3, 2020
Klug v.
Marshall University Board of Governors, et al.

### Page 45

1  Q  Okay. And then the next page in that packet
2  is an e-mail March 18, 2015, and it mentions a Robbie Ashworth.
3  What does he do?
4  A  I believe he's a person involved with the
5  H.E.L.P. program that's run through Marshall.
6  Q  What is the H.E.L.P. program?
7  A  It's a program that's meant to help students
8  who - if there is a way that they can help them improve their
9  scores or their academic performance.
10  Q  Do you know if she went to that meeting?
11  A  I do not know.
12  Q  Did you ever have any subsequent
13  conversations with Mr. Ashworth?
14  A  I do not recall.
15  Q  And the next couple of pages are about that
16  H.E.L.P. program, I think. And then if you turn over a few
17  more pages, you'll see an e-mail from Dr. Klug to Dr. Wehner.
18  A  Uh-huh.
19  Q  Do you see that? Did you get a copy of this?
20  MR. OXLEY: What page are we on?
21  MS. WHITEAKER: This is – I don't know how
22  many pages in, but it says "Klug 003235" at the bottom.
23  THE WITNESS: I do not recall at this time
24  whether I was given – I don't think I was given a copy of this

### Page 46

1  letter.
2  BY MS. WHITEAKER:
3  Q  In this letter Dr. Klug talks about being in
4  a hostile work environment. Do you recall her complaining
5  about that to you?
6  A  I remember she talked to me about it, but she
7  did not use the words "hostile work environment."
8  Q  What words do you recall her using?
9  A  She said that she feels that other residents
10  are not working with her, that she feels that sometimes she's
11  not part of the team.
12  Q  Did she complain about any of the residents
13  in particular?
14  A  At this point, I'm not sure if she brought
15  up any - I don't recall if she brought up any particular
16  residents.
17  Q  Is there a specific complaint that you can
18  recall?
19  A  She did have a formal complaint regarding Dr.
20  Marco Yung that she turned in.
21  Q  Other than that formal complaint, and we'll
22  get to that, but I'm trying to be chronological somewhat
23  here -
24  A  Sure.

### Page 47

1  Q  - to help us all keep track of what's going
2  on. So we'll get to the formal written complaint.
3  A  Okay.
4  Q  But before that, do you recall a verbal
5  complaint?
6  A  She had complained to me regarding Dr. Wolfer
7  and Dr. McCagg, that they were not getting along in the ICU
8  and they were having discussions among themselves in front
9  of everybody, and she felt very uncomfortable being in the
10  middle of that.
11  Q  Just to be clear, Dr. Wolfer and Dr. McCagg
12  were arguing with each other?
13  A  Yes.
14  Q  Is that what you mean?
15  A  Yes.
16  Q  Okay. And back to the exhibit, the e-mail
17  we were talking about, I just want to make sure we're clear.
18  You said you don't remember ever seeing this e-mail before?
19  A  I do not.
20  Q  Did anyone talk to you about her saying that
21  she was in a hostile work environment at this time in March
22  of 2015?
23  A  I do not ever remember – I do not remember
24  those words being used, that she was in a hostile work

### Page 48

1  environment.
2  Q  Do you remember Dr. Wehner telling you that
3  Dr. Klug had complained about the work environment being toxic
4  or otherwise terrible at this time?
5  A  I remember her telling me that, and I told
6  her that I don't necessarily agree with Dr. Klug that the
7  environment was toxic, as I had not heard that complaint from
8  any other resident.
9  Q  Did you do anything to investigate that?
10  A  Anytime any complaint came up to me regarding
11  any of the residents or anything that the residents were
12  involved in, I always did an investigation and I always talked
13  to the people to make sure that – I strongly believe that
14  there's always two sides to the story and I need to go in and
15  listen to both sides before I can make a decision. So if a
16  complaint was ever brought up to me, I made sure that I
17  investigated it. I'm sure I did in this case as well.
18  Q  Okay. What did you do?
19  A  As far as what specifically?
20  Q  To investigate her claim that the workplace
21  was toxic.
22  A  I talked to the other residents.
23  Q  Who did you talk to?
24  A  Residents who were who peers, residents who

**Page 65**

1  Q   How was she when she came back? Were you
2  there, or were you out of town?
3  A   I do not recall exactly the day she came back
4  whether I was there or was out of town.
5  Q   I keep saying that because for some reason
6  I have in my head that you were out of the country at some
7  time during that time period.
8  A   I think I was.
9  Q   Okay. And I don't remember when it was
10 either. Do you recall working with her when she first came
11 back?
12 A   Yes.
13 Q   What do you remember about it?
14 A   I remember we had a surgery together and she
15 was there during the surgery, and I remember talking to her
16 afterwards. And I would frequently be asking her colleagues
17 how she was doing, you know, making sure that – asking
18 regarding her well-being and how she's doing.
19 Q   Do you recall her working on a gunshot wound
20 to the head case when she first got back?
21 A   I was made aware of that after the fact.
22 Q   Did you talk to her about it?
23 A   I don't think I directly talked to her about
24 it.

**Page 66**

1  Q   Do you recall telling her that she was going
2  to have to sink or swim?
3  A   I never made that comment to her.
4  Q   Did you say that to anybody else?
5  A   No.
6  Q   Do you recall telling her that worse things
7  were going to happen in her life than this?
8  A   I did not say that. I remember once we were
9  talking afterwards and she said that it was a horrible thing
10 that happened to her, that nothing worse can possibly happen
11 to her or anybody.
12     And I made the comment that "Be careful
13 saying that. From personal experience, every time I have
14 told myself it can't get any worse than this, it did." I was
15 just talking to her from my personal experience. I never made
16 any – I did not tell her that a worse thing will happen to
17 you. I just gave her some advice. I was trying to help her.
18 I was trying to encourage her to be strong, but at the same
19 time, you know, I was talking to her from my own personal
20 experience, and I specifically remember that I said, "Every
21 time I have told myself it can't get any worse than this, it
22 did." I did not say to her, "Worse things will happen to you."
23 Q   Do you remember the context of that
24 conversation, what you guys were talking about?

**Page 67**

1  A   I was asking her specifically how she's
2  doing, does she feel that she made the right decision to come
3  back at the time that she did because, you know, I thought
4  that she had come back too soon.
5  Q   Did you tell her that she was too emotional?
6  A   I don't think I made that comment, that she
7  was too emotional.
8  Q   Did you tell her you thought she came back
9  too soon?
10 A   I did.
11 Q   Okay. Did she agree with you?
12 A   At that time I don't think she agreed with
13 me on it. I don't think she said anything with that
14 conversation, whether she agreed with me that she came back
15 too soon or not.
16 Q   Okay.
17 A   I know in her deposition, she said that she
18 came to me and informed me that she thinks that she came back
19 too soon. I think it was the other way around. I think we
20 were all telling her that we think she came back too soon.
21 And when she came back and we talked about it, she said, "I
22 agree. I came back too soon."
23 Q   Okay. Who is "we" in that context?
24 A   Me, Donna Webb, Dr. Abolmaali, other

**Page 68**

1  residents that were working with her at that time.
2  Q   Did you think that she was not mentally fit
3  to do her job?
4      MR. OXLEY: Objection. Go ahead and
5  answer, if you can.
6      THE WITNESS: It was not for me to determine.
7  I'm not a mental professional, a mental health professional,
8  to determine mentally whether she was ready to come back or
9  not, but it was obvious that emotionally she was not ready.
10     BY MS. WHITEAKER:
11 Q   Did you tell her that she needed to take time
12 off until she got clearance from a mental health professional
13 to come back?
14 A   No. I told her that she needed to take more
15 time off and to recover from this and told her that before
16 she come – and I told her that I want her to see a mental health
17 professional, someone who is a professional and that's what
18 they do for a living, that they've been trained properly in
19 such.
20     And I made the comment that "By mental health
21 professional, I don't mean a Tarot reader or a palm reader,"
22 just to clarify what a mental health professional was. I
23 think she took offense to that. What I meant was that I wanted
24 it to be board certified or somebody with residency training

Case 3:18-cv-00711 Document 144-5 Filed 04/23/21 Page 6 of 11 PageID #: 1140

Farid B. Mozaffari, M.D.
February 3, 2020
Klug v.
Marshall University Board of Governors, et al.

Page 69

1 who does this for a living on a daily basis, a mental health
2 professional.
3     Q    Did you have reason to think she would go to
4 a Tarot card reader or a palm reader?
5     A    I did not have any reason, but I wanted to
6 make sure that -- I used that as an example, that there are
7 psychiatrists and psychologists, that I wanted to go ahead
8 and for her to go to a doctor.
9     Q    Okay. There's a letter in front of you, I
10 think, that's dated June 24, 2015.
11    A    June 24, 2015?
12    Q    Yes, that's right.
13    A    Uh-huh. So to finish answering your
14 question --
15    Q    Go ahead.
16    A    It is that I said that "We want you to see
17 a therapist and I want them to determine that mentally you're
18 ready to come back."
19    Q    Okay. And that's what you put in the letter
20 on June 24, 2015, that you gave her, right?
21    A    Yes.
22    Q    And, in fact, you recommended that she go see
23 Dr. Gary Patton?
24    A    I did. The GME office had recommended that

Page 70

1 because that's who they would send all their residents to.
2     Q    Okay.
3     A    But I made sure that I told her that she can
4 go to somebody else if she chooses to. I did not tell her
5 that that's the only person that you can go see.
6     Q    Okay. And part of it was she was required
7 to have an initial evaluation by a qualified mental health
8 counselor or therapist and have ongoing counseling while she
9 was off, right?
10    A    Yes.
11    Q    And then to return she had to have a statement
12 stating she was fit to return, correct?
13    A    Yes. The first time she came back, I believe
14 she came back too soon, and I wanted to go ahead and make sure
15 that we have an expert, someone who -- a mental health expert
16 that thinks that she can continue to handle the rigors of
17 general surgery, that she's mentally and emotionally ready
18 to come back.
19    Q    Well, I mean wasn't it understandable that
20 she would be experiencing acute grief after the suicide of
21 her husband?
22    A    Yes.
23    Q    Would you expect a person to just get over
24 that completely very quickly?

Page 71

1     A    No. And that's why I was surprised when she
2 decided to come back after two weeks. A lot of people were
3 surprised when she came back.
4     Q    I guess what I'm saying is it's not the kind
5 of thing you could get over within a matter of weeks, or even
6 months, is it?
7           MR. OXLEY: Objection. Go ahead and answer
8 if you can.
9           THE WITNESS: Again, I told Dr. Klug that she
10 can determine that, she should be determining that, not us.
11          BY MS. WHITEAKER:
12    Q    Did she go to the counseling with Dr. Patton?
13    A    Yes, she did.
14    Q    Did you talk to Dr. Patton about Dr. Klug?
15    A    I did talk to Dr. Patton regarding Dr. Klug,
16 as I had told her I would.
17    Q    Did she give you permission to talk to Dr.
18 Patton about her therapy and treatment?
19    A    Right over here in the letter that she has
20 signed, Dr. Klug, I said, "If you choose Dr. Patton, he will
21 also be made aware of return-to-work report requirements."
22 So I did tell her and I did provide her -- and I know I documented
23 it somewhere. I'm not sure if it's in this documentations
24 or not -- that I will be contacting whoever she chooses to see

Page 72

1 to make them aware of the requirements of our concerns and
2 what we expect for her to be ready to do once she came back.
3           In my discussion with Dr. Patton, I did not
4 discuss the treatments or what they were talking about, or
5 inquire of exactly what they were talking about and things.
6 So I believe I talked to him once just to make sure that, you
7 know, for him to know what was our expectations of what she
8 would be required to do once she came back.
9     Q    Have you reviewed the chart that he
10 provided --
11    A    I have not.
12    Q    -- in this case?
13    A    I have not.
14          MR. OXLEY: Looking ahead, if I may, we're
15 at 12:30, 12:25 right now. What are we looking at, a few more
16 hours?
17          MS. WHITEAKER: I would say yes.
18          MR. OXLEY: Okay. So we probably should
19 break for lunch and then come back at say 1:30, 1:35. Now,
20 you don't have to break right now if you want to keep going
21 for a little bit longer. I don't want to interfere with that.
22          MS. WHITEAKER: Let me ask a few more
23 questions about this and then we'll take a break.
24          MR. OXLEY: That's fine.

Page 85

1 These are the things that are still outstanding from the first
2 time we told her, a year before, that they needed to be done,
3 and they still have not been done.
4  Q  Well, some of them have not been done?
5  A  Some of them have not been done.
6  Q  Some of them have been done?
7  A  Yes.
8  Q  Okay. On the second page under "Procedures"
9 it says, "Has logged 180 cases," and then there's a little
10 bit of handwriting. What does that say?
11  A  "I discussed that with her. She said that
12 she has more cases to log in, she just has not logged them
13 in yet."
14  Q  Does it say, "Will log them today"?
15  A  That's what it says.
16  Q  Okay.
17  A  Again, our understanding was that she was
18 going to log cases and stay up to date on cases, logging in
19 cases.
20  Q  Right. And that's the same issue we talked
21 about before, right?
22  A  Yes, uh-huh.
23  Q  And then the last page you've got the Plan
24 of Action.

Page 86

1  A  Yes.
2  Q  And then it looks like you added in the item
3 "Cannot violate ADR work limit, including 25 hours." What
4 does it say after that?
5  A  "26 hours consecutively. If so, contact
6 me."
7  Q  Okay. And it looks like you both signed
8 this, and then there's some additional writing at the bottom.
9 Those are your handwriting, too, aren't they?
10  A  Yes.
11  Q  Can you please read that to me, just so I'm
12 sure what it says?
13  A  Below the signatures?
14  Q  Yes, please.
15  A  "Asked her other residents to help Dr. Klug
16 in communicating with other residents and if they see her
17 withdrawn, talk to her, bring her back and help her talk."
18  The next point is "I will abstain from voting
19 on Dr. Klug's promotion or actions deemed necessary by the
20 C3 Committee."
21  Q  Okay. And is that to reflect something you
22 guys talked about?
23  A  Yes, in that meeting, and Dr. Klug said that
24 she does not trust me, she thinks that I cannot be trusted,

Page 87

1 that I have done horrible things to her, and I did not agree
2 with what she said.
3  And in order to make sure that there was no
4 even presumed conflict or something with the accusations that
5 she was – allegations that she was making that I'm out to get
6 her, I told her I will remove myself from making those
7 decisions and I would follow strictly the C3 Committee
8 evaluations and recommendations.
9  I told her that you don't have to convince
10 me, that you can move on and become a safe and independent
11 surgeon. It's up to you to convince the C3, and Dr. Arrington
12 in particular, who was her mentor that can be an advocate for
13 her in C3. I told her that I will not make any future votes
14 or decisions on her continued promotion or staying within the
15 residency program.
16  Q  You already couldn't vote, right?
17  A  I could not vote.
18  Q  Because that's the rules?
19  A  Yes.
20  Q  But the decision, they made a recommendation
21 and then you made the final decision?
22  A  I did. And there was no vote, but I could
23 go ahead and if I had any concerns in the C3, I could voice
24 it, I could discuss it. And after this I said I won't even

Page 88

1 – you know, I will not be saying anything regarding you in
2 the C3 Committee. I will abstain from talking so I don't have
3 any input into the C3 Committee, what decisions that they
4 would make.
5  Q  Okay. But you picked the people on the C3
6 Committee, right?
7  A  Yes.
8  Q  Did you ever take people off the C3
9 Committee?
10  A  Yes, we tried to rotate people through.
11  Q  Did Dr. McCagg ever ask to be on the C3
12 Committee?
13  A  I don't recall Dr. McCagg asking me to be on
14 the C3 Committee. And the people I chose to be on the C3
15 Committee, or I asked to be on the C3 Committee, I wanted them
16 to be proponents of the residents, somebody who really looked
17 out for the residents, took their time to teach them, took
18 their time to talk to them, and Dr. McCagg did not fill that
19 bill. She was the one who usually berated residents on a
20 continuous basis, so I did not think that she was a good
21 proponent for the residents, so that's why I did not ask her
22 to be on the C3.
23  Q  Okay. Was Dr. Wolfer on the C3 Committee?
24  A  I believe the year before she left.

Page 101

1  MR. OXLEY: Objection.
2  BY MS. WHITEAKER:
3  Q  Was there somewhere else where things like
4  that would be stored?
5  MR. OXLEY: Objection. I just want to
6  clarify. The reason for my objection to Donna Webb's
7  computer is it's vague about whether she does or does not
8  retain that sort of information in a computerized format.
9  And I don't know the answer to that question myself.
10  I just wanted to – there's an ambiguity there
11  between how it was maintained after it was submitted, I guess
12  is my point. Anyway, with that clarification, you can answer
13  her question.
14  THE WITNESS: We kept a copy of the
15  communications that were made with residents, and I would
16  assume that most of that would be stored in the resident's
17  file.
18  BY MS. WHITEAKER:
19  Q  Aside from the resident file, are they kept
20  somewhere else?
21  A  If there's an electronic copy of it somewhere
22  else that's stored, I do not know.
23  Q  Okay. Could there be a paper file, like
24  here's where we put all the midpoint and final evaluations

Page 102

1  and any memos regarding those evaluations? Do you have a file
2  like that?
3  A  No.
4  Q  Can you find out from Donna Webb if she kept
5  copies of these memos she sent on March 4, 2016, on a computer
6  or somewhere on a server?
7  A  I can ask.
8  Q  Will you ask that and let your counsel know?
9  A  Sure.
10  Q  Thank you. So the following document is a
11  letter dated March 28, 2016, and this letter is to Dr. Klug
12  and it says that her surgery residence was terminated. Did
13  you write this letter?
14  A  I did. But I did not say that her residency
15  was terminated.
16  Q  What did you say?
17  A  I said her contract would be non-renewed at
18  the end of the year.
19  Q  Okay. In this second to final paragraph, or
20  final full paragraph, it says, "Surgery residency is
21  terminated," doesn't it?
22  A  As of June 30, 2016, yes.
23  Q  I mean is that different than your contract
24  will be non-renewed?

Page 103

1  A  Usually when we say the residency is
2  terminated, it means it's immediate, that they're dismissed
3  from the program immediately.
4  Q  Okay. So you said it would be terminated at
5  the end of the term?
6  A  Correct.
7  Q  When was this decision made?
8  A  I believe shortly before that by the C3
9  Committee.
10  Q  Did you attend that committee meeting?
11  A  I did.
12  Q  Okay. And why was this decision made?
13  A  Failure to remediate, failure to show
14  progress, and continued lack of fundamental surgical
15  knowledge, and overall assessments that she would not be able
16  to become a safe, competent, and independent practicing
17  surgeon.
18  Q  What specifically did she fail to complete
19  in the remediation?
20  A  I don't have the list, but some of the things
21  that I can remember is that she continued to do poor on her
22  ABSITE. She did not continue to meet with Dr. Arrington on
23  a weekly basis, as required.
24  She continued to have duty hour violations

Page 104

1  despite being told strictly not to violate those parameters,
2  and if so, contact me immediately. To continue to keep her
3  surgical logs on track and updated continuously.
4  Those are the ones from the remediation that
5  I recall. And I recall several of the committee members, that
6  they had great concern regarding how she was performing
7  clinically in the hospitals.
8  Q  What do you remember about that
9  specifically?
10  A  I remember Dr. Robinson saying that he was
11  very upset regarding her giving some old lab information to
12  him regarding a patient that – he said that if he had not gone
13  back and rechecked those, the patient could have possibly died
14  from it.
15  Q  Who is Dr. Robinson?
16  A  He was one of our faculty members.
17  Q  What is his practice area?
18  A  General surgery.
19  Q  Okay.
20  A  And I remember Dr. Thompson making comments
21  that she's horrible in patient presentations and cannot
22  present the patient right, and when you ask her questions,
23  it's - as he stated, it's obvious she hasn't read anything,
24  or if she's reading it, she's not retaining anything.

Page 105

1    Q    That was said at the C3 Committee?
2    A    I believe so.
3    Q    Okay. When it's patient presentation, is
4 that when she's describing what's going on with the patient -
5    A    Yes.
6    Q    - to the attending?
7    A    Yes, during rounds.
8    Q    Okay. Anything else specific you can
9 remember there?
10    A    She still had not reached her 250 minimum
11 cases that she needs to do by the end of PGY-2, and this was
12 — by this time it was nine months after repeating PGY-2 that
13 she still had not reached that number.
14    Q    Anything else?
15    A    It was the overall committee that they
16 thought that she would not be able to pass the boards and she
17 would not become a safe and effective independent practicing
18 surgeon.
19    Q    What was the basis of the finding that she
20 lacked surgical knowledge?
21    A    Test score would be one of them.
22 Presentation on rounds would be another one. When the
23 attendings would be questioning her to explain her reasoning
24 for the decisions that she made or when they would be talking

Page 106

1 regarding cases and would be presenting cases to them, to the
2 residents and say, "Okay, if you have this situation, what
3 would you do? How would you handle this case? How would you
4 handle such a problem?"
5    Q    And when would that happen?
6    A    That would happen continuously on a daily
7 basis. During rounds, during discussions in the call rooms,
8 anytime. That would be up to the residents and the attendings
9 for them to have these discussions.
10    Q    Okay. And who said that she wasn't doing
11 well at that?
12    A    The majority of the faculty.
13    Q    Is that a new complaint or something that
14 just happened?
15    A    No.
16    Q    Or something that had been happening
17 continually?
18    A    Since the start of PGY 2, that one seems to
19 be happening continuously. I believe one of the attendings,
20 I do not remember who, made the comment that, you know, she
21 has the basic knowledge to get her through the day-to-day
22 material, day-to-day stuff in the hospital, but when you probe
23 her a little bit more, when you ask her a little bit more,
24 it's obvious she does not know the material.

Page 107

1    Q    Okay. Was that Dr. Thompson?
2    A    I don't recall exactly who said that.
3    Q    If you go in your packet past the appeal
4 procedure documents, you're going to see a timeline.
5    A    Yes.
6    Q    Have you seen this before?
7    A    Yes.
8    Q    Do you know who prepared this timeline?
9    A    It would have been either me or Donna Webb.
10    Q    And what was it used for?
11    A    Just to give us a running summary of the
12 things that were going on with Dr. Klug as far as whether the
13 deadlines were missed or met.
14    Q    When did you prepare this document?
15    A    I don't recall exact date. It was after
16 April 15, 2016, and I believe — and I recall this was something
17 that was requested by the ad hoc committee.
18    Q    Okay. And that had to do with her appeal,
19 correct?
20    A    Yes.
21    Q    The document after that is a note from March
22 28, 2016. Do you see that there?
23    A    Yes.
24    Q    Who wrote this note?

Page 108

1    A    That would be Donna Webb.
2    Q    Okay. And is this just to memorialize the
3 meeting that took place when you gave her the notice that you
4 weren't going to renew her contract?
5    A    I would say it was a letter to summarize what
6 we had discussed.
7    Q    Okay. And does this note accurately reflect
8 what was said at the meeting?
9    A    I believe so.
10    Q    Do you recall Dr. Klug telling you that she
11 had recently been diagnosed with ADD?
12    A    She did not tell me that. She told the C3
13 Committee that.
14    Q    It's mentioned here in this note, and it says
15 that you're present at this meeting.
16    A    Yes.
17    Q    But you don't recall that?
18    A    No, I recall it, but you said "she told you
19 that" personally. She did not tell me that personally. She
20 made that statement when she was in the appeals meeting with
21 the C3 Committee.
22    Q    Did she say that in this meeting with you on
23 March 28, 2016?
24    A    Yes.

Page 133

1  to make sure that those male and female residents are treated
2  equally?
3      A   In the lectures that we give, during the
4  talks that we have with the residents, we mention that
5  harassment will not be tolerated. I believe that there is
6  a section of resident orientation when they come.
7          To become interns and residents into our
8  program, they have to go through the orientation, and I
9  believe that harassment is covered in that, and I believe when
10 I have the – on my orientation with the residents, I also cover
11 that harassment will not be tolerated in any shape, way, or
12 form.
13     Q   Does that include pornography in the
14 workplace?
15     A   Yes.
16     Q   Sexually explicit videos?
17         MR. OXLEY: Objection. Go ahead and answer
18 that question.
19         THE WITNESS: I did not name each individual
20 thing that could be considered harassment. Like I said,
21 general terms.
22         BY MS. WHITEAKER:
23     Q   Okay. Did Marshall ever provide you any
24 training into how to conduct an investigation of

Page 134

1  discrimination or harassment?
2      A   No.
3      Q   How many investigations have you been a part
4  of?
5      A   I believe this was the only one.
6      Q   Did you have any other complaints about Dr.
7  Yung besides the ones that Dr. Klug made?
8      A   No.
9      Q   Are there any rules against having sexual
10 relationships with subordinate employees?
11     A   I covered that with the residents several
12 times. I told that them that if you're in a position of
13 supervision, it is not a good idea to have any kind of personal
14 or sexual relationships with your co-workers. I told them
15 that I cannot tell you who you can have a relationship with
16 and you cannot, but what I can tell you is that it is not a
17 good idea, so beware of that and please don't do it. I don't
18 think as a program director that I can tell them who they are
19 supposed to have a relationship with and who not.
20     Q   Dr. Wolfer came and spoke in favor of Dr. Klug
21 at her appeal hearing, didn't she?
22     A   Yes, she did.
23     Q   Were you present?
24     A   Yes.

Page 135

1      Q   Okay. Were you over her, Dr. Wolfer? Do
2  you have any supervisory authority over Dr. Wolfer?
3      A   No, not unless it has directly something to
4  do with the residents.
5      Q   Did Dr. Shapiro ever talk to you about
6  bringing Dr. Klug back into the program after her research
7  year?
8      A   No.
9      Q   Did Dr. Sanabria talk to you about that?
10     A   About bringing her back, no.
11     Q   Did anyone talk to you about bringing her
12 back in?
13     A   No.
14     Q   Is that something you would have considered?
15     A   Again, I had removed myself from making
16 decisions regarding her status in the program, so if she was
17 to be reinstated in the program, C3 would have had to make
18 that decision, not me.
19     Q   C3 would have decided if she could come back
20 in after her research year, or research years?
21     A   If that was the case, if she was going to come
22 back.
23     Q   Is there a resident selection committee too?
24     A   For?

Page 136

1      Q   I don't know.
2      A   There's a resident selection committee for
3  – there is not a committee. For the people that we interview
4  as a medical student to come into the residency, we do have
5  people who interview them, and then we have rank lists and
6  we have rank meetings, but there's not a per se committee that
7  people are assigned to.
8      Q   Okay. But that wouldn't have had anything
9  to do with Dr. Klug?
10     A   No.
11     Q   So if she were going to go back into the
12 program, what would have been the procedure that should have
13 happened?
14     A   I don't know.
15     Q   Or could have happened?
16     A   I don't know. We've never gone through that
17 in our program, so I can't tell you. That's something that
18 I would have had to check with the ACGME and the American Board
19 of Surgery to see what the procedures would have been.
20     Q   You're just assuming it would have gone
21 through the C3 Committee, but you're not sure?
22     A   I would have said that I personally would not
23 have been involved in that decision.
24     Q   Okay.

Page 141

1  Q   Do you remember the circumstances of those?
2  A   Yes.
3  Q   Okay. Can you tell me?
4  A   The first one was that he did not complete
5  his Step 3, and again academically he was very poor. His
6  contract was not renewed. And the other person, he also –
7  he did not have academic issues, but he was placed on
8  remediation and he did not complete his remediation and he
9  was non-renewed on his contract.
10 Q   Why was he put on remediation?
11 A   He was on remediation for not completing his
12 work or not following up on the promotion for criteria and
13 disengagement from the program.
14 Q   Okay. And the third?
15 A   That was Dr. Klug.
16 Q   Did you ever make residents do push-ups as
17 a punishment?
18 A   I had talked to them and I said that if they
19 fall asleep during M&M that I would make them do push-ups and
20 I would come and do push-ups with them.
21 Q   But did you make them do push-ups?
22 A   A few times I did call them up on the stage
23 and we did push-ups together.
24 Q   Did other residents have duty hour

Page 142

1  violations?
2  A   Occasionally they would.
3  Q   Were they fairly common?
4  A   No.
5  Q   Did you ever have a match violation related
6  to medical students?
7  A   Yes.
8  Q   What was the violation?
9  A   It was a violation that the resident has
10 matched into another program and then contacted us and we
11 offered him a position as well for an open spot that we had,
12 and we didn't check and clear him before making sure that he
13 didn't have a prior commitment.
14 Q   Okay. And then what is the result of that
15 violation? Are there any negative consequences?
16 A   They were put on match probation for two
17 years.
18 Q   Is that something that you got in trouble
19 for, you in particular?
20 A   The program didn't. As the program
21 director, I took responsibility for that.
22 Q   Okay. Did you get disciplined for that?
23 A   No. It was not something that was
24 outrageous, it was not egregious, it was mainly the residents

Page 143

1  or applicants not informing us, and we didn't do background
2  check to make sure that that was not the case. So we took
3  the person's word for it.
4  Q   Okay, I understand.
5      MS. WHITEAKER: Let me take a short break.
6  We are almost finished.
7      MR. OXLEY: Okay.
8          (WHEREUPON, a recess was taken.)
9      MS. WHITEAKER: I just have a few more
10 questions.
11     BY MS. WHITEAKER:
12 Q   Will you get a hold of Exhibit 6 again, which
13 is the 2016 document?
14 A   Yes.
15 Q   I want to ask you again about this e-mail
16 that's about, I think, five pages in. February 2, 2016, that
17 e-mail from Dr. Klug to you that says subject line "Endo."
18 A   Yes.
19 Q   Okay. I wanted to ask you if you talked to
20 Dr. Sohrab about this complaint?
21 A   I did.
22 Q   I think that's his first name –
23 A   Yes.
24 Q   – and I don't know his last name, so forgive

Page 144

1  me. But did you talk to him, and if so, what did you guys
2  talk about?
3  A   I asked did Marco say these things that he
4  had planned for her or that in any way he was, you know, was
5  going to get her, was planning to punish her for any reason,
6  and he said, "No, I didn't get that idea."
7      He said that he said that, you know, those
8  were the discussions that they were having was in front of
9  the students, and I didn't think that that was appropriate,
10 but as far as when I asked him specifically whether Dr. Yung
11 said he had plans for her or was going to do something to her
12 and things like that, he said no, that was not the case.
13 Q   What were the discussions that were
14 inappropriate in front of the students?
15 A   Talking about another resident.
16 Q   Did Sohrab say –
17 A   Sohrab said it's obvious that Yung and –
18 Marco and Becky don't like each other and, you know, Marco
19 said that he's not happy that he has to work with her. But
20 he said that I don't think that that was appropriate to be
21 said in front of the students.
22 Q   Do you know what he said in front of the
23 students?
24 A   I do not know. I did ask did he say anything,