COPY

## In The Matter Of:

*Klug v.*
*Marshall University Board of Governors, et al.*

*Donna Webb*
*March 5, 2021*

*Mountain State Reporting LLC*
*2505 Lakeview Drive*
*St. Albans, WV  25177*
*304-727-8590*

Original File WebbDonna.prn
Min-U-Script® with Word Index

Klug v.
Marshall University Board of Governors, et al.

Donna Webb
March 5, 2021

Page 17

1    A    Yes. The remediation would have been the
2  bottom part of the remediation plan.
3    Q    The bottom part of what? I'm sorry.
4    A    The ABSITE policy.
5    Q    You're talking about the handbook?
6    A    Yes.
7    Q    Okay. I still don't understand. What is
8  the remediation plan though? On this document it says if you
9  have a certain score, you're going to qualify for serious
10  remediation. But what is the remediation?
11    A    It would depend on the resident. Whatever
12  they were — you know, wherever they fit into the ABSITE policy
13  as far as their scores, their ABSITE scores, their academic
14  performance.
15    Q    Okay.
16         MS. WHITEAKER: Can we go ahead and mark that
17  one as Exhibit No. 2? We can let her hold onto it in case
18  she needs to refer to it.
19         (WHEREUPON, Webb Deposition
20              Exhibit No. 2, Handbook, was
21              marked for identification.)
22         MS. WHITEAKER: This will be Exhibit No. 3,
23  which starts MU000866.
24         (WHEREUPON, Webb Deposition

Page 18

1              Exhibit No. 3, E-Mail, was
2              marked for identification.)
3         BY MS. WHITEAKER:
4    Q    This is an e-mail with a document attached
5  from Becky to you?
6    A    Yes.
7    Q    Okay. It says "Citi Certificate." Can you
8  explain to me what that is?
9    A    This is for any research that's done, the
10  individual has to complete the institution's Collaborative
11  Institutional Training Initiative, the CITI program. It's
12  online.
13    Q    Okay. It's something that all residents are
14  required to do?
15    A    Yes.
16    Q    Some kind of online training?
17    A    Yes.
18    Q    And this is just Becky sending you the
19  certificate showing that she completed it?
20    A    That's what it looks like, yes.
21    Q    Okay. On Exhibit No. 1 I notice that you
22  have listed on here that — it's under April 8, 2015 — that
23  Dr. Klug — it says, "Citi certification not completed." Do
24  you see that?

Page 19

1    A    I do.
2    Q    And why did you put she hadn't completed it
3  if she had given you a certificate?
4    A    I'm assuming that at the time that I did this,
5  I didn't have it, April 8.
6    Q    Well, you didn't start preparing this
7  timeline in 2015, did you?
8    A    I don't know. I mean I don't know exactly
9  when I prepared this timeline.
10    Q    Well, you have entries on here up to 2016 on
11  the timeline. Is there any reason why you didn't correct that
12  to show that she did complete the Citi certification?
13    A    I don't know.
14    Q    Okay. Well, that information is inaccurate
15  on the timeline, isn't it?
16    A    I suppose it is.
17    Q    Thank you. Let me show you another document
18  here.
19         (WHEREUPON, Webb Deposition
20              Exhibit No. 4, SCORE document,
21              was marked for identification.)
22         BY MS. WHITEAKER:
23    Q    Exhibit 4 is a document that's Bates numbered
24  at the bottom beginning Klug 000961. It says SCORE at the

Page 20

1  top. Are you familiar with this document?
2    A    I am not.
3    Q    Have you ever seen a document that looks like
4  this before?
5    A    I have not.
6    Q    Do you know what SCORE is?
7    A    I do.
8    Q    What is it?
9    A    It's a curriculum, online curriculum, for
10  surgery residents.
11    Q    How do you check to see if the residents have
12  done the SCORE requirements or whatever they're supposed to
13  do?
14    A    At this time, during the time that Rebecca
15  was there, I could just run a report from it, but I couldn't
16  — at that point, if I recall correctly, we couldn't tell
17  whether it was completed or not. The resident had to mark
18  that it was completed.
19    Q    Okay. There's some information on the
20  timeline document about SCORE, and it's under April 20, 2015,
21  where it says, "100% completion of SCORE curriculum."
22    A    Yes.
23    Q    And you indicated on this timeline that
24  that's one of the things she didn't do, correct?

**Page 53**

1  Q   What was the situation, briefly?
2  A   The situation was that there was a new
3  attending, Dr. McCagg, and she was going to be working on the
4  ICU as well with Dr. Wolfer. Dr. Wolfer and Dr. McCagg did
5  not get along very well.
6  Q   Okay. And then you wrote that you spoke with
7  Becky at length about it and it was apparent her stress level
8  had been high even before she finished her VA rotation. Do
9  you know why her stress level was high?
10  A   I would say it's because of the situation
11  that she had mentioned with Dr. Yung.
12  Q   What did she say --
13  A   While she was at the VA.
14  Q   I'm sorry. I didn't mean to interrupt you.
15  A   That's okay.
16  Q   What did she say about Dr. Yung?
17  A   She was upset because she felt like Dr. Yung
18  was viewing inappropriate material on the computer at the VA.
19  Q   Did she also say that he was treating her
20  unfairly?
21  A   I believe she had said that -- and I don't know
22  what the timeline is here, but during this conversation I
23  believe she just mentioned the question of the website.
24  Q   Okay. And do you recall what the website was

**Page 54**

1  that made her uncomfortable?
2  A   I heard it was a movie trailer for 50 Shades
3  of Gray.
4  Q   Well, that's not a website. Do you know what
5  the website was?
6  A   The website, no. I have no idea.
7  Q   Okay. And then it --
8  A   Sorry.
9  Q   That's okay. It says, "This issue was later
10  addressed with all the residents and they were cautioned again
11  about viewing inappropriate information on any hospital
12  computers." So to me that kind of indicates that you wrote
13  this after the fact?
14  A   It could have been.
15  Q   Do you see what I mean?
16  A   Yes. It could have been.
17  Q   Do you know when that issue was addressed
18  with the residents?
19  A   I do not. I would say right around the time
20  that I wrote this, or that we had the meeting with Becky.
21  Q   And when was the meeting with Becky?
22  A   That I don't know.
23  Q   Is that the February?
24  A   Yes, February. I don't know the exact date.

**Page 55**

1  Q   Okay. And then the next entry is March 9,
2  2015. Is that a meeting that you attended?
3  A   No, I did not.
4  Q   Okay. So what did you know about the
5  March 9, 2015 meeting or conversation that took place?
6  A   This is a conversation that Dr. Mozafarri
7  had, and I believe he asked me just to make note of it. He
8  told me. He would have told me this information. I was not
9  there.
10  Q   So the information in March 9, 2015, that
11  entry is all information you got from Dr. Mozafarri?
12  A   Correct.
13  Q   Did you discuss it with Dr. Klug?
14  A   No, not this conversation. No, I did not
15  discuss this with Dr. Klug.
16  Q   Okay. It says here Dr. Mozafarri told you
17  that Dr. Klug said she was having personal problems at home
18  and he asked you to speak with her because he felt there was
19  more to the home situation than she felt comfortable talking
20  about with him. Did you do that?
21  A   I did.
22  Q   Okay. Tell me about that conversation.
23  A   He was concerned, I guess, about her home
24  situation and he wanted to make sure that she was safe. And

**Page 56**

1  he felt that she'd be more comfortable talking with me, and
2  so that's all I did was I asked her just to make sure that
3  her home situation was okay, that she was safe, she felt okay
4  to go home.
5  Q   Okay. What did he say made you think that
6  her home situation might not be safe?
7  A   I guess that she was having personal
8  problems. She talked to him about having personal problems
9  at home and she was stressed because of the problems. His
10  concern was that there was something going on where she may
11  not have been comfortable.
12  Q   Okay. Nothing in particular that you can
13  think of?
14  A   No. No.
15  Q   And then so the following notes are March 10
16  and March 11. Are those just your notes about how you tried
17  to talk to her about her personal issues?
18  A   Yes.
19  Q   Okay. You talk about March 11 that she came
20  to your office?
21  A   Yes.
22  Q   Okay. Tell me about that meeting.
23  A   I believe that was the meeting where I had
24  asked her in the previous paragraph there for March 10 -- that's

Page 61

1    A    The resident was having problems with
2  alcohol.
3    Q    Did that resident take a leave to attend
4  rehab or something like that?
5    A    Yes.
6    Q    And that would be considered an
7  accommodation, wouldn't it?
8    MR. OXLEY: Objection. Go ahead and answer
9  if you can.
10    THE WITNESS: I assume it would be.
11    BY MS. WHITEAKER:
12    Q    Dr. Klug took a short leave of absence or some
13  time off after her husband passed away, didn't she?
14    A    Yes, she did.
15    Q    What do you remember about when her husband
16  passed away?
17    MR. OXLEY: Objection. To the extent that
18  you can answer that question, go ahead.
19    THE WITNESS: I just remember what a
20  horrible time it was.
21    BY MS. WHITEAKER:
22    Q    Right. Did you talk to her about it?
23    A    Not so much about how he died or anything like
24  that.

Page 62

1    Q    Right. But in general, about losing her
2  husband, did you talk to her about that?
3    MR. OXLEY: Objection. Go ahead and
4  answer.
5    THE WITNESS: I'm sure I probably, you know,
6  offered my condolences and to see if there was anything I could
7  do to help her, that sort of thing. Offered help.
8    BY MS. WHITEAKER:
9    Q    Did her husband's death affect her moving on
10  to the third year, moving to PGY 3?
11    MR. OXLEY: Objection. Go ahead and answer
12  if you can.
13    THE WITNESS: No.
14    BY MS. WHITEAKER:
15    Q    Okay. In your mind, why didn't she move on
16  to PGY 3 then?
17    A    She didn't complete the remediation.
18    Q    Well –
19    MR. OXLEY: I want to just – I'm a little
20  confused about that last question. From the standpoint that
21  – it's unclear to me whether you're talking about the first
22  time through or the second time through.
23    MS. WHITEAKER: I was talking about the
24  first time. I thought that was obvious.

Page 63

1    MR. OXLEY: Okay. Fair enough then.
2    MS. WHITEAKER: Because that's when he died.
3    MR. OXLEY: Okay, fair enough. I think
4  that's what she answered that question.
5    MS. WHITEAKER: That's what I meant.
6    MR. OXLEY: Okay.
7    MS. WHITEAKER: That wasn't a trick
8  question.
9    MR. OXLEY: I understand it in context. By
10  itself it was confusing.
11    MS. WHITEAKER: I see what you're saying. I
12  don't ask trick questions. I might ask bad questions, but
13  they're not on purpose.
14    BY MS. WHITEAKER:
15    Q    How much time do you recall that she took off
16  after her husband died?
17    A    Several weeks. I'm not sure exactly how
18  much time, but several weeks.
19    Q    Okay. Did you know her husband?
20    A    I did not. I may have met him once maybe at
21  a Christmas party or something.
22    Q    Was there any discussion among the
23  administrative people about giving her a year off after that
24  and letting her come back after a year?

Page 64

1    MR. OXLEY: Objection, but go ahead and
2  answer if you can.
3    THE WITNESS: Not that I'm aware of.
4    BY MS. WHITEAKER:
5    Q    Is that something that could have been done
6  under the ACGME rules?
7    MR. OXLEY: Objection. Go ahead and answer
8  if you can.
9    THE WITNESS: I'm not sure. I'm not sure
10  about that.
11    BY MS. WHITEAKER:
12    Q    When Dr. Klug first came back after her
13  husband died, did Dr. Mozafarri have concerns that she was
14  unfit to fulfill her duties?
15    A    He was concerned that she came back to work
16  too early. I mean his concern was for her.
17    Q    What do you recall him saying about it?
18    A    Just that because of the situation, he just
19  thought that it may have been a little too early, you know,
20  for anybody to come back to work.
21    Q    Did you guys discuss that?
22    A    I'm sure we had some casual conversations
23  about it.
24    Q    Do you recall anything specific?

Donna Webb
March 5, 2021

Klug v.
Marshall University Board of Governors, et al.

Page 69

1   Q   Okay. What document would you need to look
2   at?
3   A   I would think any kind of decision made by
4   the committee or her level or what do you call them, appeals,
5   those sorts of things.
6           MR. OXLEY: I'm going to make a specific
7   objection that while she took notes in the C3 Committee, she
8   was not a voting member of that committee.
9           MS. WHITEAKER: I understand.
10          MR. OXLEY: And so her answers are based on
11  answers of someone who was observing and not decision making.
12          MS. WHITEAKER: Yes, I understand that you
13  didn't make the decision.
14          BY MS. WHITEAKER:
15  Q   If a resident does not complete their
16  remediation plan, are they going to be discharged
17  automatically?
18          MR. OXLEY: Objection to form. Go ahead and
19  answer to the extent that you can.
20          THE WITNESS: I would say that it's up to the
21  Clinical Competency Committee.
22          MS. WHITEAKER: I'm going to give you
23  another exhibit. I'm just taking it apart and putting it back
24  together. Just give me a second. It's two things, but I

Page 70

1   think we can make it one exhibit.
2           (WHEREUPON, Webb Deposition
3           Exhibit No. 13, ABSITE Exam,
4           was marked for identification.)
5           MS. WHITEAKER: Okay. These are documents
6   we just got yesterday related to a different resident.
7           MR. OXLEY: Now, to the extent that you were
8   planning to use that in this deposition, I think this
9   deposition needs to be placed under seal.
10          MS. WHITEAKER: I don't mind if you just want
11  me to identify it by Bates number on the record and not attach
12  it. I'm okay with that.
13          MR. OXLEY: And not use any names?
14          MS. WHITEAKER: Yes. What name do you want
15  me to say, John Doe?
16          MR. OXLEY: Candidate A or John Doe or
17  however you want to do it. I mean I do not want to -- I think
18  that we're going to have to put the deposition in a Protective
19  Order if we talk about the specifics or the specific person.
20          MS. WHITEAKER: We do have a Protective
21  Order in this case.
22          MR. OXLEY: I agree. I just want to make
23  sure that the deposition is placed under the Protective Order,
24  or under the guidelines of the Protective Order, which, as

Page 71

1   you know, has specific requirements. So if a document were
2   to be submitted and be placed in a Protective Order, it would
3   be subject to the guidelines of the Protective Order. This
4   deposition, if you're going to talk about it, this whole
5   deposition would have to be subject to that same Protective
6   Order.
7           MS. WHITEAKER: Okay. I understand.
8   We're good. But you don't have to -- I don't care about his
9   name. I mean the name is not important to me.
10          THE WITNESS: Okay.
11          MS. WHITEAKER: And as far as I'm concerned,
12  we don't have to attach this as an exhibit, but I am going
13  to identify for the record the Bates number, but on the bottom
14  you've got the names. Do you want me to say the Bates number?
15          MR. OXLEY: Well, I would say I think that
16  for purposes of the record you could say A and then the number.
17  Is that fair?
18          MS. WHITEAKER: Is that okay? As long as we
19  all know what we're talking about, I think it's okay.
20  Documents related to a different resident, we're just going
21  to say Letter A for the Bates number 000381, and then it goes
22  to 385, and then there's another document, 0004548 through
23  461.
24          BY MS. WHITEAKER:

Page 72

1   Q   And, Ms. Webb, you were working there during
2   this time, too, when this document was prepared, correct?
3   A   Yes, correct.
4   Q   Okay. Do you recall this resident?
5   A   I do.
6   Q   Okay. And it looks like this person had an
7   educational enhancement issue; is that correct?
8   A   Correct.
9   Q   And what was the issue with this resident?
10  A   ABSITE performance.
11  Q   Okay. Is that the only issue?
12  A   I believe so.
13  Q   Okay. And did this resident's ABSITE scores
14  improve?
15  A   I do not remember. I don't know.
16  Q   If you look at this document -- I'll hold it
17  up -- it's the one that starts at 000458 and turn to the third
18  page.
19  A   Okay.
20  Q   I'm not that familiar with New Innovations
21  like you are, but I see a category that says "ABSITE Exam"
22  there.
23  A   I'm sorry. I was looking at the wrong one.
24  Are you looking at the semi-annual review?

**Page 73**

1    Q    Yes.

2    A    Okay. I'm with you.

3    Q    And then on the very right-hand side column

4    it's got the percentile. Do you see that?

5    A    I do.

6    Q    And it looks like it's sort of in reverse date

7    order, but it goes percentile 4 to 11, and then 1 is the last

8    one in 2013.

9    A    Correct.

10   Q    So did this resident improve his ABSITE

11   scores?

12        MR. OXLEY: I'm going to object to that

13   question, but go ahead and answer to the extent that you can.

14        THE WITNESS: Well, he did.

15        BY MS. WHITEAKER:

16   Q    He did between 11 and 12, up to 11th

17   percentile, correct?

18   A    Correct.

19   Q    Okay. Did he ever get above 50 percentile?

20   A    I am assuming not, looking at this

21   information.

22   Q    Okay. And did he complete the program, to

23   your recollection?

24   A    He did.

**Page 74**

1         (WHEREUPON, Webb Deposition

2         Exhibit No. 14, Text Messages,

3         was marked for identification.)

4    BY MS. WHITEAKER:

5    Q    Exhibit 14 is this one page, Klug 003638, and

6    this is some text messages. Have you seen this before?

7    A    Well, I'm assuming yes. It's been a long

8    time.

9    Q    Okay. Well, just take a minute and look at

10   it.

11   A    It looks like texts that Dr. Klug and I sent

12   back and forth.

13   Q    Would you commonly text with residents?

14   A    Yes.

15   Q    Do you retain your texts?

16   A    I don't delete them off my phone. You know,

17   if I get a new phone, I don't make sure that they carry over

18   or anything like that. So as a rule I don't get rid of them.

19   If that makes sense.

20   Q    I think it makes sense. You don't actively

21   try to preserve your texts?

22   A    No.

23   Q    But you're not deleting them off your phone

24   either?

**Page 75**

1    A    Correct.

2    Q    Okay. Do you think you would still have

3    texts between you and Becky somewhere on your phone, or a phone

4    you still have?

5    A    I can probably say no. I'm pretty sure no

6    because I've gone through quite a few phones.

7    Q    Since 2015 and 2016?

8    A    Yes.

9    Q    Okay.

10        MR. OXLEY: So I'm familiar with what you're

11   about ready to ask about. I think it's important that she

12   have these in context. So this is the middle of a

13   conversation, so I want to make sure that she has – that you

14   have this and she has this in context. This is the first part

15   of the conversation.

16        MS. WHITEAKER: Okay.

17        MR. OXLEY: Take a look at the date and the

18   times and coordinate that with what you have in front of you.

19   The last part of that leads into the first part of, I guess,

20   the text message. Have we entered that as an exhibit yet?

21        MS. WHITEAKER: Yes, that's Exhibit 14.

22        MR. OXLEY: Okay. I just wanted to make

23   sure you had that in front of you.

24        MS. WHITEAKER: No, that's good. Thank

**Page 76**

1    you. Do you want to give that to her so she can have that?

2        MR. OXLEY: Sure.

3        BY MS. WHITEAKER:

4    Q    So my question is, as Perry has defined, do

5    you remember what was going on in this situation that Becky

6    was complaining to you about?

7    A    I do.

8    Q    Okay. Tell me what you recall.

9    A    This was the situation I talked about a

10   little earlier between Dr. Wolfer on the ICU. Dr. Klug was

11   doing her ICU rotation at the time, and Dr. Klug was getting

12   in the middle of Dr. Wolfer's behavior, so to speak.

13   Q    Okay. That was when you said Dr. McCagg and

14   Dr. Wolfer weren't getting along together?

15   A    I believe so, yes.

16   Q    And did you feel like Dr. Wolfer was the

17   aggressor in that situation?

18   A    You know, I don't really know who was the

19   aggressor.

20   Q    Do you know what the problem was between

21   those two?

22   A    I could speculate, but I don't – you know,

23   they wanted, both of them wanted control of the ICU and the

24   care of the patients and there were personality conflicts

Page 109

1          MR. OXLEY: Okay, so this is 12.
2          BY MR. OXLEY:
3     Q    So now let's read through these real quick.
4  I'm going to read them dash by dash.  You tell me if I read
5  them correctly.
6          This is Exhibit 14-A.  "Dr. Wolfer is taking
7  over the care of our ICU patients today.  She is calling the
8  nurses, they follow her orders and tell" -- this says "an,"
9  but I think it means and -- "and tell me sorry we can't make
10 her mad."  Did I read that correctly?
11    A    Correct.
12    Q    The next one is "This is really hurting
13 patient care and my education.  I refuse to be in the middle
14 of this anymore."  Did I read that correctly?
15    A    Correct.
16    Q    "But now the nurses are not carrying out the
17 ICU plan."  Did I read that correctly?
18    A    Correct.
19    Q    And that's Dr. Klug, those three texts,
20 right?
21    A    That's right.
22    Q    Then we go down to your texts.  "Thanks
23 Becky.  Just be cool and professional."  And then the next
24 text is "We will get it figured out."  Did I read that

Page 110

1  correctly?
2     A    Correct.
3     Q    And then the next text is "Dr. McCagg does
4  not know it is to this degree.  I didn't tell her because I
5  don't want to deal with this anymore, I'm sorry."  Did I read
6  that correctly?
7     A    Correct.
8     Q    "You are doing the right thing.  Stay out of
9  it as much as you can.  Dr. Mozafarri will deal with it."  Did
10 I read that correctly?
11    A    Correct.
12    Q    That's you, right?
13    A    Correct.
14    Q    And then here's you again.  "Does Dr. Uffort
15 know this is going on?"  Did I read that correctly?
16    A    Right.
17    Q    That's you again, right?
18    A    Yes.
19    Q    And then this is Rebecca Klug.  "I told him
20 some things but not everything.  I don't have the time to talk
21 to him today.  I am post call and I'm very late leaving
22 already."  Did I read that correctly?
23    A    Correct.
24    Q    And that's Dr. Klug, right?

Page 111

1     A    Correct.
2     Q    And this is Dr. Klug again.  "I just have to
3  be honest with you, this situation on a whole is absolutely
4  the most toxic and hostile workplace situation I have ever
5  experienced.  It's impacting me on all levels and I don't
6  think it's worth doing it anymore.  My professional education
7  and now personal life are all falling apart.  I really don't
8  know what to do."  Did I read that correctly?
9     A    Correct.
10    Q    And then you said, "Are you working
11 tomorrow?"
12    A    Correct.
13    Q    And then she says, "Yes."  And then you said,
14 "I want to see you in my office when Dr. Mozafarri is going
15 to be here.  I will let you know what time he is going to be
16 here.  Ok?"  You wrote that?
17    A    Correct.
18    Q    And she says, "OK"?
19    A    Correct.
20    Q    All right.  Now, this was a situation that
21 was ongoing between Dr. McCagg and Dr. Wolfer in the ICU?
22    A    Correct.
23    Q    And that was, as Dr. Klug described it, the
24 most hostile and toxic workplace situation she'd experienced,

Page 112

1  right?
2     A    Correct.
3     Q    And they were fighting amongst themselves
4  about?
5     A    About who was going to control the ICU, the
6  care of patients.
7     Q    Okay.  And Dr. Klug felt like she was in the
8  middle of that, right?
9     A    She did.
10    Q    Now, this last text is -- it looks like the
11 date is January 22.  Is that right?
12    A    Yes.
13    Q    And then she said she couldn't come over
14 immediately.  In February there's a reference in Exhibit 12,
15 and it starts out, "Dr. Mozafarri and I met with Dr. Klug to
16 discuss the situation on the ICU between Dr. Wolfer and Dr.
17 McCagg.  There had been a lot of tension between the two
18 doctors and Dr. Klug seemed to be caught in the middle of the
19 situation.  After speaking with her at length" -- I'm going
20 to stop there.
21          This meeting was in reference principally to
22 this dispute between Wolfer and McCagg, right?
23    A    Correct.
24    Q    And so that's why the meeting took place to

Case 3:18-cv-00711   Document 144-7   Filed 04/23/21   Page 8 of 8 PageID #: 1154

Klug v.                                                                    Donna Webb
Marshall University Board of Governors, et al.                           March 5, 2021

Page 113

1   begin with?
2       A    Correct.
3       Q    During this time period there was further
4   exploration in here, and she described the situation with Dr.
5   Young?
6       A    Yes.
7       Q    Other than 50 Shades of Gray trailer, do you
8   ever remember Dr. Klug referencing any specific material that
9   was inappropriate to you?
10      A    I do not.
11      Q    Okay.  In this meeting, other than the 50
12  Shades of Gray trailer, did she reference anything
13  specifically?
14      A    No.
15      Q    After having met with her during this meeting
16  and talking with her yourself, do you think that she was
17  offended by the 50 Shades of Gray trailer?
18      A    No.
19      Q    Okay.  She just found it inappropriate?
20      A    Correct.
21      Q    Okay.  Did Dr. Yung, in your experience – did
22  you work with Dr. Yung during the entirety of his residency
23  program?
24      A    Yes.

Page 114

1       Q    Was that five years?
2       A    Yes.
3       Q    So you knew him for five years as a resident?
4       A    Correct.
5       Q    Did he have trouble getting along with
6   females in the program?
7       A    No.
8       Q    Did he have good relationships with all other
9   females except for Dr. Klug?
10      A    Yes.
11      Q    Did any other female ever say that he
12  sexually harassed them or behaved in an inappropriate manner,
13  whether it pertains to sexual discrimination or sexual
14  harassment, to your memory?
15      A    No.
16      Q    Did he get along with Dr. Klug?
17      A    As far as – I mean I just don't know of
18  anything.
19      Q    Okay.  But I mean there were reports.
20  Obviously, she filed a formal report against him, didn't she?
21      A    Yes.
22      Q    That he had done different things?  I've
23  shown you e-mails that we've reviewed here today?
24      A    Yes.

Page 115

1       Q    They seemed to have a dispute; is that fair
2   to say?
3       A    They seemed to, yes.  I never saw it.
4       Q    Okay, fair enough.  You just read about it,
5   right?
6       A    Right.
7       Q    Okay.  I think this is Exhibit 1, which is
8   a chart which you prepared at some point for Dr. Mozafarri?
9       A    Correct.
10      Q    Now, just to be clear, was this chart used
11  in the C3 Committee?
12      A    It was not.
13      Q    Okay.  So this was solely for Dr. Mozafarri
14  to have as information?
15      A    Correct.
16      Q    And you were asked about a couple of things
17  in this.  One was the CITI certification not being completed
18  on April 15, and you were shown an e-mail that showed that
19  it was completed.  Was that a mistake?
20      A    Yes.
21      Q    Okay.  Now, we go down here and you talk
22  about this 100% completion.  I think it was the SCORES.  Hold
23  on one second.  Yes, the SCORES, I think it was.  One hundred
24  percent completion of the SCORES curriculum.  And I think you

Page 116

1   were asked about whether or not that was eventually completed,
2   and you were shown some documents that suggested it was.  Do
3   you remember that?
4       A    Yes, that's correct.
5       Q    But can we agree – and I can pull that up.
6   Was it completed on June 15, 2015?  Let me get that for you.
7   You probably can't remember.
8           Do you have a copy of the SCORES – I think
9   maybe Exhibit 2.  Well, here it is.  I'm sorry.  I apologize.
10  Do you know what exhibit it is, this one (indicating)?  I have
11  Exhibit 4.
12          BY MR. OXLEY:
13      Q    All right.  So this says completion date
14  June 15, 2015, right?
15      A    Correct.
16      Q    And you said it was not completed?
17      A    Correct.
18      Q    At that time?  Her SCORES assignments seemed
19  to be going through November of 2015.  Is that right?
20      A    Yes.
21      Q    Would they have been completed in June 2015?
22      A    No.
23      Q    I didn't get that?
24      A    No.