**In The Matter Of:**

*Klug v.*
*Marshall University Board of Governors, et al.*



*Jillian McCagg, M.D.*
*January 13, 2020*

**Mountain State Reporting LLC**
*2505 Lakeview Drive*
*St. Albans, WV 25177*
*304-727-8590*

Original File McCaggJillian.prn
Min-U-Script® with Word Index

Page 5

1  Q  All right. And did you speak with anybody
2  to prepare for your deposition?
3  A  No.
4  Q  Okay. Can you tell us just briefly what your
5  educational background is?
6  A  So I received my medical school education
7  from the Joan C. Edwards School of Medicine at Marshall
8  University. I then completed my residency training at
9  CAMC-WVU from 2006 to 2011. I then spent a year at Cincinnati
10 Children's Hospital as an unaccredited trauma pediatric
11 fellow. I then did an accredited critical care trauma
12 training at the University of Michigan in Ann Arbor. And then
13 I finished my last unaccredited fellowship at the University
14 of San Francisco, UCSF Benioff Children's Hospital of
15 Oakland-San Francisco for one year after that.
16 Q  Okay.
17 A  And I'm double boarded in general surgery and
18 trauma critical care.
19 Q  And can you describe your work history,
20 please?
21 A  Yes. From 2014, I believe, until 2018 I
22 worked for Marshall University School of Medicine, Department
23 of Surgery. Following my exit from them, I started working
24 in September of 2018 here at Three Rivers Medical Center.

Page 6

1  Q  Okay.
2  A  I believe that's right.
3  Q  I won't hold you to the exact dates on that.
4  A  I don't have my CV with me. Sorry.
5  Q  That's fine. Why did you leave Marshall?
6  A  Various reasons.
7  Q  Can you describe the reasons?
8     MR. RICH: I'm going to object, but proceed.
9     THE WITNESS: I was working a lot of hours,
10 way too many hours. There was a refusal by the powers-that-
11 be to change the schedule to something that would be more time
12 friendly to everybody involved.
13    The new contracts that came out were less
14 than stellar and I chose to look for work elsewhere, where
15 I now have a job working way fewer hours and have a better
16 home life balance for the amount of money. I also did not
17 feel as though I was ever going to get any further than where
18 I was as a female in the department.
19    BY MS. WHITEAKER:
20 Q  What were your job duties at Marshall when
21 you worked there?
22 A  So I was supposed to be on call 24/7/365,
23 essentially, for pediatric surgery. I was also a general
24 surgeon, and I was the critical care surgeon responsible in

Page 7

1  the ICU whenever I was assigned.
2     I shared those duties with at one point Dr.
3  Wolfer, Dr. Thompson, and then when Dr. Adkins came and left,
4  he was also part of that group who worked in the ICU. So in
5  that I also did trauma call when I was on call for the ER as
6  well.
7  Q  Okay. How many hours a week would you say
8  you worked?
9  A  I'd say a hundred. I would literally get
10 home from being on call for a 24-hour shift, plus would round
11 in the ICU with, you know, a full ICU of 15 patients. I would
12 no more than get home and get a phone call that there was a
13 child with appendicitis that had to go that night and would
14 have to literally come back in.
15 Q  Were you also considered part of the faculty
16 at Marshall when you worked there?
17 A  Yes, I was an assistant professor of surgery.
18 Q  Can you tell me how that worked?
19 A  From what I can see, basically every new
20 hire, unless you were tenured somewhere else, became an
21 assistant professor at Marshall. It basically subsidizes
22 the salary, so you're hired by the university to teach medical
23 students and residents, in addition to your clinical duties.
24 Q  So in addition to your clinical duties, you

Page 8

1  said you would teach medical – did you say –
2  A  Medical students and residents, yes, both.
3  Q  Okay.
4  A  So like I was responsible for the pediatric
5  lecture every eight weeks for the medical students. I would
6  have fourth-year medical students assigned to me as part of
7  the pediatric or trauma critical care, or sometimes general
8  surgery rotation because they get to kind of pick and choose
9  where they go.
10    And then as far as residents, of course, the
11 residents help us manage the service and the day-to-day nuts
12 and bolts of things that happen, and they also participate
13 in surgeries with us. And, of course, it was my job as an
14 assistant professor to teach them the appropriate ways of how
15 to do surgical procedures.
16 Q  How often were you working with residents?
17 A  Daily.
18 Q  Did you work with all the residents or
19 certain ones? How did that work?
20 A  Pretty much all of them at any given time.
21 Their schedule is set at the beginning of the year, and that
22 schedule is based on requirements that are set forth by their
23 governing body, by the ACGME, and so they get assigned.
24    So if they were assigned to the ICU, then they

Case 3:18-cv-00711  Document 144-9  Filed 04/23/21  Page 3 of 7 PageID #: 1167

Klug v.                                                                                                    Jillian McCagg, M.D.
Marshall University Board of Governors, et al.                                                             January 13, 2020

**Page 9**

would see me. And they were usually there one to two months, depending on their level. And then, of course, they would be with me on trauma call, again depending on level, and then each resident was supposed to be assigned to pediatric surgery for a period of time as well.

Q So they would work with you on that?

A Yes, give or take, you would see everybody in the program at least once a year.

Q Okay. Was part of your job evaluating residents?

A Yes.

Q And how would you do that?

A They had a computer-based program that would send out a generic form about each resident, and it was - I believe it was a - I can't remember the name of the website. But anyway, it's supposed to have been designed by the ACGME and used by them to help determine levels and whether residents would move on, et cetera.

Q Would you complete the computer program forms on the day you worked with the residents?

A No. Typically they got sent out at the end of their entire rotation.

Q Okay.

A So it wasn't a - daily bump and grind

**Page 10**

corrections happen as they're happening but the global aspect happened at the end.

Q Okay. Besides that, is there any other way that you would evaluate residents?

A I mean if you ever had any questions, you could always go to Dr. Mozaffari if there were areas of real like concern.

Q Right. Were there ever meetings where you would discuss residents or committees or anything like that?

A None that I was on. Those were all decided - I don't know how those were decided. But it was always a group of - and usually one of the tenured professors were a part of that. But they put Dr. Adkins on and immediately after he left there, which was a little bit interesting since he had not yet passed his boards.

Q Are you talking about the C3 Committee? Is that what it was called?

A I think that's what it's called now.

Q And what does that committee do?

A I have no idea, again, because I was not on it.

Q Did you ever ask to be on it?

A I did, and I was told it was full.

Q Okay. Is Dr. Adkins a man?

**Page 11**

A Yes.

Q Did you get any training when you started working at Marshall on their educational policies related to the surgical residency program?

A It consists of they give you the manual that they give the residents.

Q The resident handbook?

A Yes.

Q I think that's what it's called?

A Yeah, there you go.

Q Okay. What about any training from Marshall on their anti-discrimination policies, did you get any training on that?

A I can't say yes or no. I'm going to have to say I don't remember. And you'll have to forgive me, because I've gone through so many. I've been through several organizations, right, and most of them all have a discrimination policy, so I know that there's one in the handbook, but to say necessarily that I remember someone doing a full education PowerPoint and talking point, I can't say that they did.

Q Okay.

A But I also can't say they didn't, so I'm going to say I don't remember.

**Page 12**

Q I understand. Do you remember having any training at Marshall on Title IX?

A No, I do not. I did know about Title IX personally before I came to Marshall, but that's because as a female basketball player at my high school, we had to fight to receive monies based on Title IX, because the athletics department only wanted to give to the football, basketball, boys' basketball and baseball team. They didn't want to give to girls' basketball or softball.

Q Okay. And is it your understanding that Title IX would also apply to Marshall?

A Well, yeah, because it's a state and federally funded institution, so they would fall under the same statutes.

Q Okay. And as a surgeon and a faculty member at Marshall, did you have any duties under Title IX?

A Not that I'm aware of.

Q What was your relationship like with the residents?

A I'll have to say my relationship with the residents was rough in the beginning. The style of teaching at Marshall was not anything that I was used to. Dr. Denning insisted that I needed to – this quote has always stuck with me, "Let them be doctors," and told me I needed to do what

Case 3:18-cv-00711 Document 144-9 Filed 04/23/21 Page 4 of 7 PageID #: 1168

Klug v. William McCagg, M.D.
Marshall University Board of Governors, et al.
January 13, 2020

Page 17

1  Q   He who?
2  A   Mozaffari.
3  Q   Okay.
4  A   Took it to Denning.
5  Q   And then did you get disciplined for
6  something, or what do you mean –
7  A   No, no, there was no disciplinary action
8  taken. I was given a formal letter, which again had – it was
9  all hearsay information with no facts to it for anything, and
10 I again, like I told you, I hired my own lawyer who took my
11 statement and we wrote a rebuttal together back to this
12 complaint, which was investigated by Marshall University and
13 found to be completely non-factual and unwarranted, and it
14 was all expunged from my time at Marshall.
15 Q   So you hired an attorney to respond to that
16 complaint and the end result was you got that letter removed
17 from your personnel file?
18 A   Yes.
19 Q   Okay. Who was the chief resident?
20 A   Oh, Lord, what's his name? I try to forget
21 these terrible things in my life. Let's see. Who was it?
22 That was during the Vandendool time.
23 Q   Okay. Well, let me ask you something else,
24 then. Do you remember when it was, approximately?

Page 18

1  A   It was around the 2015-ish mark, I believe.
2  Q   Okay. So is that the same – does that go
3  along with the same kind of things that you were speaking to
4  Beth –
5  A   Hammers.
6  Q   – Hammers about?
7  A   Yes.
8  Q   Okay.
9  A   I mean from my own personal issues, it even
10 came to a point where there was an issue of Medicare fraud
11 that happened by another physician and I happened to inherit
12 it one morning when I came on. And the chairman spun it around
13 after the fact to say it was my fault that it had happened
14 even though I, of course, had none of the decision-making
15 concerning the patient's surgery and I didn't abandon the
16 patient on the table to go home to my loved ones in Charleston,
17 nor did I tell that surgeon to write his operative report
18 saying that he was present for the entire case.
19 Q   Is that –
20 A   This was another issue.
21 Q   Is that the same chief resident or is that
22 somebody else?
23 A   No, no, this was an actual attending where
24 this happened.

Page 19

1  Q   And is that related to the other incident,
2  or is it something else?
3  A   No, it was a whole new incident that followed
4  shortly thereafter where again I got the blame for it even
5  though I was just the one who cleaned up the mess.
6  Q   All right. Do you recall working with Dr.
7  Klug at Marshall?
8  A   I do.
9  Q   Did you do rounds with her?
10 A   Yes.
11 Q   What was your impression with her as a
12 resident?
13 A   Initially, Becky was a little scattered, but
14 that was when I was first beginning, and I found most of the
15 residents to be scattered and could not really organize, and
16 that would have also been appropriate for her current level
17 at that time. I believe she was only an intern at that time.
18 And then gradually as I worked with Becky, she did learn
19 several things and she started to get more organized, and we
20 worked on her organizational pattern so she could be more
21 efficient in the ICU.
22    She ultimately became someone that I could
23 call and count on. It went from scattered to focused, even
24 during times when Becky was going through substantial

Page 20

1  personal things.
2  Q   Did she have good skills in surgery?
3  A   She did.
4  Q   Do you recall Becky telling you that she felt
5  like she was being treated differently and less favorably than
6  male residents?
7  A   I do.
8     MR. RICH: Objection.
9     BY MS. WHITEAKER:
10 Q   Did you witness any of that discriminatory
11 treatment she complained about?
12 A   I didn't, but I wasn't necessarily around
13 them as much when they were in group events per se.
14 Q   What do you recall her telling you?
15    MR. RICH: Objection.
16    THE WITNESS: Well, there were – I mean Becky
17 would often be scutted out to do extra lab work, write notes,
18 do consults that would not necessarily be of her level.
19 Especially when she was higher up in the ranks, that should
20 have been placed to another intern. Those interns would, of
21 course, be male. She would be sent out by male chief
22 residents to do the work instead. She would also be not
23 allowed to come to – even when she was assigned to me on pedes,
24 she would be given so much other work that she would never

Jillian McCag... MD
January 13, 2020
Case 3:18-cv-00711   Document 144-9   Filed 04/23/21   Page 5 of 7 PageID #: 2169
Marshall University Board of Governors, et al.

### Page 21

1  make it to the operating room.
2     BY MS. WHITEAKER:
3     Q   Okay. And are those things that you
4  witnessed?
5     A   Those things I did witness. Obviously,
6  it's notable if your resident doesn't show up for a case,
7  right?
8     Q   And who would decide on those assignments
9  that you described?
10    A   As far as like being assigned to ICU or pedes
11 or the assignments of the scut work?
12    Q   The scut work, as you referred to it earlier,
13 sort of the lab work or grunt work?
14    A   Those are determined by whoever is the acting
15 chief on the service.
16    Q   Okay. And if I said Dr. Marco Yung, would
17 you remember that name?
18    A   Yeah.
19    Q   Okay. And he was, I believe, if I'm not
20 mistaken, the chief resident during some of that time when
21 Dr. Klug was there?
22    A   Yes.
23    Q   Okay. Do you recall her specifically
24 complaining that Dr. Yung was treating her unfairly?

### Page 22

1     MR. RICH: Objection.
2     THE WITNESS: I do remember her saying it.
3  I don't remember specifics about it.
4     BY MS. WHITEAKER:
5     Q   Okay. Do you recall any time that you did
6  anything to address her complaints?
7     A   I told her most often times to go speak with
8  Dr. Mozaffari about these issues because I really didn't feel
9  like I was in any position to correct the behavior of any of
10 the chiefs. They seemed to be all protected by the chairman
11 and by Dr. Mozaffari, and as he was her residency director,
12 he should be the person who addressed those issues. And I
13 did tell her that if he couldn't address them, that she would
14 have to go higher up the chain.
15    Q   Okay. But you had experience that
16 complaints to Dr. Mozaffari weren't very successful, correct?
17    A   Yes. I had other complaints with Dr.
18 Mozaffari that fell on deaf ears.
19    Q   And you mentioned the chairman. Who was
20 that?
21    A   Dr. Denning.
22    Q   And have you complained to Dr. Denning
23 before?
24    MR. RICH: Objection.

### Page 23

1     THE WITNESS: About?
2     BY MS. WHITEAKER:
3     Q   About your own experiences of being treated
4  unfairly?
5     MR. RICH: Objection.
6     THE WITNESS: Yes.
7     BY MS. WHITEAKER:
8     Q   And did Dr. Denning do anything to address
9  your concerns?
10    A   No.
11    Q   When you said that if Dr. Klug didn't get
12 anywhere with Dr. Mozaffari, she should go higher -- I think
13 that is what you said -- who were you talking about?
14    A   Well, she would have to go to someone in the
15 medical school, much like I had to do to Beth Hammers or to
16 Dr. Dial, because ultimately all of the departments have to
17 attest to someone, and that happens to be the school.
18    Q   Okay. Do you recall a time where you took
19 Becky to Donna Webb's office to discuss the complaints?
20    A   I don't remember them specifically. I mean
21 I do remember going there, I don't remember the content, all
22 of the specifics. I'm sorry.
23    Q   That's okay. So you do remember going with
24 her to Donna Webb's office?

### Page 24

1     A   Yes.
2     Q   Okay.
3     A   Because Dr. Mozaffari at that time did not
4  have an office at main campus. He is a plastic surgeon who
5  had an office over on Route 60, so the majority of the time
6  when you had resident complaints, you were told to talk to
7  Donna, who was his assistant, and she would get those messages
8  to him.
9     Q   Do you know what -- I know you said you don't
10 remember specifically everything that was said at that
11 meeting, but do you recall if anything happened after that
12 meeting to address her complaints?
13    A   To my knowledge, no.
14    Q   Okay. Do you recall that Dr. Klug ended up
15 repeating her second year?
16    A   I do.
17    Q   And what do you remember about that?
18    A   I remember that she took her in-service exam
19 and they wanted them to get a certain percentile, and I don't
20 remember what that percentile was, and that she had not made
21 that percentile. However, she was not the only resident who
22 did not meet that percentile, and there were other residents,
23 male residents, who had not met that percentile multiple times
24 who were continually advanced and later they even graduated,

Case 3:18-cv-00711 Document 144-9 Filed 04/23/21 Page 6 of 7 PageID #: 1170
Klug v. Marshall University Board of Governors, et al.
Jillian McCagg, M.D.
January 13, 2020

Page 25

1 ones who never actually met the percentile, to my knowledge.
2 Q Okay. And can you tell me that person's
3 name, that male resident?
4 A Oh, hell, what was his name? Glasses, nice
5 guy, loved kids. I can't remember his name. Again, I've
6 tried to black it out.
7 Q Glasses, nice guy, is that what you called
8 him?
9 A Jason. Shoot. I need pictures in front of
10 me.
11 Q Well, if you think of it, you just let me
12 know. Can you think of the names of any of the other male
13 residents who failed to meet the percentile that were advanced
14 besides that one?
15 A No.
16 Q Okay. And how did you know what percentiles
17 people were getting?
18 A Well, therein is an interesting part of all
19 surgical training programs. There's only supposed to be a
20 small group of individuals who know that information.
21 However, it always seems to leak out.
22 Q Okay. Do you know if there were any other
23 reasons besides that exam percentile that Becky repeated the
24 second year?

Page 26

1 A Well, Becky also had a leave of absence after
2 her husband committed suicide, which was of course a very
3 strenuous time. I mean I can't even imagine how one would
4 respond to that. And part of the policy is that you have to
5 complete so many days of residency in order to move forward,
6 and residency programs are limited by the number of people
7 they can graduate each year, as well, so they can only move
8 so many people forward at a time.
9 Q When Becky was on medical leave, do you
10 recall Dr. Mozaffari saying anything about her medical leave
11 to you?
12     MR. RICH: Objection.
13     THE WITNESS: Not that I remember. I just
14 knew she was on medical leave and another resident would be
15 coming in to fill in the gaps.
16     BY MS. WHITEAKER:
17 Q So does that mean another medical resident
18 was in her spot? I'm confused by what you meant. Or are you
19 just meaning on the rounds?
20 A No, just on the rounds. No, they shuffled
21 the resident grouping around in order to help cover her
22 responsibilities while she was on medical leave.
23 Q Okay. Were you involved in evaluating
24 residents in terms of their promotions to the next level

Page 27

1 within the program?
2 A No. That was again part of that C3
3 Committee.
4 Q How many people are on that committee?
5 A Again, I don't know. I wasn't on the
6 committee, so I don't know.
7 Q Okay. What is your experience with
8 residency programs in terms of offering remediation for
9 residents who aren't scoring as high on those in-service exams
10 as they should?
11 A Well, in my particular program, they had a
12 rule. The in-service exam was not necessarily meant ever to
13 be a reason to pass or fail a resident. It's really only --
14 its intention is to show you where you are in your knowledge
15 base during your residency training, and it has been used by
16 the college as a benchmark to tell whether or not you will
17 pass your final written exam for your boards.
18     But as I said, in my particular residency,
19 if you didn't meet it, it was kind of a three strike rule.
20 So if you didn't meet it, then they sent you into education,
21 and that education for us was extra time with our residency
22 coordinator and another attending who was very pro education,
23 and we even came in on Saturdays and had a group study kind
24 of thing. And they also arranged -- there was an online bank

Page 28

1 at the time I went through my residency that they bought, if
2 you scored less than a certain percentile, to encourage you
3 to do better. But as far as other programs, I can't really
4 speak to that because there's no real such thing in fellowship
5 that's equivalent to that.
6 Q Okay. And the program you described was the
7 residency program that you were in at CAMC?
8 A At CAMC, yes.
9 Q Did Marshall have any program similar to that
10 that you know of?
11 A No. There were -- and I don't remember all
12 the details as to why residents were sent there, but there
13 were a few residents in the program, and even after Dr. Klug
14 left, that were sent to the education center at Marshall to
15 test them in learning disabilities. And then if they didn't
16 have those, then they also sent them to like a test-taking
17 prep class to be able to better take standardized tests.
18 Q Okay. But as far as any specific
19 substantive help with the materials, was there anything like
20 that offered at Marshall?
21 A Not that I'm aware of. And there was
22 nothing, to my knowledge, that was outlined in the handbook
23 that gave a step-wise fashion that would help correct the
24 problem.

Jillian McCagg, M.D.
January 13, 2020
Case 3:18-cv-00711  Document 144-9  Filed 04/23/21  Page 7 of 7 PageID #: 1471
Klug v.
Marshall University Board of Governors, et al.

**Page 69**

1  A   Not that I remember.
2  Q   Did she ever tell you her ABSITE scores?
3  A   Yes.
4  Q   Okay. So you knew at some point the exact
5  scores that she received in those -
6  A   Yeah, at some point I knew the exact scores,
7  but again I didn't commit them to memory.
8  Q   Did you feel like they were low enough that
9  she needed some further remediation?
10 A   They were low. Again, I won't say that you
11 necessarily have to have - as I told her, the ABSITE was never
12 intended to be a benchmark to pass or fail a resident. It
13 was only intended to be a benchmark for your own knowledge
14 of where you were in your educational process.
15 Q   Okay. So you were not a person to determine
16 what ABSITE is low enough where someone needs remediation?
17 A   Right.
18 Q   Or what remediation they should get?
19 A   Correct.
20 Q   That's funny, because you said earlier that
21 you didn't think she received proper remediation. What is
22 proper remediation for Dr. Klug if you don't know what her
23 ABSITE scores were or what other things they considered?
24 You're going to sit in judgment of Marshall University and

**Page 70**

1  say they didn't give her proper remediation. What should
2  they have done?
3  A   Well, perhaps what I should have said was
4  there should be an actual formal protocol that should have
5  already been derived, seeing as how other people have been
6  through similar things in the past.
7  Q   But you don't have any --
8  A   And that should be based on people who have
9  educational certification, I suppose.
10 Q   And do you know --
11 A   Therein is the problem with surgery
12 education, right? We are trained by the surgeons who came
13 before us. None of them had any educational – I mean my mother
14 has a master's 45 in education, but that doesn't mean I do.
15 Q   Okay. So you don't know that they have any
16 formal protocols for remediation for the residents?
17 A   As a person looking from the outside in, it
18 appeared that it was all kind of pick and choose between
19 people.
20 Q   Okay. But you don't have any information
21 about how they did it, why they did it, or what they did?
22 A   No.
23 Q   So when you offer the opinion that the
24 remediation they offered was either unsubstantial or not

**Page 71**

1  efficient, that's based on from the outside looking in?
2  A   Yeah. That was my opinion, from what I was
3  seeing.
4  Q   Now, have you seen the "Fifty Shades of
5  Grey"?
6  A   I'm sorry?
7  Q   Have you seen the movie "Fifty Shades of
8  Grey"?
9  A   No.
10 Q   Did you read the book?
11 A   No.
12 Q   Okay. You say no like it's a bad thing.
13 Inappropriate?
14 A   No, I don't care.
15 Q   Okay. If someone was watching –
16 A   I haven't read for fun since med school.
17 Q   I'm right there with you. If someone was
18 watching the video trailer of "Fifty Shades of Grey" in the
19 hospital, do you think that would be inappropriate?
20 A   No.
21 Q   If someone was watching the video trailer for
22 "Friday the 13th," would that be inappropriate?
23 A   It's already been censored. It's on TV.
24 Q   Okay. Did you know "Fifty Shades of Grey"

**Page 72**

1  was actually telecast on a major network?
2  A   No.
3  Q   Okay. You don't think that, in and of
4  itself, is a problem that, if done, let's say, in the resident
5  lounge would be aimed at discrimination of women?
6  A   Well, they have a TV in their room. Things
7  that come on TV are already censored by the time they make
8  it to television.
9  Q   Now, you said that she was subjected to a
10 hostile work environment. What is your understanding of the
11 legal requirements to prove that?
12 A   I don't know the legal ramifications of it.
13 I'm not a lawyer.
14 Q   Well, what does the word "hostile" mean to
15 you?
16 A   For me, a hostile work environment is one
17 that you can't stand to go into, that you feel that every
18 moment you're looking over your shoulder, that the hammer is
19 going to drop for various and sundry reasons, and that there
20 seems to be inappropriate behaviors that happen,
21 inappropriate judgments that happen. All in all, just not
22 a wonderful place. Not sunshine and rainbows.
23 Q   Well, what surgery center is? Is the one
24 that you're at now?