# In The Matter Of:



*Klug v.*
*Marshall University Board of Governors*

*Debra Hart*
*February 17, 2020*

*Mountain State Reporting LLC*
*2505 Lakeview Drive*
*St. Albans, WV 25177*
*304-727-8590*

Original File HartDebra.prn
Min-U-Script® with Word Index

**Page 41**

1 answer.
2     THE WITNESS: The Office of Equity Programs
3 would refer to Policy No. GA-1. That is the policy that we
4 follow for any complaints relevant to sexual harassment,
5 unwanted sexual advances, requests for sexual favors, denied
6 opportunities, as listed in GA-1.
7     BY MS. WHITEAKER:
8   Q  Okay. And if somebody at the School of
9 Medicine is aware of complaints of the nature that are on
10 Page 2 of Exhibit 5, a responsible employee would have a duty
11 to report those to you, correct?
12     MR. OXLEY: Objection. Go ahead and
13 answer.
14     THE WITNESS: Yes.
15     BY MS. WHITEAKER:
16   Q  The third page of this talks about a
17 Behavioral Integrity Committee. Are you familiar with that
18 committee?
19   A  I am not familiar with that committee other
20 than what I've read. I'm not a member of the committee.
21   Q  Okay. Do you work with that committee at
22 all?
23   A  Directly, no.
24   Q  You were describing for me the procedures you

**Page 42**

1 follow for a complaint, and I was wondering if you had a
2 document, like a flow chart or something, that shows the
3 procedure process?
4   A  Currently, yes.
5   Q  Did you just develop that recently?
6   A  It's been effective with the 2018 GA-1.
7   Q  Before that, did you have any type of a flow
8 chart type thing that showed how it goes?
9   A  Flow chart, no. And I wouldn't consider the
10 handout a flow chart. It identifies the process as it is
11 defined in GA-1, but flow chart, no.
12   Q  Okay. Prior to 2017, did you have any sort
13 of document that you would provide to complainants describing
14 the process in any more detail than what is in GA-1?
15     MR. OXLEY: Objection to form. Go ahead and
16 answer the question.
17     THE WITNESS: Our complaint process is
18 available online, detailed. It asks questions that you
19 answer.
20     BY MS. WHITEAKER:
21   Q  Online where?
22   A  On the equity web page.
23   Q  Was it part of the complaint form?
24   A  Yes.

**Page 43**

1   Q  You would investigate complaints if they
2 were made by members of the faculty, too, wouldn't you?
3   A  Yes.
4   Q  How do you ensure that the School of Medicine
5 is complying with the Title IX policy?
6     MR. OXLEY: Objection to form. Go ahead and
7 answer the question.
8     THE WITNESS: Could you be more specific
9 with the question?
10     BY MS. WHITEAKER:
11   Q  Yes. You told me before that you take a
12 proactive approach, and I know that you keep track of
13 complaints and things like that. How do you ensure that the
14 School of Medicine, in particular, is following the Title IX
15 policies that you have?
16   A  We have an online training program that's
17 been made available to all faculty and all staff and all
18 students that are paid, and the School of Medicine is actually
19 a – they're part of the process that assists us in
20 administering that program.
21     Our training that will come out this year
22 will even have the dean's signature, along with the president
23 and general counsel, to ensure that all members of Marshall
24 faculty and staff and students understand that this training

**Page 44**

1 is available, and the importance of understanding federal
2 law.
3   Q  Okay. Prior to that, how did you make sure
4 that everyone understood the importance of it?
5   A  We would contact the school to determine –
6 if we received a request for training, they may ask for a
7 department, and we might consider or ask are there other
8 departments. And we've had the training in place for quite
9 some time.
10   Q  How did you make sure that the trainings were
11 happening?
12   A  Documentation follow-up.
13   Q  Do you keep documentation of who completed
14 the online training?
15   A  That was maintained through our office, and
16 it is up to date from the previous year. Obviously, we don't
17 keep it for – once it's updated, we'll have 2017, 2018, 2019.
18 And once the company merged, those records were no longer
19 available.
20   Q  When you were tracking them, let's say 2015
21 or 2016, it doesn't matter, if you were tracking them, did
22 you do anything if you saw, you know, ten people haven't done
23 this training in the School of Medicine?
24   A  Yes. Friendly reminder notices were

Page 49

1  Q   Do you know when it was revised before that?
2  A   I would like to look at the date.
3  Q   Does it have a revised date on it somewhere?
4  A   Yes.
5  Q   Is that something you could look for?
6  A   Yes.
7  Q   Okay.
8        MR. OXLEY: If we could take a break here in
9  just a few minutes.
10       MS. WHITEAKER: We can do it right now.
11          (WHEREUPON, a recess was taken.)
12       MS. WHITEAKER: Back on the record after a
13 short break.
14       BY MS. WHITEAKER:
15 Q   Would you look at Exhibit No. 3, please?
16 A   Three?
17 Q   Yes, ma'am.
18 A   Yes.
19 Q   Section 4, which is 9 of 12, I think you told
20 me that this is the procedure that you use?
21 A   Yes.
22 Q   And it says at 4.22, it talks about
23 responsible employees. And then right above that, 4.21, it
24 says, "Responsible employees must report incidents of

Page 50

1  prohibited conduct to the Title IX coordinator." Right?
2  A   Yes.
3  Q   Under "Responsible Employees," it mentions
4  deputy Title IX coordinators and I notice at the top of this,
5  4.1, it says that deputy coordinators can be appointed. I
6  just want to make sure we're clear on this. The university
7  or you have never appointed any deputy coordinators; is that
8  right?
9        MR. OXLEY: Objection to form. Go ahead and
10 answer.
11       THE WITNESS: Correct.
12       BY MS. WHITEAKER:
13 Q   "'Responsible Employees' are employees in a
14 leadership or supervisory position, or who have significant
15 responsibility for the welfare of students or employees." Is
16 that the correct definition?
17 A   Yes.
18 Q   The filing of a complaint is considered
19 protected conduct, right?
20       MR. OXLEY: Objection. Go ahead and answer
21 that question.
22       BY MS. WHITEAKER:
23 Q   Protected activity? Is it?
24 A   Could you state the question again?

Page 51

1  Q   Yes. Is the filing of the complaint under
2  this policy considered protected activity?
3  A   What is your definition of protected?
4  Q   Something that you can't be retaliated
5  against for doing.
6        MR. OXLEY: Objection. Go ahead and answer
7  if you can.
8        THE WITNESS: Yes.
9        BY MS. WHITEAKER:
10 Q   Do you provide any information to a
11 complainant about retaliation?
12       MR. OXLEY: Objection to form. Go ahead and
13 answer.
14       THE WITNESS: Yes. It's in the policy and
15 procedures.
16       BY MS. WHITEAKER:
17 Q   Anything specific that you would give to a
18 complainant about retaliation or just explaining that they
19 should not be retaliated against?
20       MR. OXLEY: Objection to form. Go ahead and
21 answer.
22       THE WITNESS: All complainants and
23 respondents receive the entire administrative policy and
24 procedures, and there is a section on retaliation.

Page 52

1        BY MS. WHITEAKER:
2  Q   Okay. Is that that same booklet you
3  mentioned to me that the advisors and leaders would get?
4        MR. OXLEY: Objection to form. Go ahead and
5  answer.
6        THE WITNESS: Yes.
7        BY MS. WHITEAKER:
8  Q   Retaliation against a complainant is
9  prohibited, correct?
10 A   Yes.
11 Q   Do the administrative procedures you
12 mentioned also talk about the procedures related to
13 disability complaints?
14       MR. OXLEY: Objection to form. Go ahead and
15 answer if you can.
16       THE WITNESS: Yes.
17       BY MS. WHITEAKER:
18 Q   And just like sex discrimination complaints,
19 responsible employees are supposed to report disability
20 discrimination also; is that right?
21       MR. OXLEY: Objection to form. Go ahead and
22 answer.
23       THE WITNESS: They can report that to the
24 Title IX coordinator, myself, director of equity programs,

Page 53

1 and to the director of human resources.
2  BY MS. WHITEAKER:
3  Q   And they must do that, under the policy, if
4 they're aware of a discrimination allegation, right?
5  MR. OXLEY: Objection to form. Go ahead and
6 answer if you can.
7  THE WITNESS: Yes.
8  BY MS. WHITEAKER:
9  Q   When is the first time you became aware of
10 complaints that Dr. Klug had regarding discriminatory
11 treatment?
12  MR. OXLEY: Objection to form. Go ahead and
13 answer if you can.
14  THE WITNESS: When she sent me an e-mail to
15 request – well, she sent me an e-mail to request a meeting.
16  (WHEREUPON, Hart Deposition
17   Exhibit No. 6, Office of Equity
18   Complaint Form, was marked for
19   identification.)
20  BY MS. WHITEAKER:
21  Q   I'm going to give you Exhibit No. 6, and this
22 is a document, the first page of it says, "Office of Equity
23 Program Complaint Form." I know you mentioned an e-mail.
24 Is this the document that was e-mailed to you, or was it

Page 54

1 something else?
2  A   This is the document.
3  Q   Okay. And when it was e-mailed to you, did
4 you get all of these pages? There's a cover page form and
5 then there's three pages after that with detailed
6 allegations.
7  A   I believe so.
8  Q   And the date on this form on the front, it
9 says February 17, 2016?
10  A   Yes.
11  Q   Is that the date you received it?
12  A   Yes.
13  Q   When you received this complaint form, what
14 did you do?
15  A   Well, I immediately identified that the date
16 of the last incident was 6/20/2014. If alleged
17 discrimination is continuing, no. And the complainant in
18 this particular complaint form marks "Other." So my
19 responsibility included to determine what is this complaint,
20 what happened, what is it about, is it Title IX, is it a
21 grievance, what is it.
22  Q   Right. So how did you establish that?
23  A   Dr. Klug scheduled a meeting to have what I
24 call an assessment and intake to determine what the complaint

Page 55

1 was about and whether or not it was a responsibility under
2 Equity Programs or Title IX.
3  Q   Okay. Tell me about that assessment.
4  A   I can tell you that. There was inclement
5 weather that day, so we communicated about whether or not we
6 were both going to be able to make the meeting and confirmed
7 at that time that we both could make the meeting.
8  I'm sharing the truth, as I'm under oath to
9 do so. Dr. Klug was visibly upset during the time of our short
10 meeting and wasn't able to articulate all of the information
11 that I needed to determine whether or not it was Title IX or
12 an equity issue.
13  Q   Was anybody else in the meeting that you had
14 with Dr. Klug?
15  A   No, not that I can recall.
16  Q   The written narrative that she provided goes
17 right up to February of 2016, doesn't it?
18  Q   Did you answer me? I'm sorry.
19  A   You asked me did I see it up to February 2016?
20  Q   Does it go up –
21  A   Yes, it does.
22  Q   The narrative goes up through 2016?
23  A   February 2016, correct.
24  Q   So when you said it ended at 2014, are you

Page 56

1 just talking about the date that she wrote on the cover?
2  A   The date on the report. Alleged incident
3 discrimination took place on or about 2014.
4  Q   Okay. And then you said she marked "No"
5 under continuing?
6  A   Correct.
7  Q   And "Other." Is it unusual for complainants
8 not to understand exactly how to fill out these forms?
9  MR. OXLEY: Objection.
10  THE WITNESS: I can't answer that question
11 simply because complainants have the responsibility to
12 articulate the alleged incident to give us the message to tell
13 us what's happened. And as I indicated earlier, Dr. Klug was
14 visibly upset and we certainly had enough time. I shared with
15 her, too, if there's other information she wanted to share
16 with me to please do so when she felt better.
17  BY MS. WHITEAKER:
18  Q   Okay. And what did you guys talk about
19 during the short meeting?
20  A   We talked about counseling because she – I
21 actually left the room to get a box of tissues because she
22 was upset.
23  Q   Did she bring any other materials to you
24 other than what you already had with the complaint form and

Page 57

1 the attached narrative?
2   A   Not that were presented to me.
3   Q   Did you take all the pages of this complaint
4 form together when you were looking at it?
5   A   In all honesty, I believe so, but I spent most
6 of my time concerned about the state that Dr. Klug was in.
7 And it's common for complainants and respondents to come in
8 and they are upset, and our first goal is to ensure that
9 counseling services are made available.
10      I'm not a clinical psychologist or a
11 counselor, so I always make sure that they are going to be
12 okay. And a lot of times we wait to make sure that they have
13 a chance to settle down a little bit and kind of regroup, and
14 they may even come back for another meeting with additional
15 information.
16   Q   Right. At that point did you assign an
17 advisor to her?
18   A   I did not. There was nothing on the form
19 that indicated this was a Title IX complaint.
20   Q   Okay. What about her narrative, did you
21 find anything in there that made you think it was a Title IX
22 complaint?
23   A   In my initial overview, it appeared to be a
24 personnel issue, human resources.

Page 58

1   Q   Okay. Did you change your view of that at
2 any time?
3   A   No.
4   Q   Did you speak to anybody else about her
5 complaint?
6   A   My expectation was that Dr. Klug was going
7 to get back with other information when she was in a better
8 state.
9   Q   Okay. Did you get an investigator involved
10 at any time?
11   A   No.
12   Q   Did Dr. Klug get back in touch with you?
13   A   I didn't hear any more from her.
14   Q   Okay. Did you contact Dr. Klug?
15   A   Only in – I would have to look at the e-mail
16 to determine, but no. The next correspondence or
17 communication I received was from the department.
18   Q   And what was that?
19   A   That they had worked out a plan of action to
20 accommodate the request made in the complaint form.
21   Q   Who did you talk to?
22   A   I had a brief conversation, an e-mail from
23 Donna Webb.
24   Q   Was it an e-mail or conversation?

Page 59

1   A   E-mail.
2   Q   E-mail. Any other communication that you
3 had with the School of Medicine regarding Dr. Klug?
4   A   No.
5   Q   Did you ever open any type of investigation
6 for Dr. Klug?
7   A   No.
8   Q   And just to make sure we're clear, other than
9 this complaint that we're talking about here, you never
10 received any other complaints either from Dr. Klug or on Dr.
11 Klug's behalf any time prior to this?
12   A   No.
13      MR. OXLEY: Objection to form.
14      (WHEREUPON, Hart Deposition
15      Exhibit No. 7, Letter dated
16      3/18/16, was marked for
17      identification.)
18      BY MS. WHITEAKER:
19   Q   Let me show you a document. This one is
20 marked Exhibit No. 7 to your deposition, and it is a letter
21 dated March 18, 2016, from Dr. Mozaffari to Dr. Klug. Have
22 you seen this letter before (indicating)?
23   A   (Witness examines document.) I don't
24 recall. Yes, I think so.

Page 60

1   Q   It looks like you were copied in on it at the
2 bottom. I think your name was misspelled, but at least it
3 appears your name is at the bottom.
4   A   Yes, I see it.
5   Q   Okay. Do you recall specifically what was
6 in the e-mail from Donna Webb?
7      MR. OXLEY: Objection to form. Go ahead and
8 answer if you can.
9      THE WITNESS: Yes.
10      BY MS. WHITEAKER:
11   Q   What was it?
12   A   She is – a copy of this letter (indicating)?
13 Is that what you're speaking of?
14   Q   I don't know. I'm asking you what Donna Webb
15 sent you. And if I'm –
16   A   This is the document (indicating).
17   Q   Okay. Did Dr. Mozaffari or anyone with the
18 School of Medicine consult with you about this resolution?
19   A   No.
20   Q   Did you talk to Dr. Klug after this to see
21 if it was satisfactory to her?
22   A   I did not speak to Dr. Klug again. I had no
23 information that this was a Title IX complaint. And it
24 appeared in the correspondence that they were accommodating

Page 69

1 Q Okay. And where is that located?
2 A In the Department of Human Resources.
3 Q Is it a written plan that we could look at?
4 A Yes.
5 Q And where do we find it?
6 A The director of human resources houses that plan. And let me say it's done in a variety of ways: recruiting, and we are looking at retention. There's a lot in the plan.
10 Q In the affirmative action plan?
11 A Yes, and our recruiting resources.
12 Q Are you involved in recruiting at the School of Medicine?
14 A I think every faculty and staff member at the university is directly involved with recruiting. Yes, I am involved in recruiting.
17 Q Does that all go through HR?
18 MR. OXLEY: Objection to form. Go ahead and answer the question.
20 THE WITNESS: Yes.
21 BY MS. WHITEAKER:
22 Q How are you involved with HR?
23 A I oversee the hiring process for the university.

Page 70

1 Q Okay. So does HR report to you?
2 A No, we work cooperatively together to ensure that we're identifying available candidates, that the pool of eligible candidates is diverse by gender, ethnicity, et cetera.
6 Q Does that also go into graduate programs like selecting graduate students, residents, things like that?
8 MR. OXLEY: Objection to form. Go ahead and answer.
10 THE WITNESS: I can't answer that question.
11 BY MS. WHITEAKER:
12 Q Do you have any oversight over the different –
14 A The GA positions?
15 Q Yes, diversity with regard to graduate schools and medical schools?
17 A No.
18 MR. OXLEY: Objection. I don't want to intervene, but the reason I'm – the first of my objections, I was confused about whether or not you're talking about hiring people for those positions or admitting students. And that question, the way it was phrased, I could not differentiate between the two.
24 MS. WHITEAKER: Okay, fair enough. So I'll

Page 71

1 go back to it to clarify that.
2 BY MS. WHITEAKER:
3 Q I would like to know if you have involvement or oversight with regard to the selection of graduate students or residents for the programs?
6 A No.
7 Q What about for faculty serving in programs, particularly at the School of Medicine?
9 A The decision in hiring them?
10 Q Yes.
11 A No.
12 Q Do you think you should have a role in that?
13 A That's a hypothetical question that I can't answer. I don't know. I mean that's not part of my responsibility.
16 Q Whose job is it? Is there anyone who has the job to ensure that there's equity in those selections?
18 A Yes. We have search committees that make the decision for all hires, individual hires.
20 Q And what about for graduate students and medical residents?
22 A I'm not familiar extremely with that process. I don't know that process.
24 Q Is there any assessment that you have done

Page 72

1 to determine the culture of the School of Medicine, so far as it is equitable for gender? Is it welcoming to people with different disability statuses? Have you done any sort of analysis of that?
5 MR. OXLEY: Objection. Go ahead and answer that question if you can.
7 THE WITNESS: I don't conduct any assessment from my office that would reveal any climate survey for any department.
10 BY MS. WHITEAKER:
11 Q Okay. Why not?
12 A That's not part of my responsibility, and I don't know. If there's an issue or a concern that we need assistance in a specific area or a point of specificity is defined for us to respond to, we do that, but no, not overall.
16 Q Part of your position is to prevent discriminatory environments, correct?
18 A Correct, yes.
19 Q But how is it that you do that, other than I know, of course, you've mentioned the online training and the seminars or workshops that you do? But is there anything else that you're doing?
23 MR. OXLEY: Objection to form. Go ahead and answer if you can.

Page 73

1  THE WITNESS: We don't have a way to identify
2  concerns unless a faculty, staff, or student would notify our
3  office to say that there are issues or problems. And when
4  we're notified of such, then we respond to that.
5  And just like everyone who visits the Office
6  of Equity Programs is coming because they have a complaint
7  that they will articulate as Title IX or a grievance. They've
8  been denied residency or there's a grievance that they're
9  filing. So we're not – we don't solicit to say tell me what's
10 going on in your area or defining a trend.
11  BY MS. WHITEAKER:
12  Q  Okay. Today one of the documents you
13 brought with you is this Title IX summary and this has dates
14 for the – it looks like it's January 2018 through November
15 2019.
16  A  Yes.
17  Q  Is this something that you do every year? Or
18 how often do you do this?
19  A  We have at least provided this for the last
20 two years.
21  Q  Okay. Before that, did you do something
22 similar?
23  A  Not as detailed, no.
24  Q  Who do you prepare this chart for?

Page 74

1  A  The Office of General Counsel receives this
2  on a weekly basis, depending on, of course, the time period.
3  The Office of the President receives this at least quarterly
4  to know what's going on, on the campus.
5  Q  Is there anything on this document that is
6  going to show whether the complaints are substantiated or not
7  or what the outcomes were?
8  A  Not on this form, no.
9  Q  Is there a different form where you show
10 that?
11  A  The outcome?
12  Q  Yes.
13  A  We have accessibility to it, but no, it's not
14 defined on this form.
15  Q  You have accessibility to what?
16  A  To determine the outcome. We're fully aware
17 of all the outcomes.
18  Q  But do you ever put it together on a chart
19 like we got ten complaints and we verified five of them?
20  A  It's in our end-of-year report. And we
21 haven't completed it for 2019 because -
22  Q  Who does the – I'm sorry.
23  A  Who sees that?
24  Q  Yes, ma'am.

Page 75

1  A  Office of the General Counsel.
2  Q  And how many years have you been doing the
3  end-of-year report?
4  A  The last three years.
5  Q  Did you do it in 2016?
6  A  No.
7  Q  In 2016, did you do anything similar?
8  A  No.
9  Q  So if you wanted to figure out how many
10 complaints we had in 2016, what would you do?
11  A  Manually review the files that we have in our
12 office.
13  Q  Are the files in your office organized by
14 date?
15  A  Yes.
16  Q  So it wouldn't be that hard to go back to the
17 2016 or the 2015?
18  A  2016, yes.
19  Q  Well, 2015, same thing?
20  A  I think so.
21  Q  Do you only have them back so far?
22  A  I'm sure I have the last four years.
23  Q  Okay. Are there records retention policies
24 under Title IX or some of these other policies you have about

Page 76

1  how long you keep documents?
2  A  Yes.
3  Q  How long are you to keep them?
4  A  Seven years.
5  Q  And do you follow those policies?
6  A  Very much, yes.
7  Q  So you should at least have information going
8  back seven years?
9  A  We have it from the inception.
10  Q  Okay. Does this chart contain just the ones
11 that you've done actual investigations for?
12  A  No, it's everything.
13  Q  It's everything. And are there some times
14 when you don't end up doing investigations?
15  A  Yes.
16  Q  What kind of circumstances would those be?
17  A  When a complainant withdraws the complaint,
18 the parties agree, respondent/complainant, that the
19 situation reported or their account is different than what
20 they initially reported. Various circumstances.
21  Some complaints are filed on behalf of
22 complainants, and the complainant may say I have no clue what
23 they're speaking about or why they filed this complaint on
24 my behalf.