Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

REBECCA KLUG,

    Plaintiff,

v.                       Civil Action No. 3:18-cv-00711
                        Judge Robert C. Chambers

MARSHALL UNIVERSITY
BOARD OF GOVERNORS,
and FARID B. MOZAFFARI, an individual,

    Defendants.


        The deposition of FARID B. MOZAFFARI, M.D., was taken under the Federal Rules of Civil Procedure in the above-entitled action before Lisa V. Miller, a Certified Court Reporter and Notary Public within and for the State of West Virginia, on the 3rd day of February 2020, commencing at 10:12 a.m., at the law offices of Oxley Rich Sammons, 517 9th Street, Suite 1000, Huntington, West Virginia, pursuant to notice.


MOUNTAIN STATE REPORTING, LLC
(304) 727-8590

Page 66

1  Q    Do you recall telling her that she was going
2  to have to sink or swim?
3  A    I never made that comment to her.
4  Q    Did you say that to anybody else?
5  A    No.
6  Q    Do you recall telling her that worse things
7  were going to happen in her life than this?
8  A    I did not say that.  I remember once we were
9  talking afterwards and she said that it was a horrible thing
10 that happened to her, that nothing worse can possibly happen
11 to her or anybody.
12      And I made the comment that "Be careful
13 saying that.  From personal experience, every time I have
14 told myself it can't get any worse than this, it did."  I was
15 just talking to her from my personal experience.  I never made
16 any – I did not tell her that a worse thing will happen to
17 you.  I just gave her some advice.  I was trying to help her.
18 I was trying to encourage her to be strong, but at the same
19 time, you know, I was talking to her from my own personal
20 experience, and I specifically remember that I said, "Every
21 time I have told myself it can't get any worse than this, it
22 did."  I did not say to her, "Worse things will happen to you."
23 Q    Do you remember the context of that
24 conversation, what you guys were talking about?

Page 76

1    A    Members of the C3 Committee are allowed, and
2  therefore no, residents are not part of the C3 Committee.
3             MS. WHITEAKER:  Okay.  If you want to go
4  ahead and take a break now, I think we can, before we finish
5  up.  I wanted to finish up these last few, but I think it might
6  take a while, so let's just go ahead.
7             MR. OXLEY:  Okay.  What do you think, 1:40,
8  to give everybody time to get back?
9             MS. WHITEAKER:  Yes, that's plenty of time.
10                      (WHEREUPON, from 12:31 p.m. to
11                       1:58 p.m., the luncheon recess
12                       was taken.)
13             MS. WHITEAKER:  Back on the record.
14             BY MS. WHITEAKER:
15    Q    If you'll turn on Exhibit 4 to about the third
16  page from the end of that group of documents.
17             Before I ask you that, I want to go back in
18  your mind to when Dr. Klug first came back after her husband
19  passed away, did anyone in the program talk to you about
20  letting her come back and just work at the VA or some kind
21  of altered schedule?
22    A    That came up and I looked at it, exactly.
23  The VA for some reason wouldn't work.  I don't exactly
24  remember why it was, what it was about the scheduling that

Page 77

1  I thought that VA was not going to be an option.  So it was
2  going to be either at Cabell or at St. Mary's that she was
3  going to come back with.  And she was scheduled to go back
4  to St. Mary's.  And Cabell is usually - the workload is a lot
5  higher at Cabell than it is at St. Mary's, so I thought that
6  she would be better staying at St. Mary's.
7        Q    Okay.  Is VA the least workload?
8        A    Correct.  And I specifically looked at that,
9  and I don't recall exactly why, but I remember I looked at
10 it to see if I could switch something and switch her and put
11 her at the VA.  And I don't exactly recall why, but I recall
12 that I wouldn't be able to switch somebody, you know, switch
13 her with somebody at the VA.
14       Q    Okay.
15       A    I did not refuse to do so.  I did look at it,
16 and it was not going to work out to put her at the VA.  And
17 I thought if I brought her to Cabell, it would have been worse
18 for her.
19       Q    The letter that I directed you to is dated
20 July 10, 2015.
21       A    Yes.
22       Q    It's a letter from you to Dr. Klug.  What is
23 the purpose of this letter?
24       A    To make sure that we document everything that

Page 94

1  regarding the meeting that I had with her, but it was put in
2  her chart and, as always, all the residents had complete
3  access to their charts.
4       Q    Okay.  The next page in that same exhibit we
5  were in, Exhibit 6, it's an e-mail about her having her numbers
6  for endo.  Is that talking about the number of procedures she
7  was supposed to have?
8       A    Yes.
9       Q    And then I think what she asked you is if she
10 was permitted to attend the OR at the VA, and I think what
11 you told her was if it's an interesting or big case that she
12 could cover that.  Am I getting that okay?
13      A    Yes.
14      Q    And then the next page in that packet is an
15 e-mail.  I think it's dated that same date, February 2, 2016.
16 There's a Bates number at the bottom, Klug 000947.
17      A    Yes.
18      Q    Do you remember this e-mail?
19      A    Yes.
20      Q    In this e-mail Dr. Klug says that somebody
21 told her that she needed to watch her back around Marco and
22 that he said some bad things about her and things that he had
23 plans for her.  Do you remember that?
24      A    Yes.

1    Q    What do you remember about it?
2    A    Exactly as this e-mail said that those things
3 were said.  I was not in the room and I did not hear those
4 for myself, but that's what the e-mail said.
5    Q    Well, she had complained about Dr. Yung
6 before, correct?
7    A    Yes.
8    Q    Did you do anything in response to this
9 e-mail?
10   A    Yes.  I talked to Dr. Yung.
11   Q    What did you talk to him about?
12   A    I told him that he is not to discuss resident
13 matters in front of medical students.  Do not make any sort
14 of threat in any way, shape, or form, or even something that
15 could be – you know, somebody could take that as that way.
16   Q    What did he say?
17   A    He said that he didn't make any threats or
18 said that he had anything planned for her.
19   Q    Did you believe him?
20   A    I didn't have any reason not to believe him,
21 but I made a note to myself to make sure that when I'm at the
22 VA that I keep a close eye on that.
23   Q    Did Dr. Klug tell you any time before this
24 that Dr. Yung was lying to you about her?

1      A      No, not that I recall.

2      Q      Prior to this, do you recall her making
3  complaints about Dr. Yung looking at inappropriate videos and
4  things like that in the call room?

5      A      I recall that she made the comment that he
6  was looking at inappropriate comments.  I'm not sure if it
7  was before this date or after this date.

8      Q      Do you remember Dr. Wolfer telling you that
9  she saw pornography on the computer in the call room at St.
10 Mary's?

11     A      No, she did not.  And definitely not when I
12 was the program director.  And to clarify something over
13 here, St. Mary's was very diligent about looking at sites that
14 were visited from the computers within the hospital, and if
15 there was pornographic sites that somebody would visit, we
16 would get a report from their IT department.

17     Q      Did you see those before?

18     A      I had seen one - I had heard about one while
19 I was a resident, but not while I was the program director.

20     Q      Did they have personal laptops at the
21 hospital, too, sometimes?

22     A      Yes.

23     Q      And they had personal cell phones?

24     A      Yes.

Page 119

1                          E-Mail dated 1/20/15, was
2                          marked for identification.)
3           BY MS. WHITEAKER:
4       Q    Exhibit No. 8 is going to be a memo or an
5   e-mail that Dr. Klug wrote to you.  It's dated January 20,
6   2015.  Do you recall getting this e-mail?
7       A    Yes.
8       Q    And in this e-mail she's telling you several
9   things, but one of them is issues that she's having with Marco,
10  which is Dr. Yung, correct?
11      A    Yes.
12      Q    One of the things she mentions in here - after
13  the enumerated list of things there's a paragraph, and she
14  talks about "Marco and uffort were very upset that I switched
15  one of my days off a few weeks ago; but I was exhausted
16  emotionally and physically and uffort through this in my face
17  at the roast.  I was very hurt by that."  Do you remember what
18  she was referring to there?
19      A    I do not recall exactly what was mentioned
20  at the roast.
21      Q    Did you attend the roast in 2015?
22      A    I do not recall if I was there or not.
23      Q    Do you remember Dr. Uffort giving her a pair
24  of slippers and says words to the effect that she forgot she

Page 120

1 was a resident because she was taking a lot of time off.
2     A    I do not recall.
3     Q    June 20, 2015, was shortly after her
4 husband's death, correct?
5     A    It was. I believe the date of his death was
6 May 12, and this is June 20.
7     Q    When would the roast have been, do you know?
8     A    The roast is something that they do as a fun
9 thing usually towards the end of June, close to the end of
10 June before the seniors leave, before the chiefs leave.
11     Q    Okay. So some of the problems she's talking
12 about with Dr. Yung is that he doesn't listen at all to her,
13 he ignores her, he criticizes her decisions, always tells her
14 she's wrong, has temper tantrums, wouldn't let her call you
15 with consults, things like that. Did you do anything to
16 address these complaints that she was making?
17     A    I discussed this with Dr. Yung, and I told
18 him that, you know, that he can - if someone writes a note
19 in the chart that he has to leave it in there, if he had done
20 that. He said that he didn't throw the notes out. I went
21 down everything that was said and discussed this with him.
22     Q    Did you talk to anyone else besides Dr. Yung
23 about this?
24     A    I do not recall if I talked to somebody else

Page 121

1 or not.

2 Q Did you make any record of this complaint
3 anywhere?

4 A The e-mail was a complaint, and I put that
5 in her chart.

6 Q What about Dr. Yung's chart, did you put
7 anything in his?

8 A I do not recall if anything was put in his
9 chart or not.

10 Q Did you find that any of her complaints in
11 her e-mail here were validated?

12 MR. OXLEY: Objection to form. Go ahead and
13 answer if you can.

14 THE WITNESS: I knew that Dr. Yung and Dr.
15 Klug did not get along with each other, and I spoke to Dr.
16 Yung, saying that, you know, they need to find a way to work
17 with each other and be cordial to each other.

18 Q Well, do you think – she said that Dr. –
19 A And –
20 Q I'm sorry. She said that Dr. Yung doesn't
21 like to work with her. Did you find that to be true?

22 MR. OXLEY: Objection to form. Answer if
23 you can.

24 THE WITNESS: The schedule was there, and

Page 122

1    even if they didn't like to work with each other, it's
2    something that they both had to work out in order to work with
3    each other in a cordial way.
4                BY MS. WHITEAKER:
5         Q    Do you know what he didn't like about her?
6         A    I do not.
7         Q    Okay.  But you spoke to him about her
8    complaints?
9         A    Yes.
10        Q    And you went through all the complaints in
11   this e-mail with him?
12        A    I believe I did.
13        Q    Did he deny all of this, or did he admit or
14   explain some of these things?
15        A    He said that he did lose his cool in the ICU.
16        Q    Okay.  And what did you do about that?
17        A    I counseled him, saying that he needs to keep
18   his cool, and I told him, you know, that she's in an
19   emotionally rough spot in her life with the things that have
20   happened and she, along with all the residents, need
21   everything they can do in order to help her.
22                              (WHEREUPON, Mozaffari
23                              Deposition Exhibit No. 9, Text
24                              Message Dated 2/4/16, was

Page 141

1  Q    Do you remember the circumstances of those?
2  A    Yes.
3  Q    Okay. Can you tell me?
4  A    The first one was that he did not complete
5  his Step 3, and again academically he was very poor. His
6  contract was not renewed. And the other person, he also –
7  he did not have academic issues, but he was placed on
8  remediation and he did not complete his remediation and he
9  was non-renewed on his contract.
10 Q    Why was he put on remediation?
11 A    He was on remediation for not completing his
12 work or not following up on the promotion for criteria and
13 disengagement from the program.
14 Q    Okay. And the third?
15 A    That was Dr. Klug.
16 Q    Did you ever make residents do push-ups as
17 a punishment?
18 A    I had talked to them and I said that if they
19 fall asleep during M&M that I would make them do push-ups and
20 I would come and do push-ups with them.
21 Q    But did you make them do push-ups?
22 A    A few times I did call them up on the stage
23 and we did push-ups together.
24 Q    Did other residents have duty hour

Page 148

1  until after the position by Dr. Klug was completed?
2        A    Do you mean PGY-3?
3        Q    Yes, correct.  I'm sorry.
4        A    Yes.  Nothing was done until her full
5  process was done.
6        Q    Okay.  Was that even contemplated prior to
7  her process being completed?
8        A    I had thought about it, looking forward into
9  the future, but were any concrete steps taken, no.
10       Q    Okay.  So very early on in the deposition of
11 the day there was testimony concerning the final say.  I don't
12 remember – there was a question about whether or not you had
13 the final say on promotions.
14            Do you have the final say, or is that a
15 situation where you make a preliminary decision that can be
16 appealed and the final say is made during the appeal process?
17       A    I make the decision whether they're promoted
18 or not, and if the decision is for them not to be promoted
19 – well, I'm pretty sure that if I make the decision to promote
20 them, they're not going to appeal that.  But if I make the
21 decision for them not to be promoted, then they go through
22 the appeal process.  And if the appeal process thinks that
23 it should be overturned, then it would be overturned.
24       Q    So ultimately, those people who are not

```
                                                         Page 149
 1    promoted, the final say is had in the appeal process?
 2          A     If they went through the appeal process, yes.
 3          Q     Okay.
 4                MR. OXLEY:  Where are we at on exhibits?
 5    What number are we on?  I think 11.  I'll have this one
 6    marked.  I think it's 12.
 7                                (WHEREUPON, Mozaffari
 8                                Deposition Exhibit No. 12,
 9                                Midpoint Evaluation 2016, was
10                                marked for identification.)
11                MR. OXLEY:  I don't have a copy of it, but
12    I think you've seen that document before.  I'll show it to
13    you before I present it to the witness.
14                MS. WHITEAKER:  Yes, I think that's in some
15    of these documents we already have that we've talked about
16    today.  But that's fine.
17                MR. OXLEY:  Okay.  That will make it easier.
18                BY MR. OXLEY:
19          Q     I'm showing you now Exhibit 12.  Do you
20    recognize that?
21          A     Yes, this was a midterm evaluation in 2016,
22    midpoint evaluation.
23          Q     Okay.  So Exhibit 12 is the Midpoint
24    Evaluation; is that right?
```

1  residents be asked to do push-ups?

2      A   Residents sometimes fell asleep during grand
3  rounds, during M&M presentation. I thought that was
4  disrespectful. I wanted to do something to instead of just
5  them sitting there, do something, calisthenics, push-ups or
6  jumping jacks. It was going to be their choice. And I told
7  them I would do it for them just to get their blood going so
8  they would stay awake for the didactics, for the lectures,
9  and for M&M.

10     Q   Okay.

11     A   It wasn't supposed to be as a punishment. It
12 was supposed to ridicule them. They're not supposed to – you
13 know, conferences are not a place for you to come and take
14 a nap or sleep.

15     Q   Have you ever considered gender regarding
16 any decision that you've made of any shape or kind, concerning
17 Dr. Klug or any other resident?

18     A   Never. Her gender or any other resident's
19 gender, race, religion never, ever played a part in any
20 decision that we ever made in the entire department.

21     MR. OXLEY: Can I have two minutes?

22     (WHEREUPON, a recess was taken.)

23     BY MR. OXLEY:

24     Q   You were completely removed from all